NOT YET SCHEDULED FOR ORAL ARGUMENT

# United States Court of Appeals
# for the District of Columbia Circuit

### Nos. 22-1337, (Consolidated with 23-1001)

THE INTERNATIONAL DARK-SKY ASSOCIATION, INC.,

*Appellant,*

*v.*

FEDERAL COMMUNICATIONS COMMISSION,

*Appellee,*

SPACE EXPLORATION HOLDINGS, LLC,

*Intervenor for Respondent.*

_____

*On Appeal from the Federal Communications Commission*
*in Nos. SAT-LOA-20200526-00055 and SAT-AMD-20210818.*

## ADDENDUM TO BRIEF FOR APPELLANT

CHARLES LEE MUDD JR.
MUDD LAW
411 South Sangamon Street, Suite 1B
Chicago, Illinois 60607
Tel.: (312) 964-5051
Fax: (773) 588-5440
charles@muddlaw.com

*Counsel for Appellant*

August 16, 2023

# TABLE OF CONTENTS

**Page**

5 USCS § 706, Part 1 of 4 [706(2)(A) ........................................... ADD1

40 C.F.R. § 1500, et seq. ............................................................. ADD2

47 C.F.R. §§ 1.1301, et seq [FCC] ............................................. ADD48

47 C.F.R. § 17.4 .......................................................................... ADD72

47 USCS § 308 ............................................................................ ADD82

47 USCS § 309 ............................................................................ ADD84

47 USCS § 402 ............................................................................ ADD99

National Environmental Policy Act-1969 [42 U.S.C. §§ 4321, et seq.] ...... ADD102

Declaration of Ruskin Hartley, dated April 13, 2023 ................................. ADD109

Declaration of James Lowenthal, dated April 12, 2023 ............................. ADD113

Declaration of Diana Umpierre, dated April 13 2023 ................................. ADD128

## *5 USCS § 706, Part 1 of 4*

Current through Public Law 117-327, approved December 27, 2022.

*United States Code Service > TITLE 5. GOVERNMENT ORGANIZATION AND EMPLOYEES (§§ 101 — 13146) > Part I. The Agencies Generally (Chs. 1 — 10) > CHAPTER 7. Judicial Review (§§ 701 — 706)*

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [*5 USCS §§ 556* and *557*] or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## History

**HISTORY:**

Sept. 6, 1966, *P. L. 89-554*, § 1, *80 Stat. 393*.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

ADD1

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**

▼ **Title 40**   Protection of Environment        Part / Section

    ▼ **Chapter V**   Council on Environmental Quality    1500 – 1599

      ▶ **Part 1500**   Purpose, Policy, and Mandate    1500.1 – 1500.6

      ▶ **Part 1501**   NEPA and Agency Planning    1501.1 – 1501.8

      ▶ **Part 1502**   Environmental Impact Statement    1502.1 – 1502.25

      ▶ **Part 1503**   Commenting    1503.1 – 1503.4

      ▼ **Part 1504**   Predecision Referrals to the Council of    1504.1 – 1504.3
                    Proposed Federal Actions Determined
                    to Be Environmentally Unsatisfactory

         **§ 1504.1**   Purpose.

         **§ 1504.2**   Criteria for referral.

         **§ 1504.3**   Procedure for referrals and response.

      ▼ **Part 1505**   NEPA and Agency Decisionmaking    1505.1 – 1505.3

         **§ 1505.1**   Agency decisionmaking procedures.

         **§ 1505.2**   Record of decision in cases requiring environmental impact
                    statements.

         **§ 1505.3**   Implementing the decision.

      ▶ **Part 1506**   Other Requirements of NEPA    1506.1 – 1506.12

      ▼ **Part 1507**   Agency Compliance    1507.1 – 1507.3

         **§ 1507.1**   Compliance.

         **§ 1507.2**   Agency capability to comply.

         **§ 1507.3**   Agency procedures.

      ▶ **Part 1508**   Terminology and Index    1508.1 – 1508.28

      **Index to Parts 1500 Through 1508**

      ▶ **Part 1515**   Freedom of Information Act    1515.1 – 1515.19
                    Procedures

      ▶ **Part 1516**   Privacy Act Implementation    1516.1 – 1516.10

      ▶ **Part 1517**   Public Meeting Procedures of the    1517.1 – 1517.7
                    Council on Environmental Quality

      ▶ **Part 1518**   Office of Environmental Quality    1518.1 – 1518.4
                    Management Fund

      *Parts 1519-1599 [Reserved]*

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

# Index to Parts 1500 Through 1508

EDITORIAL NOTE

**Editorial Note:** This listing is provided for information purposes only. It is compiled and kept up-to-date by the Council on Environmental Quality, and is revised through July 1, 2018.

### Index

| | |
|---|---|
| Act | 1508.2. |
| Action | 1508.18, 1508.25. |
| Action-forcing | 1500.1, 1502.1. |
| Adoption | 1500.4(n), 1500.5(h), 1506.3. |
| Affected Environment | 1502.10(f), 1502.15. |
| Affecting | 1502.3, 1508.3. |
| Agency Authority | 1500.6. |
| Agency Capability | 1501.2(a), 1507.2. |
| Agency Compliance | 1507.1. |
| Agency Procedures | 1505.1, 1507.3. |
| Agency Responsibility | 1506.5. |
| Alternatives | 1501.2(c), 1502.2, 1502.10(e), 1502.14, 1505.1(e), 1505.2, 1507.2(d), 1508.25(b). |
| Appendices | 1502.10(k), 1502.18, 1502.24. |
| Applicant | 1501.2(d)(1), 1501.4(b), 1501.8(a), 1502.19(b), 1503.1(a)(3), 1504.3(e), 1506.1(d), 1506.5(a), 1506.5(b). |
| Apply NEPA Early in the Process | 1501.2. |

| | |
|---|---|
| Categorical Exclusion | 1500.4(p), 1500.5(k), 1501.4(a), 1507.3(b), 1508.4. |
| Circulation of Environmental Impact Statement | 1502.19, 1506.3. |
| Classified Information | 1507.3(c). |
| Clean Air Act | 1504.1(b), 1508.19(a). |
| Combining Documents | 1500.4(o), 1500.5(i), 1506.4. |
| Commenting | 1502.19, 1503.1, 1503.2, 1503.3, 1503.4, 1506.6(f). |
| Consultation Requirement | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25. |
| Context | 1508.27(a). |
| Cooperating Agency | 1500.5(b), 1501.1(b), 1501.5(c), 1501.5(f), 1501.6, 1503.1(a)(1), 1503.2, 1503.3, 1506.3(c), 1506.5(c), 1508.5. |
| Cost-Benefit | 1502.23. |
| Council on Environmental Quality | 1500.3, 1501.5(e), 1501.5(f), 1501.6(c), 1502.9(c)(4), 1504.1, 1504.2, 1504.3, 1506.6(f), 1506.9, 1506.10(d), 1506.11, 1507.3, 1508.6, 1508.24. |
| Cover Sheet | 1502.10(a), 1502.11. |
| Cumulative Impact | 1508.7, 1508.25(a), 1508.25(c). |
| Decisionmaking | 1505.1, 1506.1. |
| Decision points | 1505.1(b). |
| Dependent | 1508.25(a). |
| Draft Environmental Impact Statement | 1502.9(a). |
| Early Application of NEPA | 1501.2. |
| Economic Effects | 1508.8. |
| Effective Date | 1506.12. |

| | |
|---|---|
| Effects | 1502.16, 1508.8. |
| Emergencies | 1506.11. |
| Endangered Species Act | 1502.25, 1508.27(b)(9). |
| Energy | 1502.16(e). |
| Environmental Assessment | 1501.3, 1501.4(b), 1501.4(c), 1501.7(b)(3), 1506.2(b)(4), 1506.5(b), 1508.4, 1508.9, 1508.10, 1508.13. |
| Environmental Consequences | 1502.10(g), 1502.16. |
| Environmental Consultation Requirements | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c). |
| Environmental Documents | 1508.10. |
| Environmental Impact Statement | 1500.4, 1501.4, 1501.7, 1502.1, 1502.2, 1502.3, 1502.4, 1502.5, 1502.6, 1502.7, 1502.8, 1502.9, 1502.10, 1502.11, 1502.12, 1502.13, 1502.14, 1502.15, 1502.16, 1502.17, 1502.18, 1502.19, 1502.20, 1502.21, 1502.22, 1502.23, 1502.24, 1502.25, 1506.2(c), 1506.3, 1506.8, 1508.11. |
| Environmental Protection Agency | 1502.11(f), 1504.1, 1504.3, 1506.7(c), 1506.9, 1506.10, 1508.19(a). |
| Environmental Review Requirements | 1500.4(k), 1500.5(g), 1501.7(a)(6), 1502.25, 1503.3(c). |
| Expedite | 1501.8(b)(3). |
| Federal Agency | 1508.12. |
| Filing | 1506.9. |
| Final Environmental Impact Statement | 1502.9(b), 1503.1, 1503.4(b). |
| Finding of No Significant Impact | 1500.3, 1500.4(q), 1500.5(l), 1501.4(e), 1508.13. |
| Fish and Wildlife Coordination Act | 1502.25. |

| | |
|---|---|
| Format for Environmental Impact Statement | 1502.10. |
| Freedom of Information Act | 1506.6(f). |
| Further Guidance | 1506.7. |
| Generic | 1502.4(c)(2). |
| General Services Administration | 1506.8(b)(2)(iii). |
| Geographic | 1502.4(c)(1). |
| Graphics | 1502.8. |
| Handbook | 1506.7(a). |
| Housing and Community Development Act | 1506.12, 1508.12. |
| Human Environment | 1502.3, 1502.22, 1508.14. |
| Impacts | 1508.8, 1508.25(c). |
| Implementing the Decision | 1505.3. |
| Incomplete or Unavailable Information | 1502.22. |
| Incorporation by Reference | 1500.4(j), 1502.21. |
| Index | 1502.10(j). |
| Indian Tribes | 1501.2(d)(2), 1501.7(a)(1), 1502.16(c), 1503.1(a)(2)(ii), 1506.6(b)(3)(ii), 1508.5, 1508.12. |
| Intensity | 1508.27(b). |
| Interdisciplinary Preparation | 1502.6, 1502.17. |
| Interim Actions | 1506.1. |
| Joint Lead Agency | 1501.5(b), 1506.2. |
| Judicial Review | 1500.3. |

ADD6

| | |
|---|---|
| Jurisdiction by Law | 1508.15. |
| Lead Agency | 1500.5(c), 1501.1(c), 1501.5, 1501.6, 1501.7, 1501.8, 1504.3, 1506.2(c), 1506.8(c), 1506.10(d), 1508.16. |
| Legislation | 1500.5(j), 1502.3, 1506.8, 1508.17, 1508.18(a). |
| Limitation on Action During NEPA Process | 1506.1. |
| List of Preparers | 1502.10(h), 1502.17. |
| Local or State | 1500.4(n), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(c), 1502.16(c), 1503.1(a)(2), 1506.2(b), 1506.6(b)(3), 1508.5, 1508.12, 1508.18. |
| Major Federal Action | 1502.3, 1508.18. |
| Mandate | 1500.3. |
| Matter | 1504.1, 1504.2, 1504.3, 1508.19. |
| Methodology | 1502.24. |
| Mitigation | 1502.14(f), 1502.16(h), 1503.3(d), 1505.2(c), 1505.3, 1508.20. |
| Monitoring | 1505.2(c), 1505.3. |
| National Historic Preservation Act | 1502.25. |
| National Register of Historical Places | 1508.27(b)(8). |
| Natural or Depletable Resource Requirements | 1502.16(f). |
| Need for Action | 1502.10(d), 1502.13. |
| NEPA Process | 1508.21. |
| Non-Federal Sponsor | 1501.2(d). |
| Notice of Intent | 1501.7, 1507.3(e), 1508.22. |
| OMB Circular A-95 | 1503.1(a)(2)(iii), 1505.2, 1506.6(b)(3)(i). |
| Ongoing Activities | 1506.12. |

| | |
|---|---|
| Page Limits | 1500.4(a), 1501.7(b), 1502.7. |
| Planning | 1500.5(a), 1501.2(b), 1502.4(b), 1508.18. |
| Policy | 1500.2, 1502.4(b), 1508.18(a). |
| Program Environmental Impact Statement | 1500.4(i), 1502.4, 1502.20, 1508.18. |
| Programs | 1502.4, 1508.18(b). |
| Projects | 1508.18. |
| Proposal | 1502.4, 1502.5, 1506.8, 1508.23. |
| Proposed Action | 1502.10(e), 1502.14, 1506.2(d). |
| Public Health and Welfare | 1504.1. |
| Public Involvement | 1501.4(e), 1503.1(a)(4), 1506.6. |
| Purpose | 1500.1, 1501.1, 1502.1, 1504.1. |
| Purpose of Action | 1502.10(d), 1502.13. |
| Record of Decision | 1505.2, 1506.1. |
| Referrals | 1504.1, 1504.2, 1504.3, 1506.3(d). |
| Referring Agency | 1504.1, 1504.2, 1504.3. |
| Response to Comments | 1503.4. |
| Rural Electrification Administration | 1506.1(d). |
| Scientific Accuracy | 1502.24. |
| Scope | 1502.4(a), 1502.9(a), 1508.25. |
| Scoping | 1500.4(g), 1501.1(d), 1501.4(d), 1501.7, 1502.9(a), 1506.8(b). |
| Significantly | 1502.3, 1508.27. |
| Similar | 1508.25. |
| Small Business Associations | 1506.6(b)(3)(vi). |
| Social Effects | 1508.8. |

ADD8

| | |
|---|---|
| Special Expertise | 1508.26. |
| Specificity of Comments | 1500.4(l), 1503.3. |
| State and Areawide Clearinghouses | 1501.4(e)(2), 1503.1(a)(2)(iii), 1506.6(b)(3)(i). |
| State and Local | 1500.4(n), 1500.5(h), 1501.2(d)(2), 1501.5(b), 1501.5(d), 1501.7(a)(1), 1501.8(c), 1502.16(c), 1503.1(a)(2), 1506.2(b), 1506.6(b)(3), 1508.5, 1508.12, 1508.18. |
| State and Local Fiscal Assistance Act | 1508.18(a). |
| Summary | 1500.4(h), 1502.10(b), 1502.12. |
| Supplements to Environmental Impact Statements | 1502.9(c). |
| Table of Contents | 1502.10(c). |
| Technological Development | 1502.4(c)(3). |
| Terminology | 1508.1. |
| Tiering | 1500.4(i), 1502.4(d), 1502.20, 1508.28. |
| Time Limits | 1500.5(e), 1501.1(e), 1501.7(b)(2), 1501.8. |
| Timing | 1502.4, 1502.5, 1506.10. |
| Treaties | 1508.17. |
| When to Prepare an Environmental Assessment | 1501.3. |
| Whether to Prepare an Environmental Impact Statement | 1501.4. |
| Wild and Scenic Rivers Act | 1506.8(b)(2)(ii). |
| Wilderness Act | 1506.8(b)(2)(ii). |
| Writing | 1502.8. |

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1500**   Purpose, Policy, and Mandate   1500.1 – 1500.6
  **§ 1500.1**  Purpose.
  **§ 1500.2**  Policy.
  **§ 1500.3**  Mandate.
  **§ 1500.4**  Reducing paperwork.
  **§ 1500.5**  Reducing delay.
  **§ 1500.6**  Agency authority.

# PART 1500 - PURPOSE, POLICY, AND MANDATE

**Authority:** NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and E.O. 11514, Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**   43 FR 55990, Nov. 28, 1978, unless otherwise noted.

## § 1500.1 Purpose.

(a)   The National Environmental Policy Act (NEPA) is our basic national charter for protection of the environment. It establishes policy, sets goals (section 101), and provides means (section 102) for carrying out the policy. Section 102(2) contains "action-forcing" provisions to make sure that federal agencies act according to the letter and spirit of the Act. The regulations that follow implement section 102(2). Their purpose is to tell federal agencies what they must do to comply with the procedures and achieve the goals of the Act. The President, the federal agencies, and the courts share responsibility for enforcing the Act so as to achieve the substantive requirements of section 101.

(b)   NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. Most important, NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail.

(c)   Ultimately, of course, it is not better documents but better decisions that count. NEPA's purpose is not to generate paperwork - even excellent paperwork - but to foster excellent action. The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment. These regulations provide the direction to achieve this purpose.

## § 1500.2 Policy.

Federal agencies shall to the fullest extent possible:

(a)   Interpret and administer the policies, regulations, and public laws of the United States in accordance with the policies set forth in the Act and in these regulations.

(b)   Implement procedures to make the NEPA process more useful to decisionmakers and the public; to reduce paperwork and the accumulation of extraneous background data; and to emphasize real environmental issues and alternatives. Environmental impact statements shall be concise, clear, and to the point, and shall be supported by evidence that agencies have made the necessary environmental analyses.

ADD10

(c) Integrate the requirements of NEPA with other planning and environmental review procedures required by law or by agency practice so that all such procedures run concurrently rather than consecutively.

(d) Encourage and facilitate public involvement in decisions which affect the quality of the human environment.

(e) Use the NEPA process to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.

(f) Use all practicable means, consistent with the requirements of the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment.

## § 1500.3 Mandate.

Parts 1500 through 1508 of this title provide regulations applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91-190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act) except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*) section 309 of the Clean Air Act, as amended (42 U.S.C. 7609) and Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970, as amended by Executive Order 11991, May 24, 1977). These regulations, unlike the predecessor guidelines, are not confined to sec. 102(2)(C) (environmental impact statements). The regulations apply to the whole of section 102(2). The provisions of the Act and of these regulations must be read together as a whole in order to comply with the spirit and letter of the law. It is the Council's intention that judicial review of agency compliance with these regulations not occur before an agency has filed the final environmental impact statement, or has made a final finding of no significant impact (when such a finding will result in action affecting the environment), or takes action that will result in irreparable injury. Furthermore, it is the Council's intention that any trivial violation of these regulations not give rise to any independent cause of action.

## § 1500.4 Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Reducing the length of environmental impact statements (§ 1502.2(c)), by means such as setting appropriate page limits (§§ 1501.7(b)(1) and 1502.7).

(b) Preparing analytic rather than encyclopedic environmental impact statements (§ 1502.2(a)).

(c) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(d) Writing environmental impact statements in plain language (§ 1502.8).

(e) Following a clear format for environmental impact statements (§ 1502.10).

(f) Emphasizing the portions of the environmental impact statement that are useful to decisionmakers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(g) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.7).

(h) Summarizing the environmental impact statement (§ 1502.12) and circulating the summary instead of the entire environmental impact statement if the latter is unusually long (§ 1502.19).

(i) Using program, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1502.20).

(j) Incorporating by reference (§ 1502.21).

(k) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(l) Requiring comments to be as specific as possible (§ 1503.3).

(m) Attaching and circulating only changes to the draft environmental impact statement, rather than rewriting and circulating the entire statement when changes are minor (§ 1503.4(c)).

ADD11

(n)  Eliminating duplication with State and local procedures, by providing for joint preparation (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(o)  Combining environmental documents with other documents (§ 1506.4).

(p)  Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1508.4).

(q)  Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1508.13).

*[43 FR 55990, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]*

## § 1500.5 Reducing delay.

Agencies shall reduce delay by:

(a)  Integrating the NEPA process into early planning (§ 1501.2).

(b)  Emphasizing interagency cooperation before the environmental impact statement is prepared, rather than submission of adversary comments on a completed document (§ 1501.6).

(c)  Insuring the swift and fair resolution of lead agency disputes (§ 1501.5).

(d)  Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.7).

(e)  Establishing appropriate time limits for the environmental impact statement process (§§ 1501.7(b)(2) and 1501.8).

(f)  Preparing environmental impact statements early in the process (§ 1502.5).

(g)  Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(h)  Eliminating duplication with State and local procedures by providing for joint preparation (§ 1506.2) and with other Federal procedures by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(i)  Combining environmental documents with other documents (§ 1506.4).

(j)  Using accelerated procedures for proposals for legislation (§ 1506.8).

(k)  Using categorical exclusions to define categories of actions which do not individually or cumulatively have a significant effect on the human environment (§ 1508.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(l)  Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1508.13) and is therefore exempt from requirements to prepare an environmental impact statement.

## § 1500.6 Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view traditional policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to insure full compliance with the purposes and provisions of the Act. The phrase "to the fullest extent possible" in section 102 means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible.

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1501**   NEPA and Agency Planning          1501.1 – 1501.8
   **§ 1501.1**  Purpose.
   **§ 1501.2**  Apply NEPA early in the process.
   **§ 1501.3**  When to prepare an environmental assessment.
   **§ 1501.4**  Whether to prepare an environmental impact statement.
   **§ 1501.5**  Lead agencies.
   **§ 1501.6**  Cooperating agencies.
   **§ 1501.7**  Scoping.
   **§ 1501.8**  Time limits.

# PART 1501 – NEPA AND AGENCY PLANNING

**Authority:** NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609, and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**  43 FR 55992, Nov. 29, 1978, unless otherwise noted.

## § 1501.1 Purpose.

The purposes of this part include:

(a)  Integrating the NEPA process into early planning to insure appropriate consideration of NEPA's policies and to eliminate delay.

(b)  Emphasizing cooperative consultation among agencies before the environmental impact statement is prepared rather than submission of adversary comments on a completed document.

(c)  Providing for the swift and fair resolution of lead agency disputes.

(d)  Identifying at an early stage the significant environmental issues deserving of study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement accordingly.

(e)  Providing a mechanism for putting appropriate time limits on the environmental impact statement process.

## § 1501.2 Apply NEPA early in the process.

Agencies shall integrate the NEPA process with other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Each agency shall:

(a)  Comply with the mandate of section 102(2)(A) to "utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment," as specified by § 1507.2.

(b)  Identify environmental effects and values in adequate detail so they can be compared to economic and technical analyses. Environmental documents and appropriate analyses shall be circulated and reviewed at the same time as other planning documents.

ADD13

(c) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of the Act.

(d) Provide for cases where actions are planned by private applicants or other non-Federal entities before Federal involvement so that:

    (1) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

    (2) The Federal agency consults early with appropriate State and local agencies and Indian tribes and with interested private persons and organizations when its own involvement is reasonably foreseeable.

    (3) The Federal agency commences its NEPA process at the earliest possible time.

## § 1501.3 When to prepare an environmental assessment.

(a) Agencies shall prepare an environmental assessment (§ 1508.9) when necessary under the procedures adopted by individual agencies to supplement these regulations as described in § 1507.3. An assessment is not necessary if the agency has decided to prepare an environmental impact statement.

(b) Agencies may prepare an environmental assessment on any action at any time in order to assist agency planning and decisionmaking.

## § 1501.4 Whether to prepare an environmental impact statement.

In determining whether to prepare an environmental impact statement the Federal agency shall:

(a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:

    (1) Normally requires an environmental impact statement, or

    (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).

(b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment (§ 1508.9). The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments required by § 1508.9(a)(1).

(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

(d) Commence the scoping process (§ 1501.7), if the agency will prepare an environmental impact statement.

(e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

    (1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

    (2) In certain limited circumstances, which the agency may cover in its procedures under § 1507.3, the agency shall make the finding of no significant impact available for public review (including State and areawide clearinghouses) for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin. The circumstances are:

        (i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

        (ii) The nature of the proposed action is one without precedent.

## § 1501.5 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

    (1) Proposes or is involved in the same action; or

    (2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

    (1) Magnitude of agency's involvement.

    (2) Project approval/disapproval authority.

    (3) Expertise concerning the action's environmental effects.

    (4) Duration of agency's involvement.

    (5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

    (1) A precise description of the nature and extent of the proposed action.

    (2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

*[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]*

## § 1501.6 Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

    (1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

    (2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

    (3) Meet with a cooperating agency at the latter's request.

ADD15

(b) Each cooperating agency shall:

    (1) Participate in the NEPA process at the earliest possible time.

    (2) Participate in the scoping process (described below in § 1501.7).

    (3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

    (4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

    (5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

## § 1501.7 Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

    (1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

    (2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

    (3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

    (4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

    (5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

    (6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

    (7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

    (1) Set page limits on environmental documents (§ 1502.7).

    (2) Set time limits (§ 1501.8).

    (3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

## § 1501.8 Time limits.

Although the Council has decided that prescribed universal time limits for the entire NEPA process are too inflexible, Federal agencies are encouraged to set time limits appropriate to individual actions (consistent with the time intervals required by § 1506.10). When multiple agencies are involved the reference to agency below means lead agency.

(a) The agency shall set time limits if an applicant for the proposed action requests them: *Provided,* That the limits are consistent with the purposes of NEPA and other essential considerations of national policy.

(b) The agency may:

(1) Consider the following factors in determining time limits:

(i) Potential for environmental harm.

(ii) Size of the proposed action.

(iii) State of the art of analytic techniques.

(iv) Degree of public need for the proposed action, including the consequences of delay.

(v) Number of persons and agencies affected.

(vi) Degree to which relevant information is known and if not known the time required for obtaining it.

(vii) Degree to which the action is controversial.

(viii) Other time limits imposed on the agency by law, regulations, or executive order.

(2) Set overall time limits or limits for each constituent part of the NEPA process, which may include:

(i) Decision on whether to prepare an environmental impact statement (if not already decided).

(ii) Determination of the scope of the environmental impact statement.

(iii) Preparation of the draft environmental impact statement.

(iv) Review of any comments on the draft environmental impact statement from the public and agencies.

(v) Preparation of the final environmental impact statement.

(vi) Review of any comments on the final environmental impact statement.

(vii) Decision on the action based in part on the environmental impact statement.

(3) Designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(c) State or local agencies or members of the public may request a Federal Agency to set time limits.

ADD17

This content is from the eCFR and is authoritative but unofficial.

📅 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - **TABLE OF CONTENTS**

**Part 1502**  Environmental Impact Statement                    1502.1 – 1502.25
   **§ 1502.1**    Purpose.
   **§ 1502.2**    Implementation.
   **§ 1502.3**    Statutory requirements for statements.
   **§ 1502.4**    Major Federal actions requiring the preparation of environmental impact statements.
   **§ 1502.5**    Timing.
   **§ 1502.6**    Interdisciplinary preparation.
   **§ 1502.7**    Page limits.
   **§ 1502.8**    Writing.
   **§ 1502.9**    Draft, final, and supplemental statements.
   **§ 1502.10**   Recommended format.
   **§ 1502.11**   Cover sheet.
   **§ 1502.12**   Summary.
   **§ 1502.13**   Purpose and need.
   **§ 1502.14**   Alternatives including the proposed action.
   **§ 1502.15**   Affected environment.
   **§ 1502.16**   Environmental consequences.
   **§ 1502.17**   List of preparers.
   **§ 1502.18**   Appendix.
   **§ 1502.19**   Circulation of the environmental impact statement.
   **§ 1502.20**   Tiering.
   **§ 1502.21**   Incorporation by reference.
   **§ 1502.22**   Incomplete or unavailable information.
   **§ 1502.23**   Cost-benefit analysis.
   **§ 1502.24**   Methodology and scientific accuracy.
   **§ 1502.25**   Environmental review and consultation requirements.

# PART 1502 - ENVIRONMENTAL IMPACT STATEMENT

**Authority:**  NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 et seq.), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**  43 FR 55994, Nov. 29, 1978, unless otherwise noted.

### § 1502.1 Purpose.

The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous

ADD18

background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

## § 1502.2 Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## § 1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

## § 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

ADD19

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

## § 1502.5 Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decisionmaking process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

## § 1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

## § 1502.7 Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

## § 1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

## § 1502.9 Draft, final, and supplemental statements.

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.


ADD20

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion. The agency shall make every effort to disclose and discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(b) Final environmental impact statements shall respond to comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(c) Agencies:

   (1) Shall prepare supplements to either draft or final environmental impact statements if:

      (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

      (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

   (2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

   (3) Shall adopt procedures for introducing a supplement into its formal administrative record, if such a record exists.

   (4) Shall prepare, circulate, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

## § 1502.10 Recommended format.

Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. The following standard format for environmental impact statements should be followed unless the agency determines that there is a compelling reason to do otherwise:

(a) Cover sheet.

(b) Summary.

(c) Table of contents.

(d) Purpose of and need for action.

(e) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of the Act).

(f) Affected environment.

(g) Environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of the Act).

(h) List of preparers.

(i) List of Agencies, Organizations, and persons to whom copies of the statement are sent.

(j) Index.

(k) Appendices (if any).

If a different format is used, it shall include paragraphs (a), (b), (c), (h), (i), and (j), of this section and shall include the substance of paragraphs (d), (e), (f), (g), and (k) of this section, as further described in §§ 1502.11 through 1502.18, in any appropriate format.

## § 1502.11 Cover sheet.

ADD21

The cover sheet shall not exceed one page. It shall include:

(a) A list of the responsible agencies including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and if appropriate the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.10).

The information required by this section may be entered on Standard Form 424 (in items 4, 6, 7, 10, and 18).

## § 1502.12 Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of controversy (including issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

## § 1502.13 Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

## § 1502.14 Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

## § 1502.15 Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

## § 1502.16 Environmental consequences.

ADD22

This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in § 1502.14. It shall include discussions of:

(a)  Direct effects and their significance (§ 1508.8).

(b)  Indirect effects and their significance (§ 1508.8).

(c)  Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See § 1506.2(d).)

(d)  The environmental effects of alternatives including the proposed action. The comparisons under § 1502.14 will be based on this discussion.

(e)  Energy requirements and conservation potential of various alternatives and mitigation measures.

(f)  Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(g)  Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h)  Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

*[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]*

## § 1502.17 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

## § 1502.18 Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a)  Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b)  Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c)  Normally be analytic and relevant to the decision to be made.

(d)  Be circulated with the environmental impact statement or be readily available on request.

## § 1502.19 Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a)  Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

ADD23

(b)   The applicant, if any.

(c)   Any person, organization, or agency requesting the entire environmental impact statement.

(d)   In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

## § 1502.20 Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

## § 1502.21 Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

## § 1502.22 Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a)   If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b)   If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1)   A statement that such information is incomplete or unavailable;

(2)   a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3)   a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and

(4)   the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c)   The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

*[51 FR 15625, Apr. 25, 1986]*

ADD24

### § 1502.23 Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### § 1502.24 Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

### § 1502.25 Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 et seq.), the National Historic Preservation Act of 1966 (16 U.S.C. 470 et seq.), the Endangered Species Act of 1973 (16 U.S.C. 1531 et seq.), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

ADD25

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1503**  Commenting  1503.1 – 1503.4
  **§ 1503.1**  Inviting comments.
  **§ 1503.2**  Duty to comment.
  **§ 1503.3**  Specificity of comments.
  **§ 1503.4**  Response to comments.

# PART 1503 - COMMENTING

**Authority:** NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:** 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

## § 1503.1 Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A-95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

## § 1503.2 Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency

may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

### § 1503.3 Specificity of comments.

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

### § 1503.4 Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

ADD27

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1504**  Predecision Referrals to the Council of Proposed Federal Actions          1504.1 – 1504.3
          Determined to Be Environmentally Unsatisfactory
  **§ 1504.1**  Purpose.
  **§ 1504.2**  Criteria for referral.
  **§ 1504.3**  Procedure for referrals and response.

## PART 1504 – PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

**Authority:**  NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

### § 1504.1 Purpose.

(a)  This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b)  Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c)  Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council and the public.

*[43 FR 55998, Nov. 29, 1978]*

### § 1504.2 Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as possible in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a)  Possible violation of national environmental standards or policies.

(b)  Severity.

(c)  Geographical scope.

(d)  Duration.

(e)  Importance as precedents.

(f)  Availability of environmentally preferable alternatives.

*[43 FR 55998, Nov. 29, 1978]*

## § 1504.3 Procedure for referrals and response.

(a)  A Federal agency making the referral to the Council shall:

    (1)  Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

    (2)  Include such advice in the referring agency's comments on the draft environmental impact statement, except when the statement does not contain adequate information to permit an assessment of the matter's environmental acceptability.

    (3)  Identify any essential information that is lacking and request that it be made available at the earliest possible time.

    (4)  Send copies of such advice to the Council.

(b)  The referring agency shall deliver its referral to the Council not later than twenty-five (25) days after the final environmental impact statement has been made available to the Environmental Protection Agency, commenting agencies, and the public. Except when an extension of this period has been granted by the lead agency, the Council will not accept a referral after that date.

(c)  The referral shall consist of:

    (1)  A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it, and requesting that no action be taken to implement the matter until the Council acts upon the referral. The letter shall include a copy of the statement referred to in (c) (2) of this section.

    (2)  A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

        (i)  Identify any material facts in controversy and incorporate (by reference if appropriate) agreed upon facts,

        (ii)  Identify any existing environmental requirements or policies which would be violated by the matter,

        (iii)  Present the reasons why the referring agency believes the matter is environmentally unsatisfactory,

        (iv)  Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason,

        (v)  Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time, and

        (vi)  Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d)  Not later than twenty-five (25) days after the referral to the Council the lead agency may deliver a response to the Council, and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

    (1)  Address fully the issues raised in the referral.

    (2)  Be supported by evidence.

    (3)  Give the lead agency's response to the referring agency's recommendations.

(e)  Interested persons (including the applicant) may deliver their views in writing to the Council. Views in support of the referral should be delivered not later than the referral. Views in support of the response shall be delivered not later than the response.

(f) Not later than twenty-five (25) days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

   (1) Conclude that the process of referral and response has successfully resolved the problem.

   (2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

   (3) Hold public meetings or hearings to obtain additional views and information.

   (4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

   (5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

   (6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

   (7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) When the referral involves an action required by statute to be determined on the record after opportunity for agency hearing, the referral shall be conducted in a manner consistent with 5 U.S.C. 557(d) (Administrative Procedure Act).

*[43 FR 55998, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]*

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1505**   NEPA and Agency Decisionmaking                    1505.1 − 1505.3
  **§ 1505.1**  Agency decisionmaking procedures.
  **§ 1505.2**  Record of decision in cases requiring environmental impact statements.
  **§ 1505.3**  Implementing the decision.

# PART 1505 - NEPA AND AGENCY DECISIONMAKING

**Authority:**  NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**  43 FR 55999, Nov. 29, 1978, unless otherwise noted.

## § 1505.1 Agency decisionmaking procedures.

Agencies shall adopt procedures (§ 1507.3) to ensure that decisions are made in accordance with the policies and purposes of the Act. Such procedures shall include but not be limited to:

(a)  Implementing procedures under section 102(2) to achieve the requirements of sections 101 and 102(1).

(b)  Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them.

(c)  Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(d)  Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that agency officials use the statement in making decisions.

(e)  Requiring that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decisionmaker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decisionmaker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

## § 1505.2 Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.10) or, if appropriate, its recommendation to Congress, each agency shall prepare a concise public record of decision. The record, which may be integrated into any other record prepared by the agency, including that required by OMB Circular A-95 (Revised), part I, sections 6(c) and (d), and part II, section 5(b)(4), shall:

(a)  State what the decision was.

(b)  Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.

(c) State whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted, and if not, why they were not. A monitoring and enforcement program shall be adopted and summarized where applicable for any mitigation.

## § 1505.3 Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or commenting agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, make available to the public the results of relevant monitoring.

This content is from the eCFR and is authoritative but unofficial.

📅 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1506**  Other Requirements of NEPA            1506.1 – 1506.12
§ **1506.1**   Limitations on actions during NEPA process.
§ **1506.2**   Elimination of duplication with State and local procedures.
§ **1506.3**   Adoption.
§ **1506.4**   Combining documents.
§ **1506.5**   Agency responsibility.
§ **1506.6**   Public involvement.
§ **1506.7**   Further guidance.
§ **1506.8**   Proposals for legislation.
§ **1506.9**   Filing requirements.
§ **1506.10**  Timing of agency action.
§ **1506.11**  Emergencies.
§ **1506.12**  Effective date.

# PART 1506 – OTHER REQUIREMENTS OF NEPA

**Authority:**  NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**  43 FR 56000, Nov. 29, 1978, unless otherwise noted.

### § 1506.1 Limitations on actions during NEPA process.

(a)  Until an agency issues a record of decision as provided in § 1505.2 (except as provided in paragraph (c) of this section), no action concerning the proposal shall be taken which would:

(1)  Have an adverse environmental impact; or

(2)  Limit the choice of reasonable alternatives.

(b)  If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to insure that the objectives and procedures of NEPA are achieved.

(c)  While work on a required program environmental impact statement is in progress and the action is not covered by an existing program statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1)  Is justified independently of the program;

(2)  Is itself accompanied by an adequate environmental impact statement; and

(3)  Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

## § 1506.2 Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

## § 1506.3 Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of a judicial action which is not final, the agency shall so specify.

## § 1506.4 Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

ADD34

### § 1506.5 Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the cooperating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

### § 1506.6 Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

   (1) In all cases the agency shall mail notice to those who have requested it on an individual action.

   (2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor*. An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

   (3) In the case of an action with effects primarily of local concern the notice may include:

      (i) Notice to State and areawide clearinghouses pursuant to OMB Circular A-95 (Revised).

      (ii) Notice to Indian tribes when effects may occur on reservations.

      (iii) Following the affected State's public notice procedures for comparable actions.

      (iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

      (v) Notice through other local media.

      (vi) Notice to potentially interested community organizations including small business associations.

      (vii) Publication in newsletters that may be expected to reach potentially interested persons.

      (viii) Direct mailing to owners and occupants of nearby or affected property.

      (ix) Posting of notice on and off site in the area where the action is to be located.

(c) Hold or sponsor public hearings or public meetings whenever appropriate or in accordance with statutory requirements applicable to the agency. Criteria shall include whether there is:


ADD35

(1)  Substantial environmental controversy concerning the proposed action or substantial interest in holding the hearing.

(2)  A request for a hearing by another agency with jurisdiction over the action supported by reasons why a hearing will be helpful. If a draft environmental impact statement is to be considered at a public hearing, the agency should make the statement available to the public at least 15 days in advance (unless the purpose of the hearing is to provide information for the draft environmental impact statement).

(d)  Solicit appropriate information from the public.

(e)  Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f)  Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552), without regard to the exclusion for interagency memoranda where such memoranda transmit comments of Federal agencies on the environmental impact of the proposed action. Materials to be made available to the public shall be provided to the public without charge to the extent practicable, or at a fee which is not more than the actual costs of reproducing copies required to be sent to other Federal agencies, including the Council.

## § 1506.7 Further guidance.

The Council may provide further guidance concerning NEPA and its procedures including:

(a)  A handbook which the Council may supplement from time to time, which shall in plain language provide guidance and instructions concerning the application of NEPA and these regulations.

(b)  Publication of the Council's Memoranda to Heads of Agencies.

(c)  In conjunction with the Environmental Protection Agency and the publication of the 102 Monitor, notice of:

(1)  Research activities;

(2)  Meetings and conferences related to NEPA; and

(3)  Successful and innovative procedures used by agencies to implement NEPA.

## § 1506.8 Proposals for legislation.

(a)  The NEPA process for proposals for legislation (§ 1508.17) significantly affecting the quality of the human environment shall be integrated with the legislative process of the Congress. A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement which can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(b)  Preparation of a legislative environmental impact statement shall conform to the requirements of these regulations except as follows:

(1)  There need not be a scoping process.

(2)  The legislative statement shall be prepared in the same manner as a draft statement, but shall be considered the "detailed statement" required by statute; *Provided,* That when any of the following conditions exist both the draft and final environmental impact statement on the legislative proposal shall be prepared and circulated as provided by §§ 1503.1 and 1506.10.

(i)  A Congressional Committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii)  The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*) and the Wilderness Act (16 U.S.C. 1131 *et seq.*)).

ADD36

    (iii)  Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

    (iv)  The agency decides to prepare draft and final statements.

(c)  Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

## § 1506.9 Filing requirements.

(a)  Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, attention Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Mail Code 2252-A, Room 7220, 1200 Pennsylvania Ave., NW., Washington, DC 20460. This address is for deliveries by US Postal Service (including USPS Express Mail).

(b)  For deliveries in-person or by commercial express mail services, including Federal Express or UPS, the correct address is: US Environmental Protection Agency, Office of Federal Activities, EIS Filing Section, Ariel Rios Building (South Oval Lobby), Room 7220, 1200 Pennsylvania Avenue, NW., Washington, DC 20004.

(c)  Statements shall be filed with the EPA no earlier than they are also transmitted to commenting agencies and made available to the public. EPA shall deliver one copy of each statement to the Council, which shall satisfy the requirement of availability to the President. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.10.

*[70 FR 41148, July 18, 2005]*

## § 1506.10 Timing of agency action.

(a)  The Environmental Protection Agency shall publish a notice in the Federal Register each week of the environmental impact statements filed during the preceding week. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b)  No decision on the proposed action shall be made or recorded under § 1505.2 by a Federal agency until the later of the following dates:

    (1)  Ninety (90) days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

    (2)  Thirty (30) days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

An exception to the rules on timing may be made in the case of an agency decision which is subject to a formal internal appeal. Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period prescribed in paragraph (b)(2) of this section may run concurrently. In such cases the environmental impact statement shall explain the timing and the public's right of appeal. An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety, may waive the time period in paragraph (b)(2) of this section and publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement as described in paragraph (a) of this section.

(c)  If the final environmental impact statement is filed within ninety (90) days after a draft environmental impact statement is filed with the Environmental Protection Agency, the minimum thirty (30) day period and the minimum ninety (90) day period may run concurrently. However, subject to paragraph (d) of this section agencies shall allow not less than 45 days for comments on draft statements.

(d) The lead agency may extend prescribed periods. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the prescribed periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend prescribed periods, but only after consultation with the lead agency. (Also see § 1507.3(d).) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

*[43 FR 56000, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]*

## § 1506.11 Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

## § 1506.12 Effective date.

The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under section 102(2)(D) of the Act or under section 104(h) of the Housing and Community Development Act of 1974 an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

(a) These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the FEDERAL REGISTER of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time.

(b) NEPA shall continue to be applicable to actions begun before January 1, 1970, to the fullest extent possible.

ADD38

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 – Protection of Environment**
**Chapter V – Council on Environmental Quality**

ENHANCED CONTENT – TABLE OF CONTENTS

**Part 1507**   Agency Compliance   1507.1 – 1507.3

§ **1507.1**   Compliance.

§ **1507.2**   Agency capability to comply.

§ **1507.3**   Agency procedures.

# PART 1507 – AGENCY COMPLIANCE

**Authority:**   NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**   43 FR 56002, Nov. 29, 1978, unless otherwise noted.

## § 1507.1 Compliance.

All agencies of the Federal Government shall comply with these regulations. It is the intent of these regulations to allow each agency flexibility in adapting its implementing procedures authorized by § 1507.3 to the requirements of other applicable laws.

## § 1507.2 Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements enumerated below. Such compliance may include use of other's resources, but the using agency shall itself have sufficient capability to evaluate what others do for it. Agencies shall:

(a)   Fulfill the requirements of section 102(2)(A) of the Act to utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on the human environment. Agencies shall designate a person to be responsible for overall review of agency NEPA compliance.

(b)   Identify methods and procedures required by section 102(2)(B) to insure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c)   Prepare adequate environmental impact statements pursuant to section 102(2)(C) and comment on statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d)   Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of section 102(2)(E) extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) where the discussion of alternatives is confined to impact statements.

(e)   Comply with the requirements of section 102(2)(H) that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f)   Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of the Act and of Executive Order 11514, Protection and Enhancement of Environmental Quality, Sec. 2.

### § 1507.3 Agency procedures.

(a) Not later than eight months after publication of these regulations as finally adopted in the Federal Register, or five months after the establishment of an agency, whichever shall come later, each agency shall as necessary adopt procedures to supplement these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Such procedures shall not paraphrase these regulations. They shall confine themselves to implementing procedures. Each agency shall consult with the Council while developing its procedures and before publishing them in the Federal Register for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants. The procedures shall be adopted only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations. The Council shall complete its review within 30 days. Once in effect they shall be filed with the Council and made readily available to the public. Agencies are encouraged to publish explanatory guidance for these regulations and their own procedures. Agencies shall continue to review their policies and procedures and in consultation with the Council to revise them as necessary to ensure full compliance with the purposes and provisions of the Act.

(b) Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(d), 1502.9(c)(3), 1505.1, 1506.6(e), and 1508.4.

(2) Specific criteria for and identification of those typical classes of action.

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(c) Agency procedures may include specific criteria for providing limited exceptions to the provisions of these regulations for classified proposals. They are proposed actions which are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Environmental assessments and environmental impact statements which address classified proposals may be safeguarded and restricted from public dissemination in accordance with agencies' own regulations applicable to classified information. These documents may be organized so that classified portions can be included as annexes, in order that the unclassified portions can be made available to the public.

(d) Agency procedures may provide for periods of time other than those presented in § 1506.10 when necessary to comply with other specific statutory requirements.

(e) Agency procedures may provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the notice of intent required by § 1501.7 may be published at a reasonable time in advance of preparation of the draft statement.

This content is from the eCFR and is authoritative but unofficial.

 Displaying the eCFR in effect on 5/01/2020.

**Title 40 - Protection of Environment**
**Chapter V - Council on Environmental Quality**

ENHANCED CONTENT - TABLE OF CONTENTS

**Part 1508**  Terminology and Index  1508.1 – 1508.28
   **§ 1508.1**  Terminology.
   **§ 1508.2**  Act.
   **§ 1508.3**  Affecting.
   **§ 1508.4**  Categorical exclusion.
   **§ 1508.5**  Cooperating agency.
   **§ 1508.6**  Council.
   **§ 1508.7**  Cumulative impact.
   **§ 1508.8**  Effects.
   **§ 1508.9**  Environmental assessment.
   **§ 1508.10**  Environmental document.
   **§ 1508.11**  Environmental impact statement.
   **§ 1508.12**  Federal agency.
   **§ 1508.13**  Finding of no significant impact.
   **§ 1508.14**  Human environment.
   **§ 1508.15**  Jurisdiction by law.
   **§ 1508.16**  Lead agency.
   **§ 1508.17**  Legislation.
   **§ 1508.18**  Major Federal action.
   **§ 1508.19**  Matter.
   **§ 1508.20**  Mitigation.
   **§ 1508.21**  NEPA process.
   **§ 1508.22**  Notice of intent.
   **§ 1508.23**  Proposal.
   **§ 1508.24**  Referring agency.
   **§ 1508.25**  Scope.
   **§ 1508.26**  Special expertise.
   **§ 1508.27**  Significantly.
   **§ 1508.28**  Tiering.

# PART 1508 - TERMINOLOGY AND INDEX

**Authority:**  NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

**Source:**  43 FR 56003, Nov. 29, 1978, unless otherwise noted.

### § 1508.1 Terminology.

The terminology of this part shall be uniform throughout the Federal Government.

### § 1508.2 Act.

Act  means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*) which is also referred to as "NEPA."

### § 1508.3 Affecting.

Affecting  means will or may have an effect on.

### § 1508.4 Categorical exclusion.

Categorical exclusion  means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

### § 1508.5 Cooperating agency.

Cooperating agency  means any Federal agency other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment. The selection and responsibilities of a cooperating agency are described in § 1501.6. A State or local agency of similar qualifications or, when the effects are on a reservation, an Indian Tribe, may by agreement with the lead agency become a cooperating agency.

### § 1508.6 Council.

Council  means the Council on Environmental Quality established by title II of the Act.

### § 1508.7 Cumulative impact.

Cumulative impact  is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

### § 1508.8 Effects.

Effects  include:

  (a)   Direct effects, which are caused by the action and occur at the same time and place.

  (b)   Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

### § 1508.9 Environmental assessment.

Environmental assessment:

(a) Means a concise public document for which a Federal agency is responsible that serves to:

   (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

   (2) Aid an agency's compliance with the Act when no environmental impact statement is necessary.

   (3) Facilitate preparation of a statement when one is necessary.

(b) Shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

## § 1508.10 Environmental document.

*Environmental document* includes the documents specified in § 1508.9 (environmental assessment), § 1508.11 (environmental impact statement), § 1508.13 (finding of no significant impact), and § 1508.22 (notice of intent).

## § 1508.11 Environmental impact statement.

*Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of the Act.

## § 1508.12 Federal agency.

*Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes for purposes of these regulations States and units of general local government and Indian tribes assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.

## § 1508.13 Finding of no significant impact.

*Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared. It shall include the environmental assessment or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

## § 1508.14 Human environment.

*Human environment* shall be interpreted comprehensively to include the natural and physical environment and the relationship of people with that environment. (See the definition of "effects" (§ 1508.8).) This means that economic or social effects are not intended by themselves to require preparation of an environmental impact statement. When an environmental impact statement is prepared and economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss all of these effects on the human environment.

## § 1508.15 Jurisdiction by law.

*Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

## § 1508.16 Lead agency.

*Lead agency* means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.

## § 1508.17 Legislation.

*Legislation* includes a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting does not by itself constitute significant cooperation. Proposals for legislation include requests for ratification of treaties. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

## § 1508.18 Major Federal action.

*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

(a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 *et seq.*, with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(b) Federal actions tend to fall within one of the following categories:

(1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.*; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.

## § 1508.19 Matter.

*Matter* includes for purposes of part 1504:

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

## § 1508.20 Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

ADD44

§ 1508.21 NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

§ 1508.22 Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

§ 1508.23 Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

§ 1508.24 Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

§ 1508.25 Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

ADD45

    (3)  Mitigation measures (not in the proposed action).

(c)  Impacts, which may be:

    (1)  Direct;

    (2)  indirect;

    (3)  cumulative.

## § 1508.26 Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

## § 1508.27 Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a)  *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b)  *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

    (1)  Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

    (2)  The degree to which the proposed action affects public health or safety.

    (3)  Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

    (4)  The degree to which the effects on the quality of the human environment are likely to be highly controversial.

    (5)  The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

    (6)  The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

    (7)  Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

    (8)  The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

    (9)  The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

    (10)  Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

*[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]*

## § 1508.28 Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 50 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...    47 CFR Part 1 Subpart I

This content is from the eCFR and is authoritative but unofficial.

## Title 47 - Telecommunication
## Chapter I - Federal Communications Commission
## Subchapter A - General
## Part 1 - Practice and Procedure
**Authority:** 47 U.S.C. chs. 2, 5, 9, 13; 28 U.S.C. 2461 note, unless otherwise noted.

### Subpart I  Procedures Implementing the National Environmental Policy Act of 1969

§ 1.1301  Basis and purpose.
§ 1.1302  Cross-reference; Regulations of the Council on Environmental Quality.
§ 1.1303  Scope.
§ 1.1304  Information, assistance, and waiver of electronic filing and service requirements.
§ 1.1305  Actions which normally will have a significant impact upon the environment, for which Environmental Impact Statements must be prepared.
§ 1.1306  Actions which are categorically excluded from environmental processing.
§ 1.1307  Actions that may have a significant environmental effect, for which Environmental Assessments (EAs) must be prepared.
§ 1.1308  Consideration of environmental assessments (EAs); findings of no significant impact.
§ 1.1309  Application amendments.
§ 1.1310  Radiofrequency radiation exposure limits.
§ 1.1311  Environmental information to be included in the environmental assessment (EA).
§ 1.1312  Facilities for which no preconstruction authorization is required.
§ 1.1313  Objections.
§ 1.1314  Environmental impact statements (EISs).
§ 1.1315  The Draft Environmental Impact Statement (DEIS); Comments.
§ 1.1317  The Final Environmental Impact Statement (FEIS).
§ 1.1319  Consideration of the environmental impact statements.
§ 1.1320  Review of Commission undertakings that may affect historic properties.

**Editorial Note:** Nomenclature changes to part 1 appear at 63 FR 54077, Oct. 8, 1998.

### Subpart I - Procedures Implementing the National Environmental Policy Act of 1969

**Source:** 51 FR 15000, Apr. 22, 1986, unless otherwise noted.

### § 1.1301 Basis and purpose.

The provisions of this subpart implement Subchapter I of the National Environmental Policy Act of 1969, as amended, 42 U.S.C. 4321–4335.

ADD48

## § 1.1302 Cross-reference; Regulations of the Council on Environmental Quality.

A further explanation regarding implementation of the National Environmental Policy Act is provided by the regulations issued by the Council on Environmental Quality, 40 CFR 1500–1508.28.

## § 1.1303 Scope.

The provisions of this subpart shall apply to all Commission actions that may or will have a significant impact on the quality of the human environment. To the extent that other provisions of the Commission's rules and regulations are inconsistent with the subpart, the provisions of this subpart shall govern.

*[55 FR 20396, May 16, 1990]*

## § 1.1304 Information, assistance, and waiver of electronic filing and service requirements.

(a) For general information and assistance concerning the provisions of this subpart, the Office of General Counsel may be contacted, (202) 418–1700. For more specific information, the Bureau responsible for processing a specific application should be contacted.

(b) All submissions relating to this subpart shall be made electronically. If an interested party is unable to submit or serve a filing electronically, or if it would be unreasonably burdensome to do so, such party may submit its filing on paper to the appropriate address for the Commission Secretary and serve the filing on other parties by mail. Such party should include as part of its paper submission a request for waiver of the electronic filing requirement. Such waiver request must contain an explanation addressing the requestor's inability to file electronically or why electronic filing would be unreasonably burdensome. Either showing will be sufficient to obtain a waiver under this section.

*[85 FR 85530, Dec. 29, 2020]*

## § 1.1305 Actions which normally will have a significant impact upon the environment, for which Environmental Impact Statements must be prepared.

Any Commission action deemed to have a significant effect upon the quality of the human environment requires the preparation of a Draft Environmental Impact Statement (DEIS) and Final Environmental Impact Statement (FEIS) (collectively referred to as EISs) (*see* §§ 1.1314, 1.1315 and 1.1317). The Commission has reviewed representative actions and has found no common pattern which would enable it to specify actions that will thus automatically require EISs.

Note: Our current application forms refer applicants to § 1.1305 to determine if their proposals are such that the submission of environmental information is required (*see* § 1.1311). Until the application forms are revised to reflect our new environmental rules, applicants should refer to § 1.1307. Section 1.1307 now delineates those actions for which applicants must submit environmental information.

ADD49

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 52 of 134
47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1306

## § 1.1306 Actions which are categorically excluded from environmental processing.

(a) Except as provided in § 1.1307 (c) and (d), Commission actions not covered by § 1.1307 (a) and (b) are deemed individually and cumulatively to have no significant effect on the quality of the human environment and are categorically excluded from environmental processing.

(b) Specifically, any Commission action with respect to any new application, or minor or major modifications of existing or authorized facilities or equipment, will be categorically excluded, provided such proposals do not:

    (1) Involve a site location specified under § 1.1307(a) (1)–(7), or

    (2) Involve high intensity lighting under § 1.1307(a)(8).

    (3) Result in human exposure to radiofrequency radiation in excess of the applicable safety standards specified in § 1.1307(b).

(c)

    (1) Unless § 1.1307(a)(4) is applicable, the provisions of § 1.1307(a) requiring the preparation of EAs do not encompass the construction of wireless facilities, including deployments on new or replacement poles, if:

        (i) The facilities will be located in a right-of-way that is designated by a Federal, State, local, or Tribal government for communications towers, above-ground utility transmission or distribution lines, or any associated structures and equipment;

        (ii) The right-of-way is in active use for such designated purposes; and

        (iii) The facilities would not

            (A) Increase the height of the tower or non-tower structure by more than 10% or twenty feet, whichever is greater, over existing support structures that are located in the right-of-way within the vicinity of the proposed construction;

            (B) Involve the installation of more than four new equipment cabinets or more than one new equipment shelter;

            (C) Add an appurtenance to the body of the structure that would protrude from the edge of the structure more than twenty feet, or more than the width of the structure at the level of the appurtenance, whichever is greater (except that the deployment may exceed this size limit if necessary to shelter the antenna from inclement weather or to connect the antenna to the tower via cable); or

            (D) Involve excavation outside the current site, defined as the area that is within the boundaries of the leased or owned property surrounding the deployment or that is in proximity to the structure and within the boundaries of the utility easement on which the facility is to be deployed, whichever is more restrictive.

    (2) Such wireless facilities are subject to § 1.1307(b) and require EAs if their construction would result in human exposure to radiofrequency radiation in excess of the applicable health and safety guidelines cited in § 1.1307(b).

    Note 1: The provisions of § 1.1307(a) requiring the preparation of EAs do not encompass the



ADD50

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 53 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1307

mounting of antenna(s) and associated equipment (such as wiring, cabling, cabinets, or backup-power), on or in an existing building, or on an antenna tower or other man-made structure, unless § 1.1307(a)(4) is applicable. Such antennas are subject to § 1.1307(b) of this part and require EAs if their construction would result in human exposure to radiofrequency radiation in excess of the applicable health and safety guidelines cited in § 1.1307(b) of this part. The provisions of § 1.1307 (a) and (b) of this part do not encompass the installation of aerial wire or cable over existing aerial corridors of prior or permitted use or the underground installation of wire or cable along existing underground corridors of prior or permitted use, established by the applicant or others. The use of existing buildings, towers or corridors is an environmentally desirable alternative to the construction of new facilities and is encouraged. The provisions of § 1.1307(a) and (b) of this part do not encompass the construction of new submarine cable systems.

Note 2: The specific height of an antenna tower or supporting structure, as well as the specific diameter of a satellite earth station, in and of itself, will not be deemed sufficient to warrant environmental processing, *see* § 1.1307 and § 1.1308, except as required by the Bureau pursuant to the Note to § 1.1307(d).

Note 3: The construction of an antenna tower or supporting structure in an established "antenna farm": (*i.e.*, an area in which similar antenna towers are clustered, whether or not such area has been officially designated as an antenna farm), will be categorically excluded unless *one or more of the antennas to be mounted on the tower or structure are subject to the provisions of § 1.1307(b) and the additional radiofrequency radiation from the antenna(s) on the new tower or structure* would cause human exposure in excess of the applicable health and safety *guidelines* cited in § 1.1307(b).

[51 FR 15000, Apr. 22, 1986, as amended at 51 FR 18889, May 23, 1986; 53 FR 28393, July 28, 1988; 56 FR 13414, Apr. 2, 1991; 64 FR 19061, Apr. 19, 1999; 77 FR 3952, Jan. 26, 2012; 80 FR 1268, Jan. 8, 2015]

## § 1.1307 Actions that may have a significant environmental effect, for which Environmental Assessments (EAs) must be prepared.

(a) Commission actions with respect to the following types of facilities may significantly affect the environment and thus require the preparation of EAs by the applicant (see §§ 1.1308 and 1.1311) and may require further Commission environmental processing (*see* §§ 1.1314, 1.1315 and 1.1317):

(1) Facilities that are to be located in an officially designated wilderness area.

(2) Facilities that are to be located in an officially designated wildlife preserve.

(3) Facilities that:

(i) May affect listed threatened or endangered species or designated critical habitats; or



USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 54 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1307(a)(3)(ii)

(ii) are likely to jeopardize the continued existence of any proposed endangered or threatened species or likely to result in the destruction or adverse modification of proposed critical habitats, as determined by the Secretary of the Interior pursuant to the Endangered Species Act of 1973.

Note: The list of endangered and threatened species is contained in 50 CFR 17.11, 17.22, 222.23(a) and 227.4. The list of designated critical habitats is contained in 50 CFR 17.95, 17.96 and part 226. To ascertain the status of proposed species and habitats, inquiries may be directed to the Regional Director of the Fish and Wildlife Service, Department of the Interior.

(4) Facilities that may affect districts, sites, buildings, structures or objects, significant in American history, architecture, archeology, engineering or culture, that are listed, or are eligible for listing, in the National Register of Historic Places (*see* 54 U.S.C. 300308; 36 CFR parts 60 and 800), and that are subject to review pursuant to section 1.1320 and have been determined through that review process to have adverse effects on identified historic properties.

(5) Facilities that may affect Indian religious sites.

(6) Facilities to be located in floodplains, if the facilities will not be placed at least one foot above the base flood elevation of the floodplain.

(7) Facilities whose construction will involve significant change in surface features (e.g., wetland fill, deforestation or water diversion). (In the case of wetlands on Federal property, *see* Executive Order 11990.)

(8) Antenna towers and/or supporting structures that are to be equipped with high intensity white lights which are to be located in residential neighborhoods, as defined by the applicable zoning law.

(b)

(1) *Requirements.*

(i) With respect to the limits on human exposure to RF provided in § 1.1310 of this chapter, applicants to the Commission for the grant or modification of construction permits, licenses or renewals thereof, temporary authorities, equipment authorizations, or any other authorizations for radiofrequency sources must either:

(A) Determine that they qualify for an exemption pursuant to § 1.1307(b)(3);

(B) Prepare an evaluation of the human exposure to RF radiation pursuant to § 1.1310 and include in the application a statement confirming compliance with the limits in § 1.1310; or

(C) Prepare an Environmental Assessment if those RF sources would cause human exposure to levels of RF radiation in excess of the limits in § 1.1310.

(ii) Compliance with these limits for fixed RF source(s) may be accomplished by use of mitigation actions, as provided in § 1.1307(b)(4). Upon request by the Commission, the party seeking or holding such authorization must electronically submit technical information showing the basis for such compliance, either by exemption or evaluation. Notwithstanding the preceding requirements, in the event that RF sources cause human exposure to levels of RF radiation in



USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 55 of 134
47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...                    47 CFR 1.1307(b)(2)

excess of the limits in § 1.1310 of this chapter, such RF exposure exemptions and evaluations are not deemed sufficient to show that there is no significant effect on the quality of the human environment or that the RF sources are categorically excluded from environmental processing.

(2) *Definitions.* For the purposes of this section, the following definitions shall apply.

*Available maximum time-averaged power* for an RF source is the maximum available RF power (into a matched load) as averaged over a *time-averaging period;*

*Category One* is any spatial region that is compliant with the general population exposure limit with *continuous exposure* or *source-based time-averaged exposure;*

*Category Two* is any spatial region where the general population exposure limit is exceeded but that is compliant with the occupational exposure limit with *continuous exposure;*

*Category Three* is any spatial region where the occupational exposure limit is exceeded but by no more than ten times the limit;

*Category Four* is any spatial region where the exposure is more than ten times the occupational exposure limit or where there is a possibility for serious injury on contact.

*Continuous exposure* refers to the maximum time-averaged exposure at a given location for an *RF source* and assumes that exposure may take place indefinitely. The exposure limits in § 1.1310 of this chapter are used to establish the spatial regions where mitigation measures are necessary assuming continuous exposure as prescribed in § 1.1307(b)(4) of this chapter.

*Effective Radiated Power* (*ERP*) is the product of the *maximum antenna gain* which is the largest far-field power gain relative to a dipole in any direction for each transverse polarization component, and the *maximum delivered time-averaged power* which is the largest net power delivered or supplied to an antenna as averaged over a *time-averaging period; ERP* is summed over two polarizations when present;

*Exemption* for (an) *RF source(s)* is solely from the obligation to perform a routine environmental evaluation to demonstrate compliance with the RF exposure limits in § 1.1310 of this chapter; it is not exemption from the equipment authorization procedures described in part 2 of this chapter, not exemption from general obligations of compliance with the RF exposure limits in § 1.1310 of this chapter, and not exemption from determination of whether there is no significant effect on the quality of the human environment under § 1.1306 of this chapter.

*Fixed RF source* is one that is physically secured at one location, even temporarily, and is not able to be easily moved to another location while radiating;

*Mobile device* is as defined in § 2.1091(b) of this chapter;

*Plane-wave equivalent power density* is the square of the root-mean-square (rms) electric field strength divided by the impedance of free space (377 ohms).

*Portable device* is as defined in § 2.1093(b) of this chapter;

*Positive access control* is mitigation by proactive preclusion of unauthorized access to the region surrounding an RF source where the continuous exposure limit for the general population is exceeded. Examples of such controls include locked doors, ladder cages, or effective fences,

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 56 of 134

**47 CFR Part 1 Subpart I (up to date as of 4/10/2023)**
**Procedures Implementing the National Environmental Policy Act…**

**47 CFR 1.1307(b)(2) "Radiating structure"**

as well as enforced prohibition of public access to external surfaces of buildings. However, it does not include natural barriers or other access restrictions that did not require any action on the part of the licensee or property management.

*Radiating structure* is an unshielded RF current-carrying conductor that generates an RF reactive near electric or magnetic field and/or radiates an RF electromagnetic wave. It is the component of an *RF source* that transmits, generates, or reradiates an RF fields, such as an antenna, aperture, coil, or plate.

*RF source* is Commission-regulated equipment that transmits or generates RF fields or waves, whether intentionally or unintentionally, via one or more *radiating structure(s)*. Multiple *RF sources* may exist in a single *device*.

*Separation distance* (variable R in Table 1) is the minimum distance in any direction from any part of a *radiating structure* and any part of the body of a nearby person;

*Source-based time averaging* is an average of instantaneous exposure over a *time-averaging period* that is based on an inherent property or duty-cycle of a device to ensure compliance with the *continuous exposure* limits;

*Time-averaging period* is a time period not to exceed 30 minutes for fixed RF sources or a time period inherent from device transmission characteristics not to exceed 30 minutes for mobile and portable RF sources;

*Transient individual* is an untrained person in a location where occupational/controlled limits apply, and he or she must be made aware of the potential for exposure and be supervised by trained personnel pursuant to § 1.1307(b)(4) of this chapter where use of time averaging is required to ensure compliance with the general population exposure limits in § 1.1310 of this chapter.

(3) *Determination of exemption.*

   (i) For single RF sources (*i.e.,* any single fixed RF source, mobile device, or portable device, as defined in paragraph (b)(2) of this section): A single RF source is exempt if:

      (A) The available maximum time-averaged power is no more than 1 mW, regardless of separation distance. This exemption may not be used in conjunction with other exemption criteria other than those in paragraph (b)(3)(ii)(A) of this section. Medical implant devices may only use this exemption and that in paragraph (b)(3)(ii)(A);

      (B) Or the available maximum time-averaged power or effective radiated power (ERP), whichever is greater, is less than or equal to the threshold $P_{th}$ (mW) described in the following formula. This method shall only be used at separation distances (cm) from 0.5 centimeters to 40 centimeters and at frequencies from 0.3 GHz to 6 GHz (inclusive). $P_{th}$ is given by:

ADD54

USCA Case #22-1337      Document #2012869      Filed: 08/16/2023      Page 57 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1307(b)(3)(i)(C)

$$P_{th} \ (\text{mW}) = \begin{cases} ERP_{20\,cm}(d/20\,\text{cm})^x & d \leq 20\,\text{cm} \\ ERP_{20\,cm} & 20\,\text{cm} < d \leq 40\,\text{cm} \end{cases}$$

Where

$$x = -\log_{10}\left(\frac{60}{ERP_{20\,cm}\sqrt{f}}\right) \text{ and } f \text{ is in GHz;}$$

and

$$ERP_{20\,cm} \ (\text{mW}) = \begin{cases} 2040f & 0.3\,\text{GHz} \leq f < 1.5\,\text{GHz} \\ 3060 & 1.5\,\text{GHz} \leq f \leq 6\,\text{GHz} \end{cases}$$

$d$ = the separation distance (cm);

(C)   Or using Table 1 and the minimum separation distance (R in meters) from the body of a nearby person for the frequency (f in MHz) at which the source operates, the ERP (watts) is no more than the calculated value prescribed for that frequency. For the exemption in Table 1 to apply, R must be at least λ/2π, where λ is the free-space operating wavelength in meters. If the ERP of a single RF source is not easily obtained, then the available maximum time-averaged power may be used in lieu of ERP if the physical dimensions of the radiating structure(s) do not exceed the electrical length of λ/4 or if the antenna gain is less than that of a half-wave dipole (1.64 linear value).

## Table 1 to § 1.1307(b)(3)(i)(C)—Single RF Sources Subject to Routine Environmental Evaluation

| RF Source frequency (MHz) | Threshold ERP (watts) |
|---|---|
| 0.3–1.34 | 1,920 $R^2$. |
| 1.34–30 | 3,450 $R^2/f^2$. |
| 30–300 | 3.83 $R^2$. |
| 300–1,500 | 0.0128 $R^2f$. |
| 1,500–100,000 | 19.2$R^2$. |

ADD55

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 58 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...                    47 CFR 1.1307(b)(3)(ii)

(ii) For multiple RF sources: Multiple RF sources are exempt if:

(A) The available maximum time-averaged power of each source is no more than 1 mW and there is a separation distance of two centimeters between any portion of a radiating structure operating and the nearest portion of any other radiating structure in the same device, except if the sum of multiple sources is less than 1 mW during the time-averaging period, in which case they may be treated as a single source (separation is not required). This exemption may not be used in conjunction with other exemption criteria other than those is paragraph (b)(3)(i)(A) of this section. Medical implant devices may only use this exemption and that in paragraph (b)(3)(i)(A).

(B) in the case of fixed RF sources operating in the same time-averaging period, or of multiple mobile or portable RF sources within a device operating in the same time averaging period, if the sum of the fractional contributions to the applicable thresholds is less than or equal to 1 as indicated in the following equation.

$$\sum_{i=1}^{a} \frac{P_i}{P_{th,i}} + \sum_{j=1}^{b} \frac{ERP_j}{ERP_{th,j}} + \sum_{k=1}^{c} \frac{Evaluated_k}{Exposure\ Limit_k} \leq 1$$

Where:

$a$ = number of fixed, mobile, or portable RF sources claiming exemption using paragraph (b)(3)(i)(B) of this section for $P_{th}$, including existing exempt transmitters and those being added.

$b$ = number of fixed, mobile, or portable RF sources claiming exemption using paragraph (b)(3)(i)(C) of this section for Threshold ERP, including existing exempt transmitters and those being added.

$c$ = number of existing fixed, mobile, or portable RF sources with known evaluation for the specified minimum distance including existing evaluated transmitters.

$P_i$ = the available maximum time-averaged power or the ERP, whichever is greater, for fixed, mobile, or portable RF source $i$ at a distance between 0.5 cm and 40 cm (inclusive).

$P_{th,i}$ = the exemption threshold power ($P_{th}$) according to paragraph (b)(3)(i)(B) of this section for fixed, mobile, or portable RF source $i$.

$ERP_j$ = the ERP of fixed, mobile, or portable RF source $j$.

$ERP_{th,j}$ = exemption threshold ERP for fixed, mobile, or portable RF source $j$, at a distance of at least $\lambda/2\pi$ according to the applicable formula of paragraph (b)(3)(i)(C) of this section.

$Evaluated_k$ = the maximum reported SAR or MPE of fixed, mobile, or portable RF source $k$ either in the device or at the transmitter site from an existing evaluation at the location of exposure.

$Exposure\ Limit_k$ = either the general population/uncontrolled maximum permissible exposure (MPE) or specific absorption rate (SAR) limit for each fixed, mobile, or portable RF source $k$, as applicable from § 1.1310 of this chapter.

ADD56

USCA Case #22-1337      Document #2012869      Filed: 08/16/2023      Page 59 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1307(b)(4)

(4) *Mitigation.*

(i) As provided in paragraphs (b)(4)(ii) through (vi) of this section, specific mitigation actions are required for fixed RF sources to the extent necessary to ensure compliance with our exposure limits, including the implementation of an RF safety plan, restriction of access to those RF sources, and disclosure of spatial regions where exposure limits are exceeded.

(ii) Category One—INFORMATION: No mitigation actions are required when the RF source does not cause continuous or source-based time-averaged exposure in excess of the general population limit in s§ 1.1310 of this part. Optionally a green "INFORMATION" sign may offer information to those persons who might be approaching RF sources. This optional sign, when used, must include at least the following information: Appropriate signal word "INFORMATION" and associated color (green), an explanation of the safety precautions to be observed when closer to the antenna than the information sign, a reminder to obey all postings and boundaries (if higher categories are nearby), up-to-date licensee (or operator) contact information (if higher categories are nearby), and a place to get additional information (such as a website, if no higher categories are nearby).

(iii) Category Two—NOTICE: Mitigation actions are required in the form of signs and positive access control surrounding the boundary where the continuous exposure limit is exceeded for the general population, with the appropriate signal word "NOTICE" and associated color (blue) on the signs. Signs must contain the components discussed in paragraph (b)(4)(vi) of this section. Under certain controlled conditions, such as on a rooftop with limited access, a sign attached directly to the surface of an antenna will be considered sufficient if the sign specifies a minimum approach distance and is readable at this separation distance and at locations required for compliance with the general population exposure limit in § 1.1310 of this part. Appropriate training is required for any occupational personnel with access to controlled areas within restrictive barriers where the general population exposure limit is exceeded, and transient individuals must be supervised by trained occupational personnel upon entering any of these areas. Use of time averaging is required for transient individuals to ensure compliance with the general population exposure limit.

(iv) Category Three—CAUTION: Signs (with the appropriate signal word "CAUTION" and associated color (yellow) on the signs), controls, or indicators (*e.g.,* chains, railings, contrasting paint, diagrams) are required (in addition to the positive access control established for Category Two) surrounding the area in which the exposure limit for occupational personnel in a controlled environment is exceeded by no more than a factor of ten. Signs must contain the components discussed in paragraph (b)(4)(vi) of this section. If the boundaries between Category Two and Three are such that placement of both Category Two and Three signs would be in the same location, then the Category Two sign is optional. Under certain controlled conditions, such as on a rooftop with limited access, a sign may be attached directly to the surface of an antenna within a controlled environment if it specifies the minimum approach distance and is readable at this distance and at locations required for compliance with the occupational exposure limit in § 1.1310 of this part. If signs are not used at the occupational exposure limit boundary, controls or indicators (*e.g.,* chains, railings, contrasting paint, diagrams, *etc.*) must designate the boundary where the occupational exposure limit is exceeded. Additionally, appropriate training is required for any occupational personnel with access to the controlled area where the general population exposure limit is exceeded, and transient individuals must be supervised by trained personnel upon entering any of these areas. Use of time averaging is required for transient individuals to ensure compliance with the general population exposure limit. Further

ADD57

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 60 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1307(b)(4)(v)

mitigation by reducing exposure time in accord with six-minute time averaging is required for occupational personnel in the area in which the occupational exposure limit is exceeded. However, proper use of RF personal protective equipment may be considered sufficient in lieu of time averaging for occupational personnel in the areas in which the occupational exposure limit is exceeded. If such procedures or power reduction, and therefore Category reduction, are not feasible, then lockout/tagout procedures in 29 CFR 1910.147 must be followed.

(v) Category Four—WARNING/DANGER: Where the occupational limit could be exceeded by a factor of more than ten, "WARNING" signs with the associated color (orange), controls, or indicators (*e.g.,* chains, railings, contrasting paint, diagrams) are required (in addition to the positive access control established for Category Two) surrounding the area in which the occupational exposure limit in a controlled environment is exceeded by more than a factor of ten Signs must contain the components discussed in paragraph (b)(4)(vi) of this section. "DANGER" signs with the associated color (red) are required where immediate and serious injury will occur on contact, in addition to positive access control, regardless of mitigation actions taken in Categories Two or Three. If the boundaries between Category Three and Four are such that placement of both Category Three and Four signs would be in the same location, then the Category Three sign is optional. No access is permitted without Category reduction. If power reduction, and therefore Category reduction, is not feasible, then lockout/tagout procedures in 29 CFR 1910.147 must be followed.

(vi) RF exposure advisory signs must be viewable and readable from the boundary where the applicable exposure limits are exceeded, pursuant to 29 CFR 1910.145, and include at least the following five components:

(A) Appropriate signal word, associated color {*i.e.,* {DANGER" (red), "WARNING" (orange), "CAUTION," (yellow) "NOTICE" (blue)};

(B) RF energy advisory symbol;

(C) An explanation of the RF source;

(D) Behavior necessary to comply with the exposure limits; and

(E) Up-to-date contact information.

(5) *Responsibility for compliance.*

(i) In general, when the exposure limits specified in § 1.1310 of this part are exceeded in an accessible area due to the emissions from multiple fixed RF sources, actions necessary to bring the area into compliance or preparation of an Environmental Assessment (EA) as specified in § 1.1311 of this part are the shared responsibility of all licensees whose RF sources produce, at the area in question, levels that exceed 5% of the applicable exposure limit proportional to power. However, a licensee demonstrating that its facility was not the most recently modified or newly-constructed facility at the site establishes a rebuttable presumption that such licensee should not be liable in an enforcement proceeding relating to the period of non-compliance. Field strengths must be squared to be proportional to SAR or power density. Specifically, these compliance requirements apply if the square of the electric or magnetic field strength exposure level applicable to a particular RF source exceeds 5% of the square of the electric or magnetic field strength limit at the area in question where the levels due to multiple fixed RF sources exceed the exposure limit. Site owners and managers are expected to allow applicants and licensees to take reasonable steps to comply with the requirements contained

ADD58

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 61 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)                                      47 CFR 1.1307(b)(5)(ii)
Procedures Implementing the National Environmental Policy Act...

in paragraph (b)(1) of this section and, where feasible, should encourage co-location of RF sources and common solutions for controlling access to areas where the RF exposure limits contained in § 1.1310 of this part might be exceeded. Applicants and licensees are required to share technical information necessary to ensure joint compliance with the exposure limits, including informing other licensees at a site in question of evaluations indicating possible non-compliance with the exposure limits.

(ii)   Applicants for proposed RF sources that would cause non-compliance with the limits specified in § 1.1310 at an accessible area previously in compliance must submit an EA if emissions from the applicant's RF source would produce, at the area in question, levels that exceed 5% of the applicable exposure limit. Field strengths must be squared if necessary to be proportional to SAR or power density.

(iii)  Renewal applicants whose RF sources would cause non-compliance with the limits specified in § 1.1310 at an accessible area previously in compliance must submit an EA if emissions from the applicant's RF source would produce, at the area in question, levels that exceed 5% of the applicable exposure limit. Field strengths must be squared if necessary to be proportional to SAR or power density.

(c)  If an interested person alleges that a particular action, otherwise categorically excluded, will have a significant environmental effect, the person shall electronically submit to the Bureau responsible for processing that action a written petition setting forth in detail the reasons justifying or circumstances necessitating environmental consideration in the decision-making process. If an interested person is unable to submit electronically or if filing electronically would be unreasonably burdensome, such person may submit the petition by mail, with a request for waiver under § 1.1304(b). (See § 1.1313). The Bureau shall review the petition and consider the environmental concerns that have been raised. If the Bureau determines that the action may have a significant environmental impact, the Bureau will require the applicant to prepare an EA (*see* §§ 1.1308 and 1.1311), which will serve as the basis for the determination to proceed with or terminate environmental processing.

(d)  If the Bureau responsible for processing a particular action, otherwise categorically excluded, determines that the proposal may have a significant environmental impact, the Bureau, on its own motion, shall require the applicant to electronically submit an EA. The Bureau will review and consider the EA as in paragraph (c) of this section.

Note to paragraph (d): Pending a final determination as to what, if any, permanent measures should be adopted specifically for the protection of migratory birds, the Bureau shall require an Environmental Assessment for an otherwise categorically excluded action involving a new or existing antenna structure, for which an antenna structure registration application (FCC Form 854) is required under part 17 of this chapter, if the proposed antenna structure will be over 450 feet in height above ground level (AGL) and involves either:

1. Construction of a new antenna structure;

2. Modification or replacement of an existing antenna structure involving a substantial increase in size as defined in paragraph I(C)(1)(3) of Appendix B to part 1 of this chapter; or

ADD59

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 62 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1307(e)

3. Addition of lighting or adoption of a less preferred lighting style as defined in § 17.4(c)(1)(iii) of this chapter. The Bureau shall consider whether to require an EA for other antenna structures subject to § 17.4(c) of this chapter in accordance with § 17.4(c)(8) of this chapter. An Environmental Assessment required pursuant to this note will be subject to the same procedures that apply to any Environmental Assessment required for a proposed tower or modification of an existing tower for which an antenna structure registration application (FCC Form 854) is required, as set forth in § 17.4(c) of this chapter.

(e) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the regulations contained in this chapter concerning the environmental effects of such emissions. For purposes of this paragraph:

(1) The term *personal wireless service* means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(2) The term *personal wireless service facilities* means facilities for the provision of personal wireless services;

(3) The term *unlicensed wireless services* means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services; and

(4) The term *direct-to-home satellite services* means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment, except at the subscriber's premises or in the uplink process to the satellite.

*[51 FR 15000, Apr. 22, 1986]*

**Editorial Note:** For FEDERAL REGISTER citations affecting § 1.1307, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov*.

## § 1.1308 Consideration of environmental assessments (EAs); findings of no significant impact.

(a) Applicants shall prepare EAs for actions that may have a significant environmental impact (*see* § 1.1307). An EA is described in detail in § 1.1311 of this part of the Commission rules.

(b) The EA is a document which shall explain the environmental consequences of the proposal and set forth sufficient analysis for the Bureau or the Commission to reach a determination that the proposal will or will not have a significant environmental effect. To assist in making that determination, the Bureau or the Commission may request further information from the applicant, interested persons, and agencies and authorities which have jurisdiction by law or which have relevant expertise.

Note: With respect to actions specified under § 1.1307 (a)(3) and (a)(4), the Commission shall solicit and consider the comments of the Department of Interior, and the State Historic Preservation Officer and the Advisory Council on Historic Preservation, respectively, in accordance



ADD60

USCA Case #22-1337     Document #2012869     Filed: 08/16/2023     Page 63 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1308(c)

with their established procedures. *See* Interagency Cooperation—Endangered Species Act of 1973, as amended, 50 CFR part 402; Protection of Historic and Cultural Properties, 36 CFR part 800. In addition, when an action interferes with or adversely affects an American Indian tribe's religious site, the Commission shall solicit the views of that American Indian tribe. *See* § 1.1307(a)(5).

(c) If the Bureau or the Commission determines, based on an independent review of the EA and any applicable mandatory consultation requirements imposed upon Federal agencies (*see* note above), that the proposal will have a significant environmental impact upon the quality of the human environment, it will so inform the applicant. The applicant will then have an opportunity to amend its application so as to reduce, minimize, or eliminate environmental problems. *See* § 1.1309. If the environmental problem is not eliminated, the Bureau will publish in the FEDERAL REGISTER a Notice of Intent (*see* § 1.1314) that EISs will be prepared (*see* §§ 1.1315 and 1.1317), or

(d) If the Bureau or Commission determines, based on an independent review of the EA, and any mandatory consultation requirements imposed upon Federal agencies (*see* the note to paragraph (b) of this section), that the proposal would not have a significant impact, it will make a finding of no significant impact. Thereafter, the application will be processed without further documentation of environmental effect. Pursuant to CEQ regulations, *see* 40 CFR 1501.4 and 1501.6, the applicant must provide the community notice of the Commission's finding of no significant impact.

*[51 FR 15000, Apr. 22, 1986; 51 FR 18889, May 23, 1986, as amended at 53 FR 28394, July 28, 1988]*

## § 1.1309 Application amendments.

Applicants are permitted to amend their applications to reduce, minimize, or eliminate potential environmental problems. Amendments shall be made electronically. As a routine matter, an applicant will be permitted to amend its application within thirty (30) days after the Commission or the Bureau informs the applicant that the proposal will have a significant impact upon the quality of the human environment (*see* § 1.1308(c)). The period of thirty (30) days may be extended upon a showing of good cause.

*[85 FR 85530, Dec. 29, 2020]*

## § 1.1310 Radiofrequency radiation exposure limits.

(a) Specific absorption rate (SAR) shall be used to evaluate the environmental impact of human exposure to radiofrequency (RF) radiation as specified in § 1.1307(b) of this part within the frequency range of 100 kHz to 6 GHz (inclusive).

(b) The SAR limits for occupational/controlled exposure are 0.4 W/kg, as averaged over the whole body, and a peak spatial-average SAR of 8 W/kg, averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the parts of the human body treated as extremities, such as hands, wrists, feet, ankles, and pinnae, where the peak spatial-average SAR limit for occupational/controlled exposure is 20 W/kg, averaged over any 10 grams of tissue (defined as a tissue volume in the shape of a cube). Exposure may be averaged over a time period not to exceed 6 minutes to determine compliance with occupational/controlled SAR limits.

ADD61

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 64 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...                47 CFR 1.1310(c)

(c)  The SAR limits for general population/uncontrolled exposure are 0.08 W/kg, as averaged over the whole body, and a peak spatial-average SAR of 1.6 W/kg, averaged over any 1 gram of tissue (defined as a tissue volume in the shape of a cube). Exceptions are the parts of the human body treated as extremities, such as hands, wrists, feet, ankles, and pinnae, where the peak spatial-average SAR limit is 4 W/kg, averaged over any 10 grams of tissue (defined as a tissue volume in the shape of a cube). Exposure may be averaged over a time period not to exceed 30 minutes to determine compliance with general population/ uncontrolled SAR limits.

(d)

(1)  Evaluation with respect to the SAR limits in this section must demonstrate compliance with both the whole-body and peak spatial-average limits using technically supported measurement or computational methods and exposure conditions in advance of authorization (licensing or equipment certification) and in a manner that facilitates independent assessment and, if appropriate, enforcement. Numerical computation of SAR must be supported by adequate documentation showing that the numerical method as implemented in the computational software has been fully validated; in addition, the equipment under test and exposure conditions must be modeled according to protocols established by FCC-accepted numerical computation standards or available FCC procedures for the specific computational method.

(2)  For operations within the frequency range of 300 kHz and 6 GHz (inclusive), the limits for maximum permissible exposure (MPE), derived from whole-body SAR limits and listed in Table 1 in paragraph (e)(1) of this section, may be used instead of whole-body SAR limits as set forth in paragraphs (a) through (c) of this section to evaluate the environmental impact of human exposure to RF radiation as specified in § 1.1307(b) of this part, except for portable devices as defined in § 2.1093 of this chapter as these evaluations shall be performed according to the SAR provisions in § 2.1093.

(3)  At operating frequencies above 6 GHz, the MPE limits listed in Table 1 in paragraph (e)(1) of this section shall be used in all cases to evaluate the environmental impact of human exposure to RF radiation as specified in § 1.1307(b) of this part.

(4)  Both the MPE limits listed in Table 1 in paragraph (e)(1) of this section and the SAR limits as set forth in paragraphs (a) through (c) of this section are for continuous exposure, that is, for indefinite time periods. Exposure levels higher than the limits are permitted for shorter exposure times, as long as the average exposure over a period not more than the specified averaging time in Table 1 in paragraph (e)(1) is less than (or equal to) the exposure limits. Detailed information on our policies regarding procedures for evaluating compliance with all of these exposure limits can be found in the most recent edition of FCC's *OET Bulletin 65,* "Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields," and its supplements, all available at the FCC's internet website: *https://www.fcc.gov/general/oet-bulletins-line,* and in the Office of Engineering and Technology (OET) Laboratory Division Knowledge Database (KDB) (*https://www.fcc.gov/kdb*).

Note to paragraphs (a) through (d): SAR is a measure of the rate of energy absorption due to exposure to RF electromagnetic energy. These SAR limits to be used for evaluation are based generally on criteria published by the American National Standards Institute (ANSI) for localized SAR in Section 4.2 of "IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," ANSI/IEEE Std C95.1–1992, copyright 1992 by the Institute of Electrical and Electronics Engineers, Inc., New

ADD62

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 65 of 134
**47 CFR Part 1 Subpart I (up to date as of 4/10/2023)**
**Procedures Implementing the National Environmental Policy Act...**

47 CFR 1.1310(e)

York, New York 10017. These criteria for SAR evaluation are similar to those recommended by the National Council on Radiation Protection and Measurements (NCRP) in "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," NCRP Report No. 86, Section 17.4.5, copyright 1986 by NCRP, Bethesda, Maryland 20814. Limits for whole body SAR and peak spatial-average SAR are based on recommendations made in both of these documents. The MPE limits in Table 1 are based generally on criteria published by the NCRP in "Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields," NCRP Report No. 86, Sections 17.4.1, 17.4.1.1, 17.4.2 and 17.4.3, copyright 1986 by NCRP, Bethesda, Maryland 20814. In the frequency range from 100 MHz to 1500 MHz, these MPE exposure limits for field strength and power density are also generally based on criteria recommended by the ANSI in Section 4.1 of "IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz," ANSI/IEEE Std C95.1−1992, copyright 1992 by the Institute of Electrical and Electronics Engineers, Inc., New York, New York 10017.

(e)

(1) Table 1 to § 1.1310(e)(1) sets forth limits for Maximum Permissible Exposure (MPE) to radiofrequency electromagnetic fields.

### Table 1 to § 1.1310(e)(1)—Limits for Maximum Permissible Exposure (MPE)

| Frequency range (MHz) | Electric field strength (V/m) | Magnetic field strength (A/m) | Power density (mW/cm$^2$) | Averaging time (minutes) |
|---|---|---|---|---|
| (i) Limits for Occupational/Controlled Exposure | | | | |
| 0.3–3.0 | 614 | 1.63 | *(100) | ≤6 |
| 3.0–30 | 1842/f | 4.89/f | *(900/f$^2$) | <6 |
| 30–300 | 61.4 | 0.163 | 1.0 | <6 |
| 300–1,500 | | | f/300 | <6 |
| 1,500–100,000 | | | 5 | <6 |
| (ii) Limits for General Population/Uncontrolled Exposure | | | | |
| 0.3–1.34 | 614 | 1.63 | *(100) | <30 |
| 1.34–30 | 824/f | 2.19/f | *(180/f$^2$) | <30 |
| 30–300 | 27.5 | 0.073 | 0.2 | <30 |
| 300–1,500 | | | f/1500 | <30 |
| 1,500–100,000 | | | 1.0 | <30 |

f = frequency in MHz. * = Plane-wave equivalent power density.

ADD63

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 66 of 134

**47 CFR Part 1 Subpart I (up to date as of 4/10/2023)**
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1310(e)(2)

(2) Occupational/controlled exposure limits apply in situations in which persons are exposed as a consequence of their employment provided those persons are fully aware of the potential for exposure and can exercise control over their exposure. The phrase *fully aware* in the context of applying these exposure limits means that an exposed person has received written and/or verbal information fully explaining the potential for RF exposure resulting from his or her employment. With the exception of *transient* persons, this phrase also means that an exposed person has received appropriate training regarding work practices relating to controlling or mitigating his or her exposure. In situations when an untrained person is transient through a location where occupational/controlled limits apply, he or she must be made aware of the potential for exposure and be supervised by trained personnel pursuant to § 1.1307(b)(2) of this part where use of time averaging is required to ensure compliance with the general population exposure limit. The phrase *exercise control* means that an exposed person is allowed and also knows how to reduce or avoid exposure by administrative or engineering work practices, such as use of personal protective equipment or time averaging of exposure.

(3) General population/uncontrolled exposure limits apply in situations in which the general public may be exposed, or in which persons who are exposed as a consequence of their employment may not be fully aware of the potential for exposure or cannot exercise control over their exposure. For example, RF sources intended for consumer use shall be subject to the limits for general population/ uncontrolled exposure in this section.

*[85 FR 18145, Apr. 1, 2020]*

## § 1.1311 Environmental information to be included in the environmental assessment (EA).

(a) The applicant shall submit an EA with each application that is subject to environmental processing (*see* § 1.1307). The EA shall contain the following information:

(1) For antenna towers and satellite earth stations, a description of the facilities as well as supporting structures and appurtenances, and a description of the site as well as the surrounding area and uses. If high intensity white lighting is proposed or utilized within a residential area, the EA must also address the impact of this lighting upon the residents.

(2) A statement as to the zoning classification of the site, and communications with, or proceedings before and determinations (if any) made by zoning, planning, environmental or other local, state or Federal authorities on matters relating to environmental effect.

(3) A statement as to whether construction of the facilities has been a source of controversy on environmental grounds in the local community.

(4) A discussion of environmental and other considerations which led to the selection of the particular site and, if relevant, the particular facility; the nature and extent of any unavoidable adverse environmental effects, and any alternative sites or facilities which have been or might reasonably be considered.

(5) Any other information that may be requested by the Bureau or Commission.

(6) If endangered or threatened species or their critical habitats may be affected, the applicant's analysis must utilize the best scientific and commercial data available, *see* 50 CFR 402.14(c).

ADD64

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 67 of 134
**47 CFR Part I Subpart I (up to date as of 4/10/2023)**
**Procedures Implementing the National Environmental Policy Act...**    47 CFR 1.1311(b)

(b)  The information submitted in the EA shall be factual (not argumentative or conclusory) and concise with sufficient detail to explain the environmental consequences and to enable the Commission or Bureau, after an independent review of the EA, to reach a determination concerning the proposal's environmental impact, if any. The EA shall deal specifically with any feature of the site which has special environmental significance (e.g., wilderness areas, wildlife preserves, natural migration paths for birds and other wildlife, and sites of historic, architectural, or archeological value). In the case of historically significant sites, it shall specify the effect of the facilities on any district, site, building, structure or object listed, or eligible for listing, in the National Register of Historic Places. It shall also detail any substantial change in the character of the land utilized (e.g., deforestation, water diversion, wetland fill, or other extensive change of surface features). In the case of wilderness areas, wildlife preserves, or other like areas, the statement shall discuss the effect of any continuing pattern of human intrusion into the area (e.g., necessitated by the operation and maintenance of the facilities).

(c)  The EA shall also be accompanied with evidence of site approval which has been obtained from local or Federal land use authorities.

(d)  To the extent that such information is submitted in another part of the application, it need not be duplicated in the EA, but adequate cross-reference to such information shall be supplied.

(e)  An EA need not be submitted to the Commission if another agency of the Federal Government has assumed responsibility for determining whether of the facilities in question will have a significant effect on the quality of the human environment and, if it will, for invoking the environmental impact statement process.

*[51 FR 15000, Apr. 22, 1986, as amended at 51 FR 18889, May 23, 1986; 53 FR 28394, July 28, 1988]*

## § 1.1312 Facilities for which no preconstruction authorization is required.

(a)  In the case of facilities for which no Commission authorization prior to construction is required by the Commission's rules and regulations the licensee or applicant shall initially ascertain whether the proposed facility may have a significant environmental impact as defined in § 1.1307 of this part or is categorically excluded from environmental processing under § 1.1306 of this part.

(b)  If a facility covered by paragraph (a) of this section may have a significant environmental impact, the information required by § 1.1311 shall be submitted electronically by the licensee or applicant and ruled on by the Commission, and environmental processing (if invoked) shall be completed, see § 1.1308, prior to the initiation of construction of the facility.

(c)  If a facility covered by paragraph (a) of this section is categorically excluded from environmental processing, the licensee or applicant may proceed with construction and operation of the facility in accordance with the applicable licensing rules and procedures.

(d)  If, following the initiation of construction under this section, the licensee or applicant discovers that the proposed facility may have a significant environmental effect, it shall immediately cease construction which may have that effect, and submit the information required by § 1.1311 of this part. The Commission shall rule on that submission and complete further environmental processing (if invoked), see § 1.1308 of this part, before such construction is resumed.

(e)  Paragraphs (a) through (d) of this section shall not apply to the construction of mobile stations.



USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 68 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1313

[55 FR 20396, May 16, 1990, as amended at 56 FR 13414, Apr. 2, 1991; 83 FR 19458, May 3, 2018; 84 FR 59567, Nov. 5, 2019; 85 FR 85531, Dec. 29, 2020]

## § 1.1313 Objections.

(a) In the case of an application to which section 309(b) of the Communications Act applies, objections based on environmental considerations shall be filed electronically as petitions to deny. If the interested person is unable to file electronically or if filing electronically would be unreasonably burdensome, such person may submit the petition by mail, with a request for waiver under § 1.1304(b).

(b) Informal objections which are based on environmental considerations must be filed electronically prior to grant of the construction permit, or prior to authorization for facilities that do not require construction permits, or pursuant to the applicable rules governing services subject to lotteries. If the interested person is unable to file electronically or if filing electronically would be unreasonably burdensome, such person may submit the objection by mail, with a request for waiver under § 1.1304(b).

[85 FR 85531, Dec. 29, 2020]

## § 1.1314 Environmental impact statements (EISs).

(a) Draft Environmental Impact Statements (DEISs) (§ 1.1315) and Final Environmental Impact Statements (FEISs) (referred to collectively as EISs) (§ 1.1317) shall be prepared by the Bureau responsible for processing the proposal when the Commission's or the Bureau's analysis of the EA (§ 1.1308) indicates that the proposal will have a significant effect upon the environment and the matter has not been resolved by an amendment.

(b) As soon as practically feasible, the Bureau will publish in the FEDERAL REGISTER a Notice of Intent to prepare EISs. The Notice shall briefly identify the proposal, concisely describe the environmental issues and concerns presented by the subject application, and generally invite participation from affected or involved agencies, authorities and other interested persons.

(c) The EISs shall not address non-environmental considerations. To safeguard against repetitive and unnecessarily lengthy documents, the Statements, where feasible, shall incorporate by reference material set forth in previous documents, with only a brief summary of its content. In preparing the EISs, the Bureau will identify and address the significant environmental issues and eliminate the insignificant issues from analysis.

(d) To assist in the preparation of the EISs, the Bureau may request further information from the applicant, interested persons and agencies and authorities, which have jurisdiction by law or which have relevant expertise. The Bureau may direct that technical studies be made by the applicant and that the applicant obtain expert opinion concerning the potential environmental problems and costs associated with the proposed action, as well as comparative analyses of alternatives. The Bureau may also consult experts in an effort to identify measures that could be taken to minimize the adverse effects and alternatives to the proposed facilities that are not, or are less, objectionable. The Bureau may also direct that objections be raised with appropriate local, state or Federal land use agencies or authorities (if their views have not been previously sought).

(e) The Bureau responsible for processing the particular application and, thus, preparing the EISs shall draft supplements to Statements where significant new circumstances occur or information arises relevant to environmental concerns and bearing upon the application.

ADD66

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 69 of 134

**47 CFR Part 1 Subpart I (up to date as of 4/10/2023)**
Procedures Implementing the National Environmental Policy Act…                    47 CFR 1.1314(f)

(f)    The Application, the EA, the DEIS, and the FEIS and all related documents, including the comments filed by the public and any agency, shall be part of the administrative record and will be routinely available for public inspection. All documents and comments shall be filed electronically.

(g)    If EISs are to be prepared, the applicant must provide the community with notice of the availability of environmental documents and the scheduling of any Commission hearings in that action.

(h)    The timing of agency action with respect to applications subject to EISs is set forth in 40 CFR 1506.10. No decision shall be made until ninety (90) days after the Notice of Availability of the Draft Environmental Impact Statement is published in the Federal Register, and thirty (30) days after the Notice of Availability of the Final Environmental Impact Statement is published in the FEDERAL REGISTER, which time period may run concurrently, *See* 40 CFR 1506.10(c); *see also* §§ 1.1315(b) and 1.1317(b).

(i)    Guidance concerning preparation of the Draft and Final Environmental Statements is set out in 40 CFR part 1502.

*[51 FR 15000, Apr. 22, 1986, as amended at 53 FR 28394, July 28, 1988; 85 FR 85531, Dec. 29, 2020]*

## § 1.1315 The Draft Environmental Impact Statement (DEIS); Comments.

(a)    The DEIS shall include:

(1)    A concise description of the proposal, the nature of the area affected, its uses, and any specific feature of the area that has special environmental significance;

(2)    An analysis of the proposal, and reasonable alternatives exploring the important consequent advantages and/or disadvantages of the action and indicating the direct and indirect effects and their significance in terms of the short and long-term uses of the human environment.

(b)    When a DEIS and supplements, if any, are prepared, the Commission shall file the Statement with the Office of Federal Activities, Environmental Protection Agency, consistent with its procedures. Public Notice of the availability of the DEIS will be published in the FEDERAL REGISTER by the Environmental Protection Agency.

(c)    When copies or summaries of the DEIS are sent to the Environmental Protection Agency, the copies or summaries will be electronically mailed with a request for comment to Federal agencies having jurisdiction by law or special expertise, to the Council on Environmental Quality, to the applicant, to individuals, groups and state and local agencies known to have an interest in the environmental consequences of a grant, and to any other person who has requested a copy. If an interested person lacks access to electronic mail and requests a hard copy or summary of the DEIS, it must be provided by mail.

(d)    Any person or agency may comment on the DEIS and the environmental effect of the proposal described therein within 45 days after notice of the availability of the statement is published in the FEDERAL REGISTER. A copy of those comments shall be electronically mailed to the applicant by the person who files them pursuant to § 1.47 and filed electronically with the Commission. If the interested person is unable to file electronically or mail the copy electronically, or if it would be unreasonably burdensome to do so, such person may submit the comments to the Commission and the applicant by mail, with a request for waiver under § 1.1304(b). If a person submitting comments is especially qualified in any way to comment on the environmental impact of the facilities, a statement of his or her qualifications shall be set out in the comments. In addition, comments submitted by an agency shall identify the person(s) who prepared them.

USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 70 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...                47 CFR 1.1315(e)

(e) The applicant may electronically file reply comments within 15 days after the time for filing comments has expired. Reply comments shall be filed with the Commission and served by the applicant on persons or agencies which filed comments.

(f) The preparation of a DEIS and the request for comments shall not open the application to attack on other grounds.

*[51 FR 15000, Apr. 22, 1986, as amended at 85 FR 85531, Dec. 29, 2020]*

## § 1.1317 The Final Environmental Impact Statement (FEIS).

(a) After receipt of comments and reply comments, the Bureau will prepare a FEIS, which shall include a summary of the comments, and a response to the comments, and an analysis of the proposal in terms of its environmental consequences, and any reasonable alternatives, and recommendations, if any, and shall cite the Commission's internal appeal procedures (*See 47 CFR 1.101–1.117*).

(b) The FEIS and any supplements will be distributed and published in the same manner as specified in § 1.1315. Copies of the comments and reply comments, or summaries thereof where the record is voluminous, shall be attached to the FEIS.

*[51 FR 15000, Apr. 22, 1986, as amended at 76 FR 70909, Nov. 16, 2011]*

## § 1.1319 Consideration of the environmental impact statements.

(a) If the action is designated for hearing:

(1) In rendering an initial decision, the presiding officer (other than the Commission) shall use the FEIS in considering the environmental issues, together with all other non-environmental issues.

(2) When the Commission serves as the presiding officer or upon its review of an initial decision, the Commission will consider and assess all aspects of the FEIS and will render its decision, giving due consideration to the environmental and nonenvironmental issues.

(b) In all non-hearing matters, the Commission, as part of its decision-making process, will review the FEIS, along with other relevant issues, to ensure that the environmental effects are specifically assessed and given comprehensive consideration.

*[51 FR 15000, Apr. 22, 1986, as amended at 62 FR 4171, Jan. 29, 1997; 85 FR 63183, Oct. 6, 2020]*

## § 1.1320 Review of Commission undertakings that may affect historic properties.

(a) *Review of Commission undertakings.* Any Commission undertaking that has the potential to cause effects on historic properties, unless excluded from review pursuant to paragraph (b) of this section, shall be subject to review under section 106 of the National Historic Preservation Act, as amended, 54 U.S.C. 306108, by applying—

(1) The procedures set forth in regulations of the Advisory Council on Historic Preservation, 36 CFR 800.3–800.13, or

(2) If applicable, a program alternative established pursuant to 36 CFR 800.14, including but not limited to the following:

ADD68

    (i)   The Nationwide Programmatic Agreement for the Collocation of Wireless Antennas, as amended, Appendix B of this part.

    (ii)   The Nationwide Programmatic Agreement for Review of Effects on Historic Properties for Certain Undertakings, Appendix C of this part.

    (iii)   The Program Comment to Tailor the Federal Communications Commission's Section 106 Review for Undertakings Involving the Construction of Positive Train Control Wayside Poles and Infrastructure, 79 FR 30861 (May 29, 2014).

(b)   *Exclusions.* The following categories of undertakings are excluded from review under this section:

   (1)   *Projects reviewed by other agencies.* Undertakings for which an agency other than the Commission is the lead Federal agency pursuant to 36 CFR 800.2(a)(2).

   (2)   *Projects subject to program alternatives.* Undertakings excluded from review under a program alternative established pursuant to 36 CFR 800.14, including those listed in paragraph (a)(2) of this section.

   (3)   *Replacement utility poles.* Construction of a replacement for an existing structure where all the following criteria are satisfied:

    (i)   The original structure—

      (A)   Is a pole that can hold utility, communications, or related transmission lines;

      (B)   Was not originally erected for the sole or primary purpose of supporting antennas that operate pursuant to the Commission's spectrum license or authorization; and

      (C)   Is not itself a historic property.

    (ii)   The replacement pole—

      (A)   Is located no more than 10 feet away from the original pole, based on the distance between the centerpoint of the replacement pole and the centerpoint of the original pole; *provided* that construction of the replacement pole in place of the original pole entails no new ground disturbance (either laterally or in depth) outside previously disturbed areas, including disturbance associated with temporary support of utility, communications, or related transmission lines. For purposes of this paragraph, "ground disturbance" means any activity that moves, compacts, alters, displaces, or penetrates the ground surface of previously undisturbed soils;

      (B)   Has a height that does not exceed the height of the original pole by more than 5 feet or 10 percent of the height of the original pole, whichever is greater; and

      (C)   Has an appearance consistent with the quality and appearance of the original pole.

   (4)   *Collocations on buildings and other non-tower structures.* The mounting of antennas (including associated equipment such as wiring, cabling, cabinets, or backup power) on buildings or other non-tower structures where the deployment meets the following conditions:

    (i)   There is an existing antenna on the building or structure;

    (ii)   One of the following criteria is met:

ADD69

USCA Case #22-1337      Document #2012869      Filed: 08/16/2023      Page 72 of 134

47 CFR Part 1 Subpart I (up to date as of 4/10/2023)
Procedures Implementing the National Environmental Policy Act...

47 CFR 1.1320(b)(4)(ii)(A)

(A) *Non-Visible Antennas.* The new antenna is not visible from any adjacent streets or surrounding public spaces and is added in the same vicinity as a pre-existing antenna;

(B) *Visible Replacement Antennas.* The new antenna is visible from adjacent streets or surrounding public spaces, provided that

  (1) It is a replacement for a pre-existing antenna,

  (2) The new antenna will be located in the same vicinity as the pre-existing antenna,

  (3) The new antenna will be visible only from adjacent streets and surrounding public spaces that also afford views of the pre-existing antenna,

  (4) The new antenna is not more than 3 feet larger in height or width (including all protuberances) than the pre-existing antenna, and

  (5) No new equipment cabinets are visible from the adjacent streets or surrounding public spaces; or

(C) *Other Visible Antennas.* The new antenna is visible from adjacent streets or surrounding public spaces, provided that

  (1) It is located in the same vicinity as a pre-existing antenna,

  (2) The new antenna will be visible only from adjacent streets and surrounding public spaces that also afford views of the pre-existing antenna,

  (3) The pre-existing antenna was not deployed pursuant to the exclusion in this paragraph,

  (4) The new antenna is not more than three feet larger in height or width (including all protuberances) than the pre-existing antenna, and

  (5) No new equipment cabinets are visible from the adjacent streets or surrounding public spaces;

(iii) The new antenna complies with all zoning conditions and historic preservation conditions applicable to existing antennas in the same vicinity that directly mitigate or prevent effects, such as camouflage or concealment requirements;

(iv) The deployment of the new antenna involves no new ground disturbance; and

(v) The deployment would otherwise require the preparation of an Environmental Assessment under 1.1304(a)(4) solely because of the age of the structure.

Note 1 to paragraph (b)(4): A non-visible new antenna is in the "same vicinity" as a pre-existing antenna if it will be collocated on the same rooftop, façade or other surface. A visible new antenna is in the "same vicinity" as a pre-existing antenna if it is on the same rooftop, façade, or other surface and the centerpoint of the new antenna is within ten feet of the centerpoint of the pre-existing antenna. A deployment causes no new ground disturbance when the depth and width of previous disturbance exceeds the proposed construction depth and width by at least two feet.



USCA Case #22-1337    Document #2012869    Filed: 08/16/2023    Page 73 of 134

**47 CFR Part 1 Subpart I (up to date as of 4/10/2023)**
**Procedures Implementing the National Environmental Policy Act...**

47 CFR 1.1320(c)

(c) *Responsibilities of applicants.* Applicants seeking Commission authorization for construction or modification of towers, collocation of antennas, or other undertakings shall take the steps mandated by, and comply with the requirements set forth in, Appendix C of this part, sections III–X, or any other applicable program alternative.

(d) *Definitions.* For purposes of this section, the following definitions apply:

*Antenna* means an apparatus designed for the purpose of emitting radiofrequency (RF) radiation, to be operated or operating from a fixed location pursuant to Commission authorization, for the transmission of writing, signs, signals, data, images, pictures, and sounds of all kinds, including the transmitting device and any on-site equipment, switches, wiring, cabling, power sources, shelters or cabinets associated with that antenna and added to a tower, structure, or building as part of the original installation of the antenna. For most services, an antenna will be mounted on or in, and is distinct from, a supporting structure such as a tower, structure or building. However, in the case of AM broadcast stations, the entire tower or group of towers constitutes the antenna for that station. For purposes of this section, the term antenna does not include unintentional radiators, mobile stations, or devices authorized under part 15 of this title.

*Applicant* means a Commission licensee, permittee, or registration holder, or an applicant or prospective applicant for a wireless or broadcast license, authorization or antenna structure registration, and the duly authorized agents, employees, and contractors of any such person or entity.

*Collocation* means the mounting or installation of an antenna on an existing tower, building or structure for the purpose of transmitting and/or receiving radio frequency signals for communications purposes, whether or not there is an existing antenna on the structure.

*Tower* means any structure built for the sole or primary purpose of supporting Commission-licensed or authorized antennas, including the on-site fencing, equipment, switches, wiring, cabling, power sources, shelters, or cabinets associated with that tower but not installed as part of an antenna as defined herein.

*Undertaking* means a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of the Commission, including those requiring a Commission permit, license or approval. Maintenance and servicing of towers, antennas, and associated equipment are not deemed to be undertakings subject to review under this section.

[82 FR 58758, Dec. 14, 2017]

ADD71

## 47 CFR 17.4

This document is current through the Apr. 10, 2023 issue of the Federal Register, with the exception of the amendments appearing at 88 FR 21424 and 88 FR 21086.

*Code of Federal Regulations* > *Title 47 Telecommunication* > *Chapter I — Federal Communications Commission* > *Subchapter A — General* > *Part 17 — Construction, Marking, and Lighting of Antenna Structures* > *Subpart A — General Information*

# § 17.4 Antenna structure registration.

**(a)** The owner of any proposed or existing antenna structure that requires notice of proposed construction to the Federal Aviation Administration (FAA) due to physical obstruction must register the structure with the Commission. (See § 17.7 for FAA notification requirements.) This includes those structures used as part of stations licensed by the Commission for the transmission of radio energy, or to be used as part of a cable television head end system. If a Federal Government antenna structure is to be used by a Commission licensee, the structure must be registered with the Commission. If the FAA exempts an antenna structure from notification, it is exempt from the requirement that it register with the Commission. (See § 17.7(e) for exemptions to FAA notification requirements.)

**(1)** For a proposed antenna structure or alteration of an existing antenna structure, the owner must register the structure prior to construction or alteration.

**(2)** For a structure that did not originally fall under the definition of "antenna structure," the owner must register the structure prior to hosting a Commission licensee.

**(b)** Except as provided in paragraph (e) of this section, each owner of an antenna structure described in paragraph (a) of this section must electronically file FCC Form 854 with the Commission. Additionally, each owner of a proposed structure referred to in paragraph (a) of this section must submit a valid FAA determination of "no hazard." In order to be considered valid by the Commission, the FAA determination of "no hazard" must not have expired prior to the date on which FCC Form 854 is received by the Commission. The height of the structure will be the highest point of the structure including any obstruction lighting or lightning arrester. If an antenna structure is not required to be registered under paragraph (a) of this section and it is voluntarily registered with the Commission after October 24, 2014, the registrant must note on FCC Form 854 that the registration is voluntary. Voluntarily registered antenna structures are not subject to the lighting and marking requirements contained in this part.

**(c)** Each prospective applicant must complete the environmental notification process described in this paragraph, except as specified in paragraph (c)(1) of this section.

**(1)** Exceptions from the environmental notification process. Completion of the environmental notification process is not required when FCC Form 854 is submitted solely for the following purposes:

**(i)** For notification only, such as to report a change in ownership or contact information, or the dismantlement of an antenna structure;

**(ii)** For a reduction in height of an antenna structure or an increase in height that does not constitute a substantial increase in size as defined in paragraph I(E)(1)–(3) of appendix B to part 1 of this chapter, provided that there is no construction or excavation more than 30 feet beyond the existing antenna structure property;

**(iii)** For removal of lighting from an antenna structure or adoption of a more preferred or equally preferred lighting style. For this purpose lighting styles are ranked as follows (with the most preferred lighting style listed first and the least preferred listed last): no lights; FAA Lighting Styles

47 CFR 17.4

that do not involve use of red steady lights; and FAA Lighting Styles that involve use of red steady lights. A complete description of each FAA Lighting Style and the manner in which it is to be deployed can be found in the current version of FAA, U.S. Dept. of Transportation, Advisory Circular: Obstruction Marking and Lighting, AC 70/7460;

**(iv)** For replacement of an existing antenna structure at the same geographic location that does not require an Environmental Assessment (EA) under § 1.1307(a) through (d) of this chapter, provided the new structure will not use a less preferred lighting style, there will be no substantial increase in size as defined in paragraph I(C)(1)-(3) of Appendix B to part 1 of this chapter, and there will be no construction or excavation more than 30 feet beyond the existing antenna structure property;

**(v)** For any other change that does not alter the physical structure, lighting, or geographic location of an existing structure;

**(vi)** For replacement of an existing antenna structure at the same geographic location that does not require an Environmental Assessment (EA) under § 1.1307(a) through (d) of this chapter, provided the new structure will not use a less preferred lighting style, there will be no substantial increase in size as defined in paragraph I(E)(1)-(3) of appendix B to part 1 of this chapter, and there will be no construction or excavation more than 30 feet beyond the existing antenna structure property;

**(vii)** For the construction or deployment of an antenna structure that will:

**(A)** Be in place for no more than 60 days,

**(B)** Requires notice of construction to the FAA,

**(C)** Does not require marking or lighting under FAA regulations,

**(D)** Will be less than 200 feet in height above ground level, and

**(E)** Will either involve no excavation or involve excavation only where the depth of previous disturbance exceeds the proposed construction depth (excluding footings and other anchoring mechanisms) by at least two feet. An applicant that relies on this exception must wait 30 days after removal of the antenna structure before relying on this exception to deploy another antenna structure covering substantially the same service area.

**(2)** Commencement of the environmental notification process. The prospective applicant shall commence the environmental notification process by filing information about the proposed antenna structure with the Commission. This information shall include, at a minimum, all of the information required on FCC Form 854 regarding ownership and contact information, geographic location, and height, as well as the type of structure and anticipated lighting. The Wireless Telecommunications Bureau may utilize a partially completed FCC Form 854 to collect this information.

**(3)** Local notice. The prospective applicant must provide local notice of the proposed new antenna structure or modification of an existing antenna structure through publication in a newspaper of general circulation or other appropriate means, such as through the public notification provisions of the relevant local zoning process. The local notice shall contain all of the descriptive information as to geographic location, configuration, height and anticipated lighting specifications reflected in the submission required pursuant to paragraph (c)(2) of this section. It must also provide information as to the procedure for interested persons to file Requests for environmental processing pursuant to §§ 1.1307(c) and 1.1313(b) of this chapter, including any assigned file number, and state that such Requests may only raise environmental concerns.

**(4)** National notice. On or after the local notice date provided by the prospective applicant, the Commission shall post notification of the proposed construction on its Web site. This posting shall include the information contained in the initial filing with the Commission or a link to such information. The posting shall remain on the Commission's Web site for a period of 30 days.

**(5)** Requests for environmental processing. Any Request filed by an interested person pursuant to §§ 1.1307(c) and 1.1313(b) of this chapter must be received by the Commission no later than 30 days

after the proposed antenna structure goes on notice pursuant to paragraph (c)(4) of this section. The Wireless Telecommunications Bureau shall establish by public notice the process for filing Requests for environmental processing and responsive pleadings consistent with the following provisions.

(i) Service and pleading cycle. The interested person or entity shall serve a copy of its Request on the prospective ASR applicant pursuant to § 1.47 of this chapter. Oppositions may be filed no later than 10 days after the time for filing Requests has expired. Replies to oppositions may be filed no later than 5 days after the time for filing oppositions has expired. Oppositions shall be served upon the Requester, and replies shall be served upon the prospective applicant.

(ii) Content. An Environmental Request must state why the interested person or entity believes that the proposed antenna structure or physical modification of an existing antenna structure may have a significant impact on the quality of the human environment for which an Environmental Assessment must be considered by the Commission as required by § 1.1307 of this chapter, or why an Environmental Assessment submitted by the prospective Antenna Structure Registration (ASR) applicant does not adequately evaluate the potentially significant environmental effects of the proposal. The Request must be submitted as a written petition filed electronically, setting forth in detail the reasons supporting Requester's contentions. If the filer is unable to submit electronically, or if filing electronically would be unreasonably burdensome, the Request may be submitted by mail, with a request for waiver under § 1.1304(b) of this chapter.

(6) Amendments. The prospective applicant must file an amendment to report any substantial change in the information provided to the Commission. An amendment will not require further local or national notice if the only reported change is a reduction in the height of the proposed new or modified antenna structure; if proposed lighting is removed or changed to a more preferred or equally preferred lighting style as set forth in paragraph (c)(1)(iii) of this section; or if the amendment reports only administrative changes that are not subject to the requirements specified in this paragraph. All other changes to the physical structure, lighting, or geographic location data for a proposed registered antenna structure require additional local and national notice and a new period for filing Requests pursuant to paragraphs (c)(3), (c)(4), and (c)(5) of this section.

(7) Environmental Assessments. If an Environmental Assessment (EA) is required under § 1.1307 of this chapter, the antenna structure registration applicant shall attach the EA to its environmental submission, regardless of any requirement that the EA also be attached to an associated service-specific license or construction permit application. The contents of an EA are described in §§ 1.1308 and 1.1311 of this chapter. The EA may be provided either with the initial environmental submission or as an amendment. If the EA is submitted as an amendment, the Commission shall post notification on its Web site for another 30 days pursuant to paragraph (c)(4) of this section and accept additional Requests pursuant to paragraph (c)(5) of this section. However, additional local notice pursuant to paragraph (c)(3) of this section shall not be required unless information has changed pursuant to paragraph (c)(6) of this section. The applicant shall serve a copy of the EA upon any party that has previously filed a Request pursuant to paragraph (c)(5) of this section.

(8) Disposition. The processing Bureau shall resolve all environmental issues, in accordance with the environmental regulations (*47 CFR 1.1301* through *1.1319*) specified in part 1 of this chapter, before the tower owner, or the first tenant licensee acting on behalf of the owner, may complete the antenna structure registration application. In a case where no EA is submitted, the Bureau shall notify the applicant whether an EA is required under § 1.1307(c) or (d) of this chapter. In a case where an EA is submitted, the Bureau shall either grant a Finding of No Significant Impact (FONSI) or notify the applicant that further environmental processing is required pursuant to § 1.1308 of this chapter. Upon filing the completed antenna structure registration application, the applicant shall certify that the construction will not have a significant environmental impact, unless an Environmental Impact Statement is prepared pursuant to § 1.1314 of this chapter.

(9) Transition rule. An antenna structure registration application that is pending with the Commission as of the effective date of this paragraph (c) shall not be required to complete the environmental

47 CFR 17.4

notification process set forth in this paragraph. The Commission will publish a document in the Federal Register announcing the effective date. However, if such an application is amended in a manner that would require additional notice pursuant to paragraph (c)(6) of this section, then such notice shall be required.

**(d)** If a final FAA determination of "no hazard" is not submitted along with FCC Form 854, processing of the registration may be delayed or disapproved.

**(e)** If the owner of the antenna structure cannot file FCC Form 854 because it is subject to a denial of Federal benefits under the Anti-Drug Abuse Act of 1988, *21 U.S.C. 862*, the first tenant licensee authorized to locate on the structure (excluding tenants that no longer occupy the structure) must register the structure electronically using FCC Form 854, and provide a copy of the Antenna Structure Registration (FCC Form 854R) to the owner. The owner remains responsible for providing to all tenant licensees and permittees notification that the structure has been registered, consistent with paragraph (f) of this section, and for posting the registration number as required by paragraph (g) of this section.

**(f)** The Commission shall issue to the registrant FCC Form 854R, Antenna Structure Registration, which assigns a unique Antenna Structure Registration Number. The antenna structure owner shall immediately provide to all tenant licensees and permittees notification that the structure has been registered, along with either a copy of Form 854R or the Antenna Structure Registration Number and a link to the FCC antenna structure website: http:// wireless.fcc.gov/antenna/. This notification must be done electronically.

**(g)** Except as described in paragraph (h) of this section, the Antenna Structure Registration Number must be displayed so that it is conspicuously visible and legible from the publicly accessible area nearest the base of the antenna structure along the publicly accessible roadway or path. Where an antenna structure is surrounded by a perimeter fence, or where the point of access includes an access gate, the Antenna Structure Registration Number should be posted on the perimeter fence or access gate. Where multiple antenna structures having separate Antenna Structure Registration Numbers are located within a single fenced area, the Antenna Structure Registration Numbers must be posted both on the perimeter fence or access gate and near the base of each antenna structure. If the base of the antenna structure has more than one point of access, the Antenna Structure Registration Number must be posted so that it is visible at the publicly accessible area nearest each such point of access. Materials used to display the Antenna Structure Registration Number must be weather-resistant and of sufficient size to be easily seen where posted.

**(h)** The owner is not required to post the Antenna Structure Registration Number in cases where a federal, state, or local government entity provides written notice to the owner that such a posting would detract from the appearance of a historic landmark. In this case, the owner must make the Antenna Structure Registration Number available to representatives of the Commission, the FAA, and the general public upon reasonable demand.

**(i)** Absent Commission specification, the painting and lighting specifications recommended by the FAA are mandatory (see § 17.23). However, the Commission may specify painting and/or lighting requirements for each antenna structure registration in addition to or different from those specified by the FAA.

**(j)** Any change or correction in the overall height of one foot or greater or coordinates of one second or greater in longitude or latitude of a registered antenna structure requires prior approval from the FAA and modification of the existing registration with the Commission.

**(k)** Any change in the marking and lighting that varies from the specifications described on any antenna structure registration requires prior approval from the FAA and the Commission.

(Approved by the Office of Management and Budget under control numbers 3060-0139 and 3060-0798.)

(Approved by the Office of Management and Budget under control number 3060-0645.)

## Statutory Authority

47 CFR 17.4

Secs. 4, *303*, 48 Stat. 1066, 1082, as amended; *47 U.S.C. 154*, *303*. Interpret or apply secs. 301, 309, *48 Stat. 1081*, 1085 as amended; *47 U.S.C. 301*, *309*.

*Authority Note Applicable to 47 CFR Ch. I, Subch. A, Pt. 17*

## History

[32 FR 11268, Aug. 3, 1967, as amended at 34 FR 6481, Apr. 15, 1969; *42 FR 54823*, Oct. 11, 1977; *46 FR 10916*, Feb. 5, 1981; *48 FR 51917*, Nov. 15, 1983; *61 FR 4359*, 4362, Feb. 6, 1996; *77 FR 3935*, 3953, Jan. 26, 2012; *77 FR 36177*, June 18, 2012; *79 FR 56968*, 56985, Sept. 24, 2014; *80 FR 1238*, 1270, Jan. 8, 2015; *80 FR 37552*, July 1, 2015; *85 FR 85524*, 85532, Dec. 29, 2020]

Annotations

## Notes

[EFFECTIVE DATE NOTE:

 *80 FR 1238* , 1270, Jan. 8, 2015, amended paragraph (c), effective Feb. 9, 2015;  *79 FR 56968* , 56985, Sept. 24, 2014, amended this section, and  *80 FR 37552*, July 1, 2015, provides the amendments to  *47 CFR 17.4* published at  *79 FR 56968*  is effective July 1, 2015; *85 FR 85524*, 85532, Dec. 29, 2020, revised this section, effective June 29, 2021.]

Notes to Decisions

**Communications Law: Broadcasting: Licensing: Allocation Methods: General Overview**

**Communications Law: Federal Acts: Communications Act: General Overview**

**Communications Law: Federal Acts: Communications Act: Penalties**

**Transportation Law: Air Transportation: Air Traffic Control: Procedures**

**Transportation Law: Air Transportation: Airports: Airport Hazards**

**Transportation Law: Air Transportation: Airspace: General Overview**

**Transportation Law: Air Transportation: Personnel: Flight Crews**

**Transportation Law: Air Transportation: U.S. Federal Aviation Administration: Duties & Powers**

**Communications Law: Broadcasting: Licensing: Allocation Methods: General Overview**

*Big Stone Broad., Inc. v. Lindbloom, 161 F. Supp. 2d 1009, 2001 U.S. Dist. LEXIS 14984 (D.S.D. 2001).*

***Overview:*** *A state agency was enjoined from acting to prohibit federal agency determinations of "no hazard" to air navigation in connection with radio broadcast towers.*

• According to its own guidelines, *47 C.F.R. § 17.4(b)*, the Federal Communications Commission (FCC) can only authorize the construction of a tower if the applicant provides the FCC with a "no hazard" determination from the Federal Aviation Administration. *Go To Headnote*

*Reminga v. United States, 15 Av. Cas. (CCH) P 17442, 448 F. Supp. 445, 15 Av. Cas. (CCH) ¶ 17442, 1978 U.S. Dist. LEXIS 20043 (W.D. Mich. 1978)*, aff'd, *631 F.2d 449, 1980 U.S. App. LEXIS 13482 (6th Cir. 1980)*.

***Overview:*** *United States was negligent in distributing air maps with a wrong placement of a television tower that resulted in foreseeable risk to pilots such as decedents and its failure to regulate was not within discretionary function exception of FTCA.*

- The Federal Aviation Administration (FAA) is limited in its authority to control the construction of broadcast towers. The FAA is authorized to conduct aeronautical studies to determine the effect of a proposed tower on air navigation. 14 C.F.R. § 71.31. If the FAA determines that the antenna presents no hazard, then the Federal Communications Commission (FCC) will proceed to determine the application for radio station authorization without further considering its effect upon air navigation, *47 C.F.R. § 17.4(d)(1972)*. If the FAA determines that the tower will be a hazard, the FCC will take further appropriate action. *47 C.F.R. § 17.4(e)(1972)*. Thus although neither the FAA nor the FCC is authorized to prohibit the construction of such a tower per se, the FCC is authorized to determine whether a license for the use of such a tower for radio broadcasting should be granted, and included within such a determination is whether the tower has been found by the FAA to be a hazard to navigation. Assuming that the tower is intended to be used for radio and/or television broadcasting, such a denial of a broadcasting license by the FCC on the basis of the FAA hazard determination is in effect a denial of construction of the tower by the FCC. *Go To Headnote*

**Communications Law: Federal Acts: Communications Act: General Overview**

*CTIA - The Wireless Ass'n v. FCC, 466 F.3d 105, 373 U.S. App. D.C. 259, 2006 U.S. App. LEXIS 24256 (D.C. Cir. 2006)*.

***Overview:*** *NPA Order, 20 F.C.C.R. 1073, was not arbitrary or capricious in finding the FCC's registration process and NEPA approval authority made telecommunications tower construction an NHPA § 106, 16 U.S.C.S. § 470f undertaking; deference to Advisory Council on Historic Preservation's reasonable interpretation of NHPA § 106 was not arbitrary or capricious.*

- Discussing its tower registration regulations implemented pursuant to § 303(q) of the Communications Act of 1934, in the National Preservation Act Order, *20 F.C.C.R. at 1084*, para. 27, n.53 (citing *47 U.S.C.S. § 303(q)*; *47 C.F.R. §§ 17.4*, *17.7*), the Federal Communication Commission has concluded that its tower registration process provides a permissible means by which the Commission may assure, prior to construction, that towers do not pose a risk to air safety. Section 17.7 of the Commission's regulations requires a party seeking to build a tower to consult with the Federal Aviation Administration (FAA) if the proposed tower meets certain height and location criteria. *47 C.F.R. § 17.7*. An owner of such a proposed tower must then register the structure with the Commission. *47 C.F.R. § 17.4(a)*. Subject to certain exceptions, an owner must submit a valid FAA determination of "no hazard" as part of the registration request. § 17.4(b). If the owner does not or cannot submit a "no hazard" determination, processing of the registration may be delayed or disapproved. § 17.4(d). *Go To Headnote*

- The Federal Communication Commission (FCC) has chosen, through its registration regulations, to grant approval of a tower registration if it receives a "no hazard" determination from the Federal Aviation Administration. *47 C.F.R. § 17.4(d)*. If it does not the FCC's regulations allow the Commission in its discretion to delay or disapprove a registration. *Go To Headnote*

*Big Stone Broad., Inc. v. Lindbloom, 161 F. Supp. 2d 1009, 2001 U.S. Dist. LEXIS 14984 (D.S.D. 2001)*.

***Overview:*** *A state agency was enjoined from acting to prohibit federal agency determinations of "no hazard" to air navigation in connection with radio broadcast towers.*

47 CFR 17.4

• According to its own guidelines, *47 C.F.R. § 17.4(b)*, the Federal Communications Commission (FCC) can only authorize the construction of a tower if the applicant provides the FCC with a "no hazard" determination from the Federal Aviation Administration. *Go To Headnote*

• The Federal Communications Commission (FCC), pursuant to its statutory authority, has promulgated 47 C.F.R. pt. 17 of the Federal Communications Regulations governing "Construction, Marking, and Lighting of Antenna Structures. Under the regulations, the FCC is to determine whether any such structure constitutes a menace to air navigation. *47 C.F.R. § 17.1(a)*. In making such a determination, and before the FCC will approve any proposed construction, the FCC requires the owner of the antenna to provide notice to the Federal Aviation Administration (FAA). *47 C.F.R. § 17.7*. In the application for a construction permit, the FCC requires that the applicant submit a valid FAA determination of "no hazard." *47 C.F.R. § 17.4(b)*. Failure to provide the FCC with the FAA "no hazard" determination can delay the registration process or result in outright disapproval. *47 C.F.R. § 17.4(d)*. *Go To Headnote*

• The Federal Communications Commission (FCC), in situations that concern radio broadcast towers, can enforce the Federal Aviation Administration's (FAA) "no hazard" determination by staying or dismissing a FCC registration application. *47 C.F.R. § 17.4(d)*. Once issued, a hazard o hazard determination has no enforceable legal effect. The FAA's determination of "no hazard" promotes air safety through moral suasion by encouraging the voluntary cooperation of sponsors of potentially hazardous structures. *Go To Headnote*

**Communications Law: Federal Acts: Communications Act: Penalties**

*CTIA - The Wireless Ass'n v. FCC, 466 F.3d 105, 373 U.S. App. D.C. 259, 2006 U.S. App. LEXIS 24256 (D.C. Cir. 2006)*.

***Overview:*** *NPA Order, 20 F.C.C.R. 1073, was not arbitrary or capricious in finding the FCC's registration process and NEPA approval authority made telecommunications tower construction an NHPA § 106, 16 U.S.C.S. § 470f undertaking; deference to Advisory Council on Historic Preservation's reasonable interpretation of NHPA § 106 was not arbitrary or capricious.*

• The Federal Communication Commission (FCC) has chosen, through its registration regulations, to grant approval of a tower registration if it receives a "no hazard" determination from the Federal Aviation Administration. *47 C.F.R. § 17.4(d)*. If it does not the FCC's regulations allow the Commission in its discretion to delay or disapprove a registration. *Go To Headnote*

**Transportation Law: Air Transportation: Air Traffic Control: Procedures**

*Big Stone Broad., Inc. v. Lindbloom, 161 F. Supp. 2d 1009, 2001 U.S. Dist. LEXIS 14984 (D.S.D. 2001)*.

***Overview:*** *A state agency was enjoined from acting to prohibit federal agency determinations of "no hazard" to air navigation in connection with radio broadcast towers.*

• According to its own guidelines, *47 C.F.R. § 17.4(b)*, the Federal Communications Commission (FCC) can only authorize the construction of a tower if the applicant provides the FCC with a "no hazard" determination from the Federal Aviation Administration. *Go To Headnote*

**Transportation Law: Air Transportation: Airports: Airport Hazards**

*CHM Broadcasting Ltd. Partnership v. FCC, 24 F.3d 1453, 306 U.S. App. D.C. 345, 1994 U.S. App. LEXIS 14472 (D.C. Cir. 1994)*, reh'g denied, *1994 U.S. App. LEXIS 30800 (D.C. Cir. Oct. 17, 1994)*.

47 CFR 17.4

*Overview: Applications to operate an FM radio station were properly denied by FCC because no amendment to the applications would have cured the air hazard on the proposed site of the station because any station on the site would have caused interference.*

- Federal Communications Commission (FCC) regulations require an applicant to notify the Federal Aviation Association (FAA) of the proposed construction of its antenna tower if the antenna will exceed a specified height or be built close to an airport. *47 C.F.R. § 17.7.* The FAA then determines whether the proposed antenna will constitute a hazard to air navigation. If the FAA concludes that the antenna will not constitute an air hazard, it issues a "no hazard determination." When the FCC receives a "no hazard determination" from the FAA, "the antenna structure is deemed not to involve a hazard to air navigation and the antenna aspect of the application for radio station authorization will be processed accordingly." *47 C.F.R. § 17.4(d).* If, however, the FAA concludes that a proposed antenna will create an air hazard, the FCC will take further appropriate action. *47 C.F.R. § 17.4(e). Go To Headnote*

**Transportation Law: Air Transportation: Airspace: General Overview**

*Big Stone Broad., Inc. v. Lindbloom, 161 F. Supp. 2d 1009, 2001 U.S. Dist. LEXIS 14984 (D.S.D. 2001).*

*Overview: A state agency was enjoined from acting to prohibit federal agency determinations of "no hazard" to air navigation in connection with radio broadcast towers.*

- The Federal Communications Commission (FCC), pursuant to its statutory authority, has promulgated 47 C.F.R. pt. 17 of the Federal Communications Regulations governing "Construction, Marking, and Lighting of Antenna Structures. Under the regulations, the FCC is to determine whether any such structure constitutes a menace to air navigation. *47 C.F.R. § 17.1(a).* In making such a determination, and before the FCC will approve any proposed construction, the FCC requires the owner of the antenna to provide notice to the Federal Aviation Administration (FAA). *47 C.F.R. § 17.7.* In the application for a construction permit, the FCC requires that the applicant submit a valid FAA determination of "no hazard." *47 C.F.R. § 17.4(b).* Failure to provide the FCC with the FAA "no hazard" determination can delay the registration process or result in outright disapproval. *47 C.F.R. § 17.4(d). Go To Headnote*

- The Federal Communications Commission (FCC), in situations that concern radio broadcast towers, can enforce the Federal Aviation Administration's (FAA) "no hazard" determination by staying or dismissing a FCC registration application. *47 C.F.R. § 17.4(d).* Once issued, a hazard o hazard determination has no enforceable legal effect. The FAA's determination of "no hazard" promotes air safety through moral suasion by encouraging the voluntary cooperation of sponsors of potentially hazardous structures. *Go To Headnote*

*Reminga v. United States, 15 Av. Cas. (CCH) P 17442, 448 F. Supp. 445, 15 Av. Cas. (CCH) ¶ 17442, 1978 U.S. Dist. LEXIS 20043 (W.D. Mich. 1978),* aff'd, *631 F.2d 449, 1980 U.S. App. LEXIS 13482 (6th Cir. 1980).*

*Overview: United States was negligent in distributing air maps with a wrong placement of a television tower that resulted in foreseeable risk to pilots such as decedents and its failure to regulate was not within discretionary function exception of FTCA.*

- The Federal Aviation Administration (FAA) is limited in its authority to control the construction of broadcast towers. The FAA is authorized to conduct aeronautical studies to determine the effect of a proposed tower on air navigation. 14 C.F.R. § 71.31. If the FAA determines that the antenna presents no hazard, then the Federal Communications Commission (FCC) will proceed to determine the application for radio station authorization without further considering its effect upon air navigation, *47 C.F.R. § 17.4(d)(1972).* If the FAA determines that the tower will be a hazard, the FCC will take further appropriate action. *47 C.F.R. § 17.4(e)(1972).* Thus although neither the FAA nor the FCC is authorized to prohibit the construction of such a tower per se, the FCC is authorized to determine whether a license for the use of such a tower for radio broadcasting should be granted, and included within such a determination is whether the tower has been

found by the FAA to be a hazard to navigation. Assuming that the tower is intended to be used for radio and/or television broadcasting, such a denial of a broadcasting license by the FCC on the basis of the FAA hazard determination is in effect a denial of construction of the tower by the FCC.    *Go To Headnote*

**Transportation Law: Air Transportation: Personnel: Flight Crews**

*CHM Broadcasting Ltd. Partnership v. FCC, 24 F.3d 1453, 306 U.S. App. D.C. 345, 1994 U.S. App. LEXIS 14472 (D.C. Cir. 1994)*, reh'g denied, *1994 U.S. App. LEXIS 30800 (D.C. Cir. Oct. 17, 1994)*.

*Overview: Applications to operate an FM radio station were properly denied by FCC because no amendment to the applications would have cured the air hazard on the proposed site of the station because any station on the site would have caused interference.*

• Federal Communications Commission (FCC) regulations require an applicant to notify the Federal Aviation Association (FAA) of the proposed construction of its antenna tower if the antenna will exceed a specified height or be built close to an airport. *47 C.F.R. § 17.7*. The FAA then determines whether the proposed antenna will constitute a hazard to air navigation. If the FAA concludes that the antenna will not constitute an air hazard, it issues a "no hazard determination." When the FCC receives a "no hazard determination" from the FAA, "the antenna structure is deemed not to involve a hazard to air navigation and the antenna aspect of the application for radio station authorization will be processed accordingly." *47 C.F.R. § 17.4(d)*. If, however, the FAA concludes that a proposed antenna will create an air hazard, the FCC will take further appropriate action. *47 C.F.R. § 17.4(e)*. *Go To Headnote*

**Transportation Law: Air Transportation: U.S. Federal Aviation Administration: Duties & Powers**

*CHM Broadcasting Ltd. Partnership v. FCC, 24 F.3d 1453, 306 U.S. App. D.C. 345, 1994 U.S. App. LEXIS 14472 (D.C. Cir. 1994)*, reh'g denied, *1994 U.S. App. LEXIS 30800 (D.C. Cir. Oct. 17, 1994)*.

*Overview: Applications to operate an FM radio station were properly denied by FCC because no amendment to the applications would have cured the air hazard on the proposed site of the station because any station on the site would have caused interference.*

• Federal Communications Commission (FCC) regulations require an applicant to notify the Federal Aviation Association (FAA) of the proposed construction of its antenna tower if the antenna will exceed a specified height or be built close to an airport. *47 C.F.R. § 17.7*. The FAA then determines whether the proposed antenna will constitute a hazard to air navigation. If the FAA concludes that the antenna will not constitute an air hazard, it issues a "no hazard determination." When the FCC receives a "no hazard determination" from the FAA, "the antenna structure is deemed not to involve a hazard to air navigation and the antenna aspect of the application for radio station authorization will be processed accordingly." *47 C.F.R. § 17.4(d)*. If, however, the FAA concludes that a proposed antenna will create an air hazard, the FCC will take further appropriate action. *47 C.F.R. § 17.4(e)*. *Go To Headnote*

*Reminga v. United States, 15 Av. Cas. (CCH) P 17442, 448 F. Supp. 445, 15 Av. Cas. (CCH) ¶ 17442, 1978 U.S. Dist. LEXIS 20043 (W.D. Mich. 1978)*, aff'd, *631 F.2d 449, 1980 U.S. App. LEXIS 13482 (6th Cir. 1980)*.

*Overview: United States was negligent in distributing air maps with a wrong placement of a television tower that resulted in foreseeable risk to pilots such as decedents and its failure to regulate was not within discretionary function exception of FTCA.*

• The Federal Aviation Administration (FAA) is limited in its authority to control the construction of broadcast towers. The FAA is authorized to conduct aeronautical studies to determine the effect of a proposed tower on air navigation. 14 C.F.R. § 71.31. If the FAA determines that the antenna presents no hazard, then the

47 CFR 17.4

Federal Communications Commission (FCC) will proceed to determine the application for radio station authorization without further considering its effect upon air navigation, *47 C.F.R. § 17.4(d)(1972)*. If the FAA determines that the tower will be a hazard, the FCC will take further appropriate action. *47 C.F.R. § 17.4(e)(1972)*. Thus although neither the FAA nor the FCC is authorized to prohibit the construction of such a tower per se, the FCC is authorized to determine whether a license for the use of such a tower for radio broadcasting should be granted, and included within such a determination is whether the tower has been found by the FAA to be a hazard to navigation. Assuming that the tower is intended to be used for radio and/or television broadcasting, such a denial of a broadcasting license by the FCC on the basis of the FAA hazard determination is in effect a denial of construction of the tower by the FCC.      *Go To Headnote*

## Research References & Practice Aids

**Hierarchy Notes:**

*47 CFR Ch. I*

*47 CFR Ch. I, Subch. A, Pt. 17*

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2023 All rights reserved.

**End of Document**

## [47 USCS § 308](#)

Current through Public Law 117-327, approved December 27, 2022.

*United States Code Service* > *TITLE 47. TELECOMMUNICATIONS (Chs. 1 — 16)* > *CHAPTER 5. WIRE OR RADIO COMMUNICATION (§§ 151 — 646)* > *SPECIAL PROVISIONS RELATING TO RADIO (§§ 301 — 399b)* > *GENERAL PROVISIONS (§§ 301 — 345)*

## § 308. Requirements for license

**(a) Writing; exceptions.** The Commission may grant construction permits and station licenses, or modifications or renewals thereof, only upon written application therefor received by it: *Provided,* That (1) in cases of emergency found by the Commission involving danger to life or property or due to damage to equipment, or (2) during a national emergency proclaimed by the President or declared by the Congress and during the continuance of any war in which the United States is engaged and when such action is necessary for the national defense or security or otherwise in furtherance of the war effort, or (3) in cases of emergency where the Commission finds, in the nonbroadcast services, that it would not be feasible to secure renewal applications from existing licensees or otherwise to follow normal licensing procedure, the Commission may grant construction permits and station licenses, or modifications or renewals thereof, during the emergency so found by the Commission or during the continuance of any such national emergency or war, in such manner and upon such terms and conditions as the Commission shall by regulation prescribe, and without the filing of a formal application, but no authorization so granted shall continue in effect beyond the period of the emergency or war requiring it: *Provided further,* That the Commission may issue by cable, telegraph, or radio a permit for the operation of a station on a vessel of the United States at sea, effective in lieu of a license until said vessel shall return to a port of the continental United States.

**(b) Conditions.** All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used; and such other information as it may require. The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee in any manner or form, including by electronic means, as the Commission may prescribe by regulation.

**(c) Commercial communication.** The Commission in granting any license for a station intended or used for commercial communication between the United States or any Territory or possession, continental or insular, subject to the jurisdiction of the United States, and any foreign country, may impose any terms, conditions, or restrictions authorized to be imposed with respect to submarine-cable licenses by section 2 of an Act entitled "An Act relating to the landing and the operation of submarine cables in the United States", approved May 27, 1921.

**(d) Summary of complaints.** Each applicant for the renewal of a commercial or noncommercial television license shall attach as an exhibit to the application a summary of written comments and suggestions received from the public and maintained by the licensee (in accordance with Commission regulations) that comment on the applicant's programming, if any, and that are characterized by the commentor as constituting violent programming.

ADD82

47 USCS § 308

## History

**HISTORY:**

June 19, 1934, ch 652, Title III, Part I, § 308, *48 Stat. 1084*; May 20, 1937, ch 229, § 10(a), *50 Stat. 192*; July 16, 1952, ch 879, § 6, *66 Stat. 714*; April 27, 1962, *P. L. 87-444*, § 3, *76 Stat. 63*; Oct. 27, 1992, *P. L. 102-538*, Title II, § 204(b), *106 Stat. 3543*; Oct. 25, 1994, *P. L. 103-414*, Title III, § 303(a)(15), *108 Stat. 4295*; Feb. 8, 1996, *P. L. 104-104*, Title II, § 204(b), *110 Stat. 113*.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

ADD83

## 47 USCS § 309

Current through Public Law 117-327, approved December 27, 2022.

*United States Code Service  >  TITLE 47. TELECOMMUNICATIONS (Chs. 1 — 16)  >  CHAPTER 5. WIRE OR RADIO COMMUNICATION (§§ 151 — 646)  >  SPECIAL PROVISIONS RELATING TO RADIO (§§ 301 — 399b)  >  GENERAL PROVISIONS (§§ 301 — 345)*

# § 309. Application for license

**(a) Considerations in granting application.**   Subject to the provisions of this section, the Commission shall determine, in the case of each application filed with it to which section 308 [*47 USCS § 308*] applies, whether the public interest, convenience, and necessity will be served by the granting of such application, and, if the Commission, upon examination of such application and upon consideration of such other matters as the Commission may officially notice, shall find that public interest, convenience, and necessity would be served by the granting thereof, it shall grant such application.

**(b) Time of granting application.**   Except as provided in subsection (c) of this section, no such application—

   **(1)** for an instrument of authorization in the case of a station in the broadcasting or common carrier services, or

   **(2)** for an instrument of authorization in the case of a station in any of the following categories:

      **(A)** industrial radio positioning stations for which frequencies are assigned on an exclusive basis,

      **(B)** aeronautical en route stations,

      **(C)** aeronautical advisory stations,

      **(D)** airdrome control stations,

      **(E)** aeronautical fixed stations, and

      **(F)** such other stations or classes of stations, not in the broadcasting or common carrier services, as the Commission shall by rule prescribe,

shall be granted by the Commission earlier than thirty days following issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof.

**(c) Applications not affected by subsection (b).**   Subsection (b) of this section shall not apply—

   **(1)** to any minor amendment of an application to which such subsection is applicable, or

   **(2)** to any application for—

      **(A)** a minor change in the facilities of an authorized station,

      **(B)** consent to an involuntary assignment or transfer under section 310(b) [*47 USCS § 310(b)*] or to an assignment or transfer thereunder which does not involve a substantial change in ownership or control,

      **(C)** a license under section 319(c) [*47 USCS § 319(c)*] or, pending application for or grant of such license, any special or temporary authorization to permit interim operation to facilitate completion of authorized construction or to provide substantially the same service as would be authorized by such license,

      **(D)** extension of time to complete construction of authorized facilities,

**(E)** an authorization of facilities for remote pickups, studio links and similar facilities for use in the operation of a broadcast station,

**(F)** authorizations pursuant to section 325(c) [47 USCS § 325(c)] where the programs to be transmitted are special events not of a continuing nature,

**(G)** a special temporary authorization for nonbroadcast operation not to exceed thirty days where no application for regular operation is contemplated to be filed or not to exceed sixty days pending the filing of an application for such regular operation, or

**(H)** an authorization under any of the proviso clauses of section 308(a) [47 USCS § 308(a)].

**(d) Petition to deny application; time; contents; reply; findings.**

**(1)** Any party in interest may file with the Commission a petition to deny any application (whether as originally filed or as amended) to which subsection (b) of this section applies at any time prior to the day of Commission grant thereof without hearing, or the day of formal designation thereof for hearing; except that with respect to any classification of applications, the Commission from time to time by rule may specify a shorter period (no less than thirty days following the issuance of public notice by the Commission of the acceptance for filing of such application or of any substantial amendment thereof), which shorter period shall be reasonably related to the time when the applications would normally be reached for processing. The petitioner shall serve a copy of such petition on the applicant. The petition shall contain specific allegations of fact sufficient to show that the petitioner is a party in interest and that a grant of the application would be prima facie inconsistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license). Such allegations of fact shall, except for those of which official notice may be taken, be supported by affidavit of a person or persons with personal knowledge thereof. The applicant shall be given the opportunity to file a reply in which allegations of fact or denials thereof shall similarly be supported by affidavit.

**(2)** If the Commission finds on the basis of the application, the pleadings filed, or other matters which it may officially notice that there are no substantial and material questions of fact and that a grant of the application would be consistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license), it shall make the grant, deny the petition, and issue a concise statement of the reasons for denying the petition, which statement shall dispose of all substantial issues raised by the petition. If a substantial and material question of fact is presented or if the Commission for any reason is unable to find that grant of the application would be consistent with subsection (a) (or subsection (k) in the case of renewal of any broadcast station license), it shall proceed as provided in subsection (e).

**(e) Hearings; intervention; evidence; burden of proof.**   If, in the case of any application to which subsection (a) of this section applies, a substantial and material question of fact is presented or the Commission for any reason is unable to make the finding specified in such subsection, it shall formally designate the application for hearing on the ground or reasons then obtaining and shall forthwith notify the applicant and all other known parties in interest of such action and the grounds and reasons therefor, specifying with particularity the matters and things in issue but not including issues or requirements phrased generally. When the Commission has so designated an application for hearing the parties in interest, if any, who are not notified by the Commission of such action may acquire the status of a party to the proceeding thereon by filing a petition for intervention showing the basis for their interest not more than thirty days after publication of the hearing issues or any substantial amendment thereto in the Federal Register. Any hearing subsequently held upon such application shall be a full hearing in which the applicant and all other parties in interest shall be permitted to participate. The burden of proceeding with the introduction of evidence and the burden of proof shall be upon the applicant, except that with respect to any issue presented by a petition to deny or a petition to enlarge the issues, such burdens shall be as determined by the Commission.

**(f) Temporary authorization of operations under subsection (b).**   When an application subject to subsection (b) has been filed, the Commission, notwithstanding the requirements of such subsection, may,

ADD85

if the grant of such application is otherwise authorized by law and if it finds that there are extraordinary circumstances requiring temporary operations in the public interest and that delay in the institution of such temporary operations would seriously prejudice the public interest, grant a temporary authorization, accompanied by a statement of its reasons therefor, to permit such temporary operations for a period not exceeding 180 days, and upon making like findings may extend such temporary authorization for additional periods not to exceed 180 days. When any such grant of a temporary authorization is made, the Commission shall give expeditious treatment to any timely filed petition to deny such application and to any petition for rehearing of such grant filed under section 405 [*47 USCS § 405*].

**(g) Classification of applications.** The Commission is authorized to adopt reasonable classifications of applications and amendments in order to effectuate the purposes of this section.

**(h) Form and conditions of station licenses.** Such station licenses as the Commission may grant shall be in such general form as it may prescribe, but each license shall contain, in addition to other provisions, a statement of the following conditions to which such license shall be subject: (1) The station license shall not vest in the licensee any right to operate the station nor any right in the use of the frequencies designated in the license beyond the term thereof nor in any other manner than authorized therein; (2) neither the license nor the right granted thereunder shall be assigned or otherwise transferred in violation of this Act; (3) every license issued under this Act shall be subject in terms to the right of use or control conferred by section 706 of this Act [*47 USCS § 606*].

**(i) Random selection.**

**(1)** General authority. Except as provided in paragraph (5), if there is more than one application for any initial license or construction permit, then the Commission shall have the authority to grant such license or permit to a qualified applicant through the use of a system of random selection.

**(2)** No license or construction permit shall be granted to an applicant selected pursuant to paragraph (1) unless the Commission determines the qualifications of such applicant pursuant to subsection (a) and section 308(b) [*47 USCS § 308(b)*]. When substantial and material questions of fact exist concerning such qualifications, the Commission shall conduct a hearing in order to make such determinations. For the purpose of making such determinations, the Commission may, by rule, and notwithstanding any other provision of law—

**(A)** adopt procedures for the submission of all or part of the evidence in written form;

**(B)** delegate the function of presiding at the taking of the evidence to Commission employees other than administrative law judges; and

**(C)** omit the determination required by subsection (a) with respect to any application other than the one selected pursuant to paragraph (1).

**(3)**

**(A)** The Commission shall establish rules and procedures to ensure that, in the administration of any system of random selection under this subsection used for granting licenses or construction permits for any media of mass communications, significant preferences will be granted to applicants or groups of applicants, the grant to which of the license or permit would increase the diversification of ownership of the media of mass communications. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant controlled by a member or members of a minority group.

**(B)** The Commission shall have authority to require each qualified applicant seeking a significant preference under subparagraph (A) to submit to the Commission such information as may be necessary to enable the Commission to make a determination regarding whether such applicant shall be granted such preference. Such information shall be submitted in such form, at such times, and in accordance with such procedures, as the Commission may require.

**(C)** For purposes of this paragraph:

**(i)** The term "media of mass communications" includes television, radio, cable television, multipoint distribution service, direct broadcast satellite service, and other services, the licensed facilities of which may be substantially devoted toward providing programming or other information services within the editorial control of the licensee.

**(ii)** The term "minority group" includes Blacks, Hispanics, American Indians, Alaska Natives, Asians, and Pacific Islanders.

**(4)**

**(A)** The Commission shall, after notice and opportunity for hearing, prescribe rules establishing a system of random selection for use by the Commission under this subsection in any instance in which the Commission, in its discretion, determines that such use is appropriate for the granting of any license or permit in accordance with paragraph (1).

**(B)** The Commission shall have authority to amend such rules from time to time to the extent necessary to carry out the provisions of this subsection. Any such amendment shall be made after notice and opportunity for hearing.

**(C)** Not later than 180 days after the date of enactment of this subparagraph [enacted Aug. 10, 1993], the Commission shall prescribe such transfer disclosures and antitrafficking restrictions and payment schedules as are necessary to prevent the unjust enrichment of recipients of licenses or permits as a result of the methods employed to issue licenses under this subsection.

**(5)** Termination of authority.

**(A)** Except as provided in subparagraph (B), the Commission shall not issue any license or permit using a system of random selection under this subsection after July 1, 1997.

**(B)** Subparagraph (A) of this paragraph shall not apply with respect to licenses or permits for stations described in section 397(6) of this Act [*47 USCS § 397(6)*].

**(j) Use of competitive bidding.**

**(1)** General authority. If, consistent with the obligations described in paragraph (6)(E), mutually exclusive applications are accepted for any initial license or construction permit, then, except as provided in paragraph (2), the Commission shall grant the license or permit to a qualified applicant through a system of competitive bidding that meets the requirements of this subsection.

**(2)** Exemptions. The competitive bidding authority granted by this subsection shall not apply to licenses or construction permits issued by the Commission—

**(A)** for public safety radio services, including private internal radio services used by State and local governments and non-government entities and including emergency road services provided by not-for-profit organizations, that—

**(i)** are used to protect the safety of life, health, or property; and

**(ii)** are not made commercially available to the public;

**(B)** for initial licenses or construction permits for digital television service given to existing terrestrial broadcast licensees to replace their analog television service licenses; or

**(C)** for stations described in section 397(6) of this Act [*47 USCS § 397(6)*].

**(3)** Design of systems of competitive bidding. For each class of licenses or permits that the Commission grants through the use of a competitive bidding system, the Commission shall, by regulation, establish a competitive bidding methodology. The Commission shall seek to design and test multiple alternative methodologies under appropriate circumstances. The Commission shall, directly or by contract, provide for the design and conduct (for purposes of testing) of competitive bidding using a contingent combinatorial bidding system that permits prospective bidders to bid on combinations or groups of licenses in a single bid and to enter multiple alternative bids within a single bidding round. In

ADD87

identifying classes of licenses and permits to be issued by competitive bidding, in specifying eligibility and other characteristics of such licenses and permits, and in designing the methodologies for use under this subsection, the Commission shall include safeguards to protect the public interest in the use of the spectrum and shall seek to promote the purposes specified in section 1 of this Act [*47 USCS § 151*] and the following objectives:

(A)  the development and rapid deployment of new technologies, products, and services for the benefit of the public, including those residing in rural areas, without administrative or judicial delays;

(B)  promoting economic opportunity and competition and ensuring that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and by disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women;

(C)  recovery for the public of a portion of the value of the public spectrum resource made available for commercial use and avoidance of unjust enrichment through the methods employed to award uses of that resource;

(D)  efficient and intensive use of the electromagnetic spectrum;

(E)  ensure that, in the scheduling of any competitive bidding under this subsection, an adequate period is allowed—

(i)  before issuance of bidding rules, to permit notice and comment on proposed auction procedures; and

(ii)  after issuance of bidding rules, to ensure that interested parties have a sufficient time to develop business plans, assess market conditions, and evaluate the availability of equipment for the relevant services; and

(F)  for any auction of eligible frequencies described in section 113(g)(2) of the National Telecommunications and Information Administration Organization Act (*47 U.S.C. 923(g)(2)*), the recovery of 110 percent of estimated relocation or sharing costs as provided to the Commission pursuant to section 113(g)(4) of such Act [*47 USCS § 923(g)(4)*].

(4)  Contents of regulations. In prescribing regulations pursuant to paragraph (3), the Commission shall—

(A)  consider alternative payment schedules and methods of calculation, including lump sums or guaranteed installment payments, with or without royalty payments, or other schedules or methods that promote the objectives described in paragraph (3)(B), and combinations of such schedules and methods;

(B)  include performance requirements, such as appropriate deadlines and penalties for performance failures, to ensure prompt delivery of service to rural areas, to prevent stockpiling or warehousing of spectrum by licensees or permittees, and to promote investment in and rapid deployment of new technologies and services;

(C)  consistent with the public interest, convenience, and necessity, the purposes of this Act, and the characteristics of the proposed service, prescribe area designations and bandwidth assignments that promote (i) an equitable distribution of licenses and services among geographic areas, (ii) economic opportunity for a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women, and (iii) investment in and rapid deployment of new technologies and services;

(D)  ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are given the opportunity to participate in the provision of spectrum-based services, and, for such purposes, consider the use of tax certificates, bidding preferences, and other procedures;

**(E)** require such transfer disclosures and antitrafficking restrictions and payment schedules as may be necessary to prevent unjust enrichment as a result of the methods employed to issue licenses and permits; and

**(F)** prescribe methods by which a reasonable reserve price will be required, or a minimum bid will be established, to obtain any license or permit being assigned pursuant to the competitive bidding, unless the Commission determines that such a reserve price or minimum bid is not in the public interest.

**(5)** Bidder and licensee qualification. No person shall be permitted to participate in a system of competitive bidding pursuant to this subsection unless such bidder submits such information and assurances as the Commission may require to demonstrate that such bidder's application is acceptable for filing. No license shall be granted to an applicant selected pursuant to this subsection unless the Commission determines that the applicant is qualified pursuant to subsection (a) and sections 308(b) and 310 [*47 USCS §§ 308(b)* and *310*]. Consistent with the objectives described in paragraph (3), the Commission shall, by regulation, prescribe expedited procedures consistent with the procedures authorized by subsection (i)(2) for the resolution of any substantial and material issues of fact concerning qualifications.

**(6)** Rules of construction. Nothing in this subsection, or in the use of competitive bidding, shall—

**(A)** alter spectrum allocation criteria and procedures established by the other provisions of this Act;

**(B)** limit or otherwise affect the requirements of subsection (h) of this section, section 301, 304, 307, 310, or 706 [*47 USCS § 301*, *304*, *307*, *310*, or 706], or any other provision of this Act (other than subsections (d)(2) and (e) of this section);

**(C)** diminish the authority of the Commission under the other provisions of this Act to regulate or reclaim spectrum licenses;

**(D)** be construed to convey any rights, including any expectation of renewal of a license, that differ from the rights that apply to other licenses within the same service that were not issued pursuant to this subsection;

**(E)** be construed to relieve the Commission of the obligation in the public interest to continue to use engineering solutions, negotiation, threshold qualifications, service regulations, and other means in order to avoid mutual exclusivity in application and licensing proceedings;

**(F)** be construed to prohibit the Commission from issuing nationwide, regional, or local licenses or permits;

**(G)** be construed to prevent the Commission from awarding licenses to those persons who make significant contributions to the development of a new telecommunications service or technology; or

**(H)** be construed to relieve any applicant for a license or permit of the obligation to pay charges imposed pursuant to section 8 of this Act [*47 USCS § 158*].

**(7)** Consideration of revenues in public interest determinations.

**(A)** Consideration prohibited. In making a decision pursuant to section 303(c) [*47 USCS § 303(c)*] to assign a band of frequencies to a use for which licenses or permits will be issued pursuant to this subsection, and in prescribing regulations pursuant to paragraph (4)(C) of this subsection, the Commission may not base a finding of public interest, convenience, and necessity on the expectation of Federal revenues from the use of a system of competitive bidding under this subsection.

**(B)** Consideration limited. In prescribing regulations pursuant to paragraph (4)(A) of this subsection, the Commission may not base a finding of public interest, convenience, and necessity solely or predominantly on the expectation of Federal revenues from the use of a system of competitive bidding under this subsection.

**(C)** Consideration of demand for spectrum not affected. Nothing in this paragraph shall be construed to prevent the Commission from continuing to consider consumer demand for spectrum-based services.

**(8)** Treatment of revenues.

**(A)** General rule. Except as provided in subparagraphs (B), (D), (E), (F), and (G), all proceeds from the use of a competitive bidding system under this subsection shall be deposited in the Treasury in accordance with chapter 33 of title 31, United States Code [*33 USCS §§ 3301* et seq.].

**(B)** Retention of revenues. Notwithstanding subparagraph (A), the salaries and expenses account of the Commission shall retain as an offsetting collection such sums as may be necessary from such proceeds for the costs of developing and implementing the program required by this subsection. Such offsetting collections shall be available for obligation subject to the terms and conditions of the receiving appropriations account, and shall be deposited in such accounts on a quarterly basis. Such offsetting collections are authorized to remain available until expended.

**(C)** Deposit and use of auction escrow accounts. Any deposits the Commission may require for the qualification of any person to bid in a system of competitive bidding pursuant to this subsection shall be deposited in the Tresury. Within 45 days following the conclusion of the competitive bidding—

**(i)** the deposits of successful bidders shall be deposited in the general fund of the Treasury (where such deposits shall be used for the sole purpose of deficit reduction), except as otherwise provided in subparagraphs (D)(ii), (E)(ii), (F), and (G); and

**(ii)** the deposits of unsuccessful bidders shall be returned to such bidders, and payments representing the return of such deposits shall not be subject to administrative offset under *section 3716(c) of title 31, United States Code*.

**(D)** Proceeds from reallocated Federal spectrum.

**(i)** In general. Except as provided in clause (ii), cash proceeds attributable to the auction of any eligible frequencies described in section 113(g)(2) of the National Telecommunications and Information Administration Organization Act (*47 U.S.C. 923(g)(2)*) shall be deposited in the Spectrum Relocation Fund established under section 118 of such Act [*47 USCS § 928*], and shall be available in accordance with that section.

**(ii)** Certain other proceeds. Notwithstanding subparagraph (A) and except as provided in subparagraph (B), in the case of proceeds (including deposits and upfront payments from successful bidders) attributable to the auction of eligible frequencies described in paragraph (2) of section 113(g) of the National Telecommunications and Information Administration Organization Act [*47 USCS § 923(g)*] that are required to be auctioned by section 6401(b)(1)(B) of the Middle Class Tax Relief and Job Creation Act of 2012 [*47 USCS § 1451(b)(1)(B)*], such portion of such proceeds as is necessary to cover the relocation or sharing costs (as defined in paragraph (3) of such section 113(g) [*47 USCS § 923(g)*]) of Federal entities relocated from such eligible frequencies shall be deposited in the Spectrum Relocation Fund. The remainder of such proceeds shall be deposited in the Public Safety Trust Fund established by section 6413(a)(1) of the Middle Class Tax Relief and Job Creation Act of 2012 [*47 USCS § 1457(a)(1)*].

**(E)** Transfer of receipts.

**(i)** Establishment of Fund. There is established in the Treasury of the United States a fund to be known as the Digital Television Transition and Public Safety Fund.

**(ii)** Proceeds for funds. Notwithstanding subparagraph (A), the proceeds (including deposits and upfront payments from successful bidders) from the use of a competitive bidding system

under this subsection with respect to recovered analog spectrum shall be deposited in the Digital Television Transition and Public Safety Fund.

**(iii)** Transfer of amount to Treasury. On September 30, 2009, the Secretary shall transfer $7,363,000,000 from the Digital Television Transition and Public Safety Fund to the general fund of the Treasury.

**(iv)** Recovered analog spectrum. For purposes of clause (i), the term "recovered analog spectrum" has the meaning provided in paragraph (15)(C)(vi).

**(F)** Certain proceeds designated for Public Safety Trust Fund. Notwithstanding subparagraph (A) and except as provided in subparagraphs (B) and (D)(ii), the proceeds (including deposits and upfront payments from successful bidders) from the use of a system of competitive bidding under this subsection pursuant to section 6401(b)(1)(B) of the Middle Class Tax Relief and Job Creation Act of 2012 [*47 USCS § 1451(b)(1)(B)*] shall be deposited in the Public Safety Trust Fund established by section 6413(a)(1) of such Act [*47 USCS § 1457(a)(1)*].

**(G)** Incentive auctions.

**(i)** In general. Notwithstanding subparagraph (A) and except as provided in subparagraph (B), the Commission may encourage a licensee to relinquish voluntarily some or all of its licensed spectrum usage rights in order to permit the assignment of new initial licenses subject to flexible-use service rules by sharing with such licensee a portion, based on the value of the relinquished rights as determined in the reverse auction required by clause (ii)(I), of the proceeds (including deposits and upfront payments from successful bidders) from the use of a competitive bidding system under this subsection.

**(ii)** Limitations. The Commission may not enter into an agreement for a licensee to relinquish spectrum usage rights in exchange for a share of auction proceeds under clause (i) unless—

**(I)** the Commission conducts a reverse auction to determine the amount of compensation that licensees would accept in return for voluntarily relinquishing spectrum usage rights; and

**(II)** at least two competing licensees participate in the reverse auction.

**(iii)** Treatment of revenues. Notwithstanding subparagraph (A) and except as provided in subparagraph (B), the proceeds (including deposits and upfront payments from successful bidders) from any auction, prior to the end of fiscal year 2022, of spectrum usage rights made available under clause (i) that are not shared with licensees under such clause shall be deposited as follows:

**(I)** $1,750,000,000 of the proceeds from the incentive auction of broadcast television spectrum required by section 6403 of the Middle Class Tax Relief and Job Creation Act of 2012 [*47 USCS § 1452*] shall be deposited in the TV Broadcaster Relocation Fund established by subsection (d)(1) of such section.

**(II)** All other proceeds shall be deposited—

**(aa)** prior to the end of fiscal year 2022, in the Public Safety Trust Fund established by section 6413(a)(1) of such Act [*47 USCS § 1457(a)(1)*]; and

**(bb)** after the end of fiscal year 2022, in the general fund of the Treasury, where such proceeds shall be dedicated for the sole purpose of deficit reduction.

**(iv)** Congressional notification. At least 3 months before any incentive auction conducted under this subparagraph, the Chairman of the Commission, in consultation with the Director of the Office of Management and Budget, shall notify the appropriate committees of Congress of the methodology for calculating the amounts that will be shared with licensees under clause (i).

**(v)** Definition. In this subparagraph, the term "appropriate committees of Congress" means—

47 USCS § 309

    **(I)** the Committee on Commerce, Science, and Transportation of the Senate;

    **(II)** the Committee on Appropriations of the Senate;

    **(III)** the Committee on Energy and Commerce of the House of Representatives; and

    **(IV)** the Committee on Appropriations of the House of Representatives.

**(9)** Use of former Government spectrum. The Commission shall, not later than 5 years after the date of enactment of this subsection [enacted Aug. 10, 1993], issue licenses and permits pursuant to this subsection for the use of bands of frequencies that—

    **(A)** in the aggregate span not less than 10 megahertz; and

    **(B)** have been reassigned from Government use pursuant to part B of the National Telecommunications and Information Administration Organization Act [*47 USCS §§ 921* et seq.].

**(10)** Authority contingent on availability of additional spectrum.

    **(A)** Initial conditions. The Commission's authority to issue licenses or permits under this subsection shall not take effect unless—

        **(i)** the Secretary of Commerce has submitted to the Commission the report required by section 113(d)(1) of the National Telecommunications and Information Administration Organization Act [*47 USCS § 923(d)(1)*];

        **(ii)** such report recommends for immediate reallocation bands of frequencies that, in the aggregate, span not less than 50 megahertz;

        **(iii)** such bands of frequencies meet the criteria required by section 113(a) of such Act [*47 USCS § 923(a)*]; and

        **(iv)** the Commission has completed the rulemaking required by section 332(c)(1)(D) of this Act [*47 USCS § 332(c)(1)(D)*].

    **(B)** Subsequent conditions. The Commission's authority to issue licenses or permits under this subsection on and after 2 years after the date of the enactment of this subsection [enacted Aug. 10, 1993] shall cease to be effective if—

        **(i)** the Secretary of Commerce has failed to submit the report required by section 113(a) of the National Telecommunications and Information Administration Organization Act [*47 USCS § 923(a)*];

        **(ii)** the President has failed to withdraw and limit assignments of frequencies as required by paragraphs (1) and (2) of section 114(a) of such Act [*47 USCS § 924(a)*];

        **(iii)** the Commission has failed to issue the regulations required by section 115(a) of such Act [*47 USCS § 925(a)*];

        **(iv)** the Commission has failed to complete and submit to Congress, not later than 18 months after the date of enactment of this subsection [enacted Aug. 10, 1993], a study of current and future spectrum needs of State and local government public safety agencies through the year 2010, and a specific plan to ensure that adequate frequencies are made available to public safety licensees; or

        **(v)** the Commission has failed under section 332(c)(3) [*47 USCS § 332(c)(3)*] to grant or deny within the time required by such section any petition that a State has filed within 90 days after the date of enactment of this subsection [enacted Aug. 10, 1993];

    until such failure has been corrected.

**(11)** Termination. The authority of the Commission to grant a license or permit under this subsection shall expire March 9, 2023, except that, with respect to the electromagnetic spectrum identified under section 1004(a) of the Spectrum Pipeline Act of 2015 [*47 USCS § 921* note], such authority shall expire

47 USCS § 309

on September 30, 2025, and with respect to the electromagnetic spectrum identified under section 90008(b)(2)(A)(ii) of the Infrastructure Investment and Jobs Act [47 USCS § 921 note], such authority shall expire on the date that is 7 years after the date of enactment of that Act [enacted Nov. 15, 2021].

**(12)** [Deleted]

**(13)** Recovery of value of public spectrum in connection with pioneer preferences.

**(A)** In general. Notwithstanding paragraph (6)(G), the Commission shall not award licenses pursuant to a preferential treatment accorded by the Commission to persons who make significant contributions to the development of a new telecommunications service or technology, except in accordance with the requirements of this paragraph.

**(B)** Recovery of value. The Commission shall recover for the public a portion of the value of the public spectrum resource made available to such person by requiring such person, as a condition for receipt of the license, to agree to pay a sum determined by—

**(i)** identifying the winning bids for the licenses that the Commission determines are most reasonably comparable in terms of bandwidth, scope of service area, usage restrictions, and other technical characteristics to the license awarded to such person, and excluding licenses that the Commission determines are subject to bidding anomalies due to the award of preferential treatment;

**(ii)** dividing each such winning bid by the population of its service area (hereinafter referred to as the per capita bid amount);

**(iii)** computing the average of the per capita bid amounts for the licenses identified under clause (i);

**(iv)** reducing such average amount by 15 percent; and

**(v)** multiplying the amount determined under clause (iv) by the population of the service area of the license obtained by such person.

**(C)** Installments permitted. The Commission shall require such person to pay the sum required by subparagraph (B) in a lump sum or in guaranteed installment payments, with or without royalty payments, over a period of not more than 5 years.

**(D)** Rulemaking on pioneer preferences. Except with respect to pending applications described in clause (iv) of this subparagraph, the Commission shall prescribe regulations specifying the procedures and criteria by which the Commission will evaluate applications for preferential treatment in its licensing processes (by precluding the filing of mutually exclusive applications) for persons who make significant contributions to the development of a new service or to the development of new technologies that substantially enhance an existing service. Such regulations shall—

**(i)** specify the procedures and criteria by which the significance of such contributions will be determined, after an opportunity for review and verification by experts in the radio sciences drawn from among persons who are not employees of the Commission or by any applicant for such preferential treatment;

**(ii)** include such other procedures as may be necessary to prevent unjust enrichment by ensuring that the value of any such contribution justifies any reduction in the amounts paid for comparable licenses under this subsection;

**(iii)** be prescribed not later than 6 months after the date of enactment of this paragraph [enacted Dec. 8, 1994];

**(iv)** not apply to applications that have been accepted for filing on or before September 1, 1994; and

(v) cease to be effective on the date of the expiration of the Commission's authority under subparagraph (F).

**(E)** Implementation with respect to pending applications. In applying this paragraph to any broadband licenses in the personal communications service awarded pursuant to the preferential treatment accorded by the Federal Communications Commission in the Third Report and Order in General Docket 90-314 (FCC 93-550, released February 3, 1994)—

**(i)** the Commission shall not reconsider the award of preferences in such Third Report and Order, and the Commission shall not delay the grant of licenses based on such awards more than 15 days following the date of enactment of this paragraph [enacted Dec. 8, 1994], and the award of such preferences and licenses shall not be subject to administrative or judicial review;

**(ii)** the Commission shall not alter the bandwidth or service areas designated for such licenses in such Third Report and Order;

**(iii)** except as provided in clause (v), the Commission shall use, as the most reasonably comparable licenses for purposes of subparagraph (B)(i), the broadband licenses in the personal communications service for blocks A and B for the 20 largest markets (ranked by population) in which no applicant has obtained preferential treatment;

**(iv)** for purposes of subparagraph (C), the Commission shall permit guaranteed installment payments over a period of 5 years, subject to—

**(I)** the payment only of interest on unpaid balances during the first 2 years, commencing not later than 30 days after the award of the license (including any preferential treatment used in making such award) is final and no longer subject to administrative or judicial review, except that no such payment shall be required prior to the date of completion of the auction of the comparable licenses described in clause (iii); and

**(II)** payment of the unpaid balance and interest thereon after the end of such 2 years in accordance with the regulations prescribed by the Commission; and

**(v)** the Commission shall recover with respect to broadband licenses in the personal communications service an amount under this paragraph that is equal to not less than $400,000,000, and if such amount is less than $400,000,000, the Commission shall recover an amount equal to $400,000,000 by allocating such amount among the holders of such licenses based on the population of the license areas held by each licensee.

The Commission shall not include in any amounts required to be collected under clause (v) the interest on unpaid balances required to be collected under clause (iv).

**(F)** Expiration. The authority of the Commission to provide preferential treatment in licensing procedures (by precluding the filing of mutually exclusive applications) to persons who make significant contributions to the development of a new service or to the development of new technologies that substantially enhance an existing service shall expire on the date of enactment of the Balanced Budget Act of 1997 [enacted Aug. 5, 1997].

**(G)** Effective date. This paragraph shall be effective on the date of its enactment [enacted Dec. 8, 1994] and apply to any licenses issued on or after August 1, 1994, by the Federal Communications Commission pursuant to any licensing procedure that provides preferential treatment (by precluding the filing of mutually exclusive applications) to persons who make significant contributions to the development of a new service or to the development of new technologies that substantially enhance an existing service.

**(14)** Auction of recaptured broadcast television spectrum.

**(A)** Limitations on terms of terrestrial television broadcast licenses. A full-power television broadcast license that authorizes analog television service may not be renewed to authorize such service for a period that extends beyond June 12, 2009.

47 USCS § 309

**(B)** Spectrum reversion and resale.

    **(i)** The Commission shall—

        **(I)** ensure that, as licenses for analog television service expire pursuant to subparagraph (A), each licensee shall cease using electromagnetic spectrum assigned to such service according to the Commission's direction; and

        **(II)** reclaim and organize the electromagnetic spectrum in a manner consistent with the objectives described in paragraph (3) of this subsection.

    **(ii)** Licensees for new services occupying spectrum reclaimed pursuant to clause (i) shall be assigned in accordance with this subsection.

**(C)** Certain limitations on qualified bidders prohibited. In prescribing any regulations relating to the qualification of bidders for spectrum reclaimed pursuant to subparagraph (B)(i), the Commission, for any license that may be used for any digital television service where the grade A contour of the station is projected to encompass the entirety of a city with a population in excess of 400,000 (as determined using the 1990 decennial census), shall not—

    **(i)** preclude any party from being a qualified bidder for such spectrum on the basis of—

        **(I)** the Commission's duopoly rule (_47 C.F.R. 73.3555(b)_); or

        **(II)** the Commission's newspaper cross-ownership rule (_47 C.F.R. 73.3555(d)_); or

    **(ii)** apply either such rule to preclude such a party that is a winning bidder in a competitive bidding for such spectrum from using such spectrum for digital television service.

**(15)** Commission to determine timing of auctions.

**(A)** Commission authority. Subject to the provisions of this subsection (including paragraph (11)), but notwithstanding any other provision of law, the Commission shall determine the timing of and deadlines for the conduct of competitive bidding under this subsection, including the timing of and deadlines for qualifying for bidding; conducting auctions; collecting, depositing, and reporting revenues; and completing licensing processes and assigning licenses.

**(B)** Termination of portions of auctions 31 and 44. Except as provided in subparagraph (C), the Commission shall not commence or conduct auctions 31 and 44 on June 19, 2002, as specified in the public notices of March 19, 2002, and March 20, 2002 (DA 02-659 and DA 02-563).

**(C)** Exception.

    **(i)** Blocks excepted. Subparagraph (B) shall not apply to the auction of—

        **(I)** the C-block of licenses on the bands of frequencies located at 710–716 megahertz, and 740–746 megahertz; or

        **(II)** the D-block of licenses on the bands of frequencies located at 716–722 megahertz.

    **(ii)** Eligible bidders. The entities that shall be eligible to bid in the auction of the C-block and D-block licenses described in clause (i) shall be those entities that were qualified entities, and that submitted applications to participate in auction 44, by May 8, 2002, as part of the original auction 44 short form filing deadline.

    **(iii)** Auction deadlines for excepted blocks. Notwithstanding subparagraph (B), the auction of the C-block and D-block licenses described in clause (i) shall be commenced no earlier than August 19, 2002, and no later than September 19, 2002, and the proceeds of such auction shall be deposited in accordance with paragraph (8) not later than December 31, 2002.

    **(iv)** [Deleted]

    **(v)** Additional deadlines for recovered analog spectrum. Notwithstanding subparagraph (B), the Commission shall conduct the auction of the licenses for recovered analog spectrum by

commencing the bidding not later than January 28, 2008, and shall deposit the proceeds of such auction in accordance with paragraph (8)(E)(ii) not later than June 30, 2008.

**(vi)** Recovered analog spectrum. For purposes of clause (v), the term "recovered analog spectrum" means the spectrum between channels 52 and 69, inclusive (between frequencies 698 and 806 megahertz, inclusive) reclaimed from analog television service broadcasting under paragraph (14), other than—

**(I)** the spectrum required by section 337 [*47 USCS § 337*] to be made available for public safety services; and

**(II)** the spectrum auctioned prior to the date of enactment of the Digital Television Transition and Public Safety Act of 2005 [enacted Feb. 8, 2006].

**(D)** Return of payments. Within one month after the date of enactment of this paragraph [enacted June 19, 2002], the Commission shall return to the bidders for licenses in the A-block, B-block, and E-block of auction 44 the full amount of all upfront payments made by such bidders for such licenses.

**(16)** Special auction provisions for eligible frequencies.

**(A)** Special regulations. The Commission shall revise the regulations prescribed under paragraph (4)(F) of this subsection to prescribe methods by which the total cash proceeds from any auction of eligible frequencies described in section 113(g)(2) of the National Telecommunications and Information Administration Organization Act (*47 U.S.C. 923(g)(2)*) shall at least equal 110 percent of the total estimated relocation or sharing costs provided to the Commission pursuant to section 113(g)(4) of such Act [*47 USCS § 923(g)(4)*].

**(B)** Conclusion of auctions contingent on minimum proceeds. The Commission shall not conclude any auction of eligible frequencies described in section 113(g)(2) of such Act [*47 USCS § 923(g)(2)*] if the total cash proceeds attributable to such spectrum are less than 110 percent of the total estimated relocation or sharing costs provided to the Commission pursuant to section 113(g)(4) of such Act [*47 USCS § 923(g)(4)*]. If the Commission is unable to conclude an auction for the foregoing reason, the Commission shall cancel the auction, return within 45 days after the auction cancellation date any deposits from participating bidders held in escrow, and absolve such bidders from any obligation to the United States to bid in any subsequent reauction of such spectrum.

**(C)** Authority to issue prior to deauthorization. In any auction conducted under the regulations required by subparagraph (A), the Commission may grant a license assigned for the use of eligible frequencies prior to the termination of an eligible Federal entity's authorization. However, the Commission shall condition such license by requiring that the licensee cannot cause harmful interference to such Federal entity until such entity's authorization has been terminated by the National Telecommunications and Information Administration.

**(17)** Certain conditions on auction participation prohibited.

**(A)** In general. Notwithstanding any other provision of law, the Commission may not prevent a person from participating in a system of competitive bidding under this subsection if such person—

**(i)** complies with all the auction procedures and other requirements to protect the auction process established by the Commission; and

**(ii)** either—

**(I)** meets the technical, financial, character, and citizenship qualifications that the Commission may require under section 303(l)(1), 308(b), or 310 [*47 USCS § 303(l)(1), 308(b)*, or *310*] to hold a license; or

47 USCS § 309

(II) would meet such license qualifications by means approved by the Commission prior to the grant of the license.

**(B)** Clarification of authority. Nothing in subparagraph (A) affects any authority the Commission has to adopt and enforce rules of general applicability, including rules concerning spectrum aggregation that promote competition.

**(18)** Estimate of upcoming auctions.

**(A)** Not later than September 30, 2018, and annually thereafter, the Commission shall make publicly available an estimate of what systems of competitive bidding authorized under this subsection may be initiated during the upcoming 12-month period.

**(B)** The estimate under subparagraph (A) shall, to the extent possible, identify the bands of frequencies the Commission expects to be included in each such system of competitive bidding.

**(k) Broadcast station renewal procedures.**

**(1)** Standards for renewal. If the licensee of a broadcast station submits an application to the Commission for renewal of such license, the Commission shall grant the application if it finds, with respect to that station, during the preceding term of its license—

**(A)** the station has served the public interest, convenience, and necessity;

**(B)** there have been no serious violations by the licensee of this Act or the rules and regulations of the Commission; and

**(C)** there have been no other violations by the licensee of this Act or the rules and regulations of the Commission which, taken together, would constitute a pattern of abuse.

**(2)** Consequence of failure to meet standard. If any licensee of a broadcast station fails to meet the requirements of this subsection, the Commission may deny the application for renewal in accordance with paragraph (3), or grant such application on terms and conditions as are appropriate, including renewal for a term less than the maximum otherwise permitted.

**(3)** Standards for denial. If the Commission determines, after notice and opportunity for a hearing as provided in subsection (e), that a licensee has failed to meet the requirements specified in paragraph (1) and that no mitigating factors justify the imposition of lesser sanctions, the Commission shall—

**(A)** issue an order denying the renewal application filed by such licensee under section 308 [*47 USCS § 308*]; and

**(B)** only thereafter accept and consider such applications for a construction permit as may be filed under section 308 [*47 USCS § 308*] specifying the channel or broadcasting facilities of the former licensee.

**(4)** Competitor consideration prohibited. In making the determinations specified in paragraph (1) or (2), the Commission shall not consider whether the public interest, convenience, and necessity might be served by the grant of a license to a person other than the renewal applicant.

**(l) Applicability of competitive bidding to pending comparative licensing cases.** With respect to competing applications for initial licenses or construction permits for commercial radio or television stations that were filed with the Commission before July 1, 1997, the Commission shall—

**(1)** have the authority to conduct a competitive bidding proceeding pursuant to subsection (j) to assign such license or permit;

**(2)** treat the persons filing such applications as the only persons eligible to be qualified bidders for purposes of such proceeding; and

**(3)** waive any provisions of its regulations necessary to permit such persons to enter an agreement to procure the removal of a conflict between their applications during the 180-day period beginning on the date of enactment of the Balanced Budget Act of 1997 [enacted Aug. 5, 1997].

47 USCS § 309

# History

**HISTORY:**

June 19, 1934, ch 652, Title III, Part I, § 309, *48 Stat. 1085*; May 20, 1937, ch 229, § 10(a), *50 Stat. 192*; July 16, 1952, ch 879, § 7, *66 Stat. 715*; March 26, 1954, ch 110, *68 Stat. 35*; Jan. 20, 1956, ch 1, *70 Stat. 3*; Sept. 13, 1960, *P. L. 86-752*, § 4(a), *74 Stat. 889*; May 14, 1964, *P. L. 88-306*, *78 Stat. 193*; May 14, 1964, *P. L. 88-307*, *78 Stat. 194*; Aug. 13, 1981, *P. L. 97-35*, Title XII, Subtitle B, Ch 2, § 1242(a), *95 Stat. 736*; Sept. 13, 1982, *P. L. 97-259*, Title I, §§ 114, 115, *96 Stat. 1094*; Oct. 30, 1984, *P. L. 98-549*, § 6(b)(1), *98 Stat. 2804*; Aug. 10, 1993, *P. L. 103-66*, Title VI, § 6002(a), (b)(1), *107 Stat. 387*, 392; Oct. 25, 1994, *P. L. 103-414*, Title III, §§ 303(a)(16), (17), 304(a)(9), *108 Stat. 4295*, 4297; Dec. 8, 1994, *P. L. 103-465*, Title VIII, § 801, *103 Stat. 5050*; Feb. 8, 1996, *P. L. 104-104*, Title II, § 204(a), Title IV, § 403(j), Title VII, §§ 707(a), 710(c), *110 Stat. 112*, 131, 154, 161; Aug. 5, 1997, *P. L. 105-33*, Title III, §§ 3002(a)(1)–(3), 3003, *111 Stat. 258*, 260, 265; June 19, 2002, *P. L. 107-195*, § 3(a), (b)(1), *116 Stat. 716*, 717; Dec. 23, 2004, *P. L. 108-494*, Title II, § 203, *118 Stat. 3993*; Feb. 8, 2006, *P. L. 109-171*, Title III, §§ 3002(a), 3003, 3004, *120 Stat. 21*, 22; Feb. 11, 2009, *P. L. 111-4*, §§ 2(b)(2), 5, *123 Stat. 112*, 114; Feb. 22, 2012, *P. L. 112-96*, Title VI, Subtitle D, §§ 6401(c), 6402, 6404, 6405, Subtitle F, § 6601, Subtitle G, § 6701(b), *126 Stat. 223*, 224, 230, 245, 252; Nov. 2, 2015, *P. L. 114-74*, Title X, § 1007, *129 Stat. 624*; March 23, 2018, *P. L. 115-141*, Div P, Title I, § 101(b), Title IV, § 402(h)(2), (i)(4), Title V, § 512(a), *132 Stat. 1081*, 1089, 1097; Nov. 15, 2021, *P.L. 117-58*, Div I, § 90008(c)(1), *135 Stat. 1350*; Sept. 30, 2022, *P.L. 117-180*, Div C, Title I, § 101, *136 Stat. 2133*; Dec. 16, 2022, *P.L. 117-229*, Div B, Title I, § 101, *136 Stat. 2309*; Dec. 29, 2022, *P.L. 117-328*, Div O, Title IX, § 901, *136 Stat. 5232*.

United States Code Service
Copyright © 2023 All rights reserved.

**End of Document**

ADD98

## 47 USCS § 402

Current through Public Law 117-327, approved December 27, 2022.

*United States Code Service > TITLE 47. TELECOMMUNICATIONS (Chs. 1 — 16) > CHAPTER 5. WIRE OR RADIO COMMUNICATION (§§ 151 — 646) > PROCEDURAL AND ADMINISTRATIVE PROVISIONS (§§ 401 — 416)*

## § 402. Judicial review of Commission's orders and decisions

**(a) Procedure.**  Any proceeding to enjoin, set aside, annul or suspend any order of the Commission under this Act (except those appealable under subsection (b) of this section) shall be brought as provided by and in the manner prescribed in chapter 158 of title 28, United States Code [*28 USCS §§ 2341* et seq.].

**(b) Right to appeal.**  Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

**(1)** By any applicant for a construction permit or station license, whose application is denied by the Commission.

**(2)** By any applicant for the renewal or modification of any such instrument of authorization whose application is denied by the Commission.

**(3)** By any party to an application for authority to transfer, assign, or dispose of any such instrument of authorization, or any rights thereunder, whose application is denied by the Commission.

**(4)** By any applicant for the permit required by section 325 of this Act [*47 USCS § 325*] whose application has been denied by the Commission, or by any permittee under said section whose permit has been revoked by the Commission.

**(5)** By the holder of any construction permit or station license which has been modified or revoked by the Commission.

**(6)** By any other person who is aggrieved or whose interests are adversely affected by any order of the Commission granting or denying any application described in paragraphs (1), (2), (3), (4), and (9) hereof.

**(7)** By any person upon whom an order to cease and desist has been served under section 312 of this Act [*47 USCS § 312*].

**(8)** By any radio operator whose license has been suspended by the Commission.

**(9)** By any applicant for authority to provide interLATA services under section 271 of this Act [*47 USCS § 271*] whose application is denied by the Commission.

**(10)** By any person who is aggrieved or whose interests are adversely affected by a determination made by the Commission under section 717(a)(3) [*47 USCS § 618(a)(3)*].

**(c) Filing notice of appeal; contents; jurisdiction; temporary orders.**  Such appeal shall be taken by filing a notice of appeal with the court within thirty days from the date upon which public notice is given of the decision or order complained of. Such notice of appeal shall contain a concise statement of the nature of the proceedings as to which the appeal is taken; a concise statement of the reasons on which the appellant intends to rely, separately stated and numbered; and proof of service of a true copy of said notice and statement upon the Commission. Upon filing of such notice, the court shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper.

47 USCS § 402

Orders granting temporary relief may be either affirmative or negative in their scope and application so as to permit either the maintenance of the status quo in the matter in which the appeal is taken or the restoration of a position or status terminated or adversely affected by the order appealed from and shall, unless otherwise ordered by the court, be effective pending hearing and determination of said appeal and compliance by the Commission with the final judgment of the court rendered in said appeal.

**(d) Notice to interested parties; filing of record.**   Upon the filing of any such notice of appeal the appellant shall, not later than five days after the filing of such notice, notify each person shown by the records of the Commission to be interested in said appeal of the filing and pendency of the same. The Commission shall file with the court the record upon which the order complained of was entered, as provided in *section 2112 of Title 28, United States Code*.

**(e) Intervention.**   Within thirty days after the filing of any such appeal any interested person may intervene and participate in the proceedings had upon said appeal by filing with the court a notice of intention to intervene and a verified statement showing the nature of the interest of such party, together with proof of service of true copies of said notice and statement, both upon appellant and upon the Commission. Any person who would be aggrieved or whose interest would be adversely affected by a reversal or modification of the order of the Commission complained of shall be considered an interested party.

**(f) Records and briefs.**   The record and briefs upon which any such appeal shall be heard and determined by the court shall contain such information and material, and shall be prepared within such time and in such manner as the court may by rule prescribe.

**(g) Time of hearing; procedure.**   The court shall hear and determine the appeal upon the record before it in the manner prescribed by *section 706 of title 5, United States Code*.

**(h) Remand.**   In the event that the court shall render a decision and enter an order reversing the order of the Commission, it shall remand the case to the Commission to carry out the judgment of the court and it shall be the duty of the Commission, in the absence of the proceedings to review such judgment, to forthwith give effect thereto, and unless otherwise ordered by the court, to do so upon the basis of the proceedings already had and the record upon which said appeal was heard and determined.

**(i) Judgment for costs.**   The court may, in its discretion, enter judgment for costs in favor of or against an appellant, or other interested parties intervening in said appeal, but not against the Commission, depending upon the nature of the issues involved upon said appeal and the outcome thereof.

**(j) Finality of decision; review by Supreme Court.**   The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under *section 1254 of title 28 of the United States Code*, by the appellant, by the Commission, or by any interested party intervening in the appeal, or by certification by the court pursuant to the provisions of that section.

## History

HISTORY:

June 19, 1934, ch 652, Title IV, § 402, *48 Stat. 1093*; May 20, 1937, ch 229, §§ 11-13, *50 Stat. 197*; May 24, 1949, ch 139, § 132, *63 Stat. 108*; July 16, 1952, ch 879, § 14, *66 Stat. 718*; Aug. 28, 1958, *P. L. 85-791*, § 12, *72 Stat. 945*; Sept. 13, 1982, *P. L. 97-259*, Title I, §§ 121, 127(b), *96 Stat. 1097*, 1099; Nov. 8, 1984, *P. L. 98-620*, Title IV, Subtitle A, § 402(50), *98 Stat. 3361*; Feb. 8, 1996, *P. L. 104-104*, Title I, Subtitle B, § 151(b), *110 Stat. 107*; Oct. 8, 2010, *P. L. 111-260*, Title I, § 104(d), *124 Stat. 2762*.

United States Code Service
Copyright © 2023 All rights reserved.

ADD100

47 USCS § 402

**End of Document**

# The National Environmental Policy Act of 1969, as amended

(Pub. L. 91-190, 42 U.S.C. 4321-4347, January 1, 1970, as amended by Pub. L. 94-52, July 3, 1975, Pub. L. 94-83, August 9, 1975, and Pub. L. 97-258, § 4(b), Sept. 13, 1982)

An Act to establish a national policy for the environment, to provide for the establishment of a Council on Environmental Quality, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That this Act may be cited as the "National Environmental Policy Act of 1969."

**Purpose**

**Sec. 2 [42 USC § 4321].** The purposes of this Act are: To declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality.

**TITLE I**

**CONGRESSIONAL DECLARATION OF NATIONAL ENVIRONMENTAL POLICY**

**Sec. 101 [42 USC § 4331].**

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this Act, it is the continuing responsibility of the Federal Government to use all practicable means, consist with other essential

considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may --

1. fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;
2. assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;
3. attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;
4. preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice;
5. achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and
6. enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

**Sec. 102 [42 USC § 4332].** The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this Act, and (2) all agencies of the Federal Government shall --

(A) utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on --

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, United States Code, and shall accompany the proposal through the existing agency review processes;

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this Act; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

(E) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative

uses of available resources;

(F) recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment;

(G) make available to States, counties, municipalities, institutions, and individuals, advice and information useful in restoring, maintaining, and enhancing the quality of the environment;

(H) initiate and utilize ecological information in the planning and development of resource-oriented projects; and

(I) assist the Council on Environmental Quality established by title II of this Act.

**Sec. 103 [42 USC § 4333].** All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this Act and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this Act.

**Sec. 104 [42 USC § 4334].** Nothing in section 102 [42 USC § 4332] or 103 [42 USC § 4333] shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency.

**Sec. 105 [42 USC § 4335].** The policies and goals set forth in this Act are supplementary to those set forth in existing authorizations of Federal agencies.

# TITLE II

# COUNCIL ON ENVIRONMENTAL QUALITY

**Sec. 201 [42 USC § 4341].** The President shall transmit to the Congress annually beginning July 1, 1970, an Environmental Quality Report (hereinafter referred to as the "report") which shall set forth (1) the status and condition of the major natural, manmade, or altered environmental classes of the Nation, including, but not limited to, the air, the aquatic, including marine, estuarine, and fresh water, and the terrestrial environment, including, but not limited to, the forest, dryland, wetland, range, urban, suburban and rural environment; (2) current and foreseeable trends in the quality, management and utilization of such environments and the effects of those trends on the social, economic, and other requirements

of the Nation; (3) the adequacy of available natural resources for fulfilling human and economic requirements of the Nation in the light of expected population pressures; (4) a review of the programs and activities (including regulatory activities) of the Federal Government, the State and local governments, and nongovernmental entities or individuals with particular reference to their effect on the environment and on the conservation, development and utilization of natural resources; and (5) a program for remedying the deficiencies of existing programs and activities, together with recommendations for legislation.

**Sec. 202 [42 USC § 4342].** There is created in the Executive Office of the President a Council on Environmental Quality (hereinafter referred to as the "Council"). The Council shall be composed of three members who shall be appointed by the President to serve at his pleasure, by and with the advice and consent of the Senate. The President shall designate one of the members of the Council to serve as Chairman. Each member shall be a person who, as a result of his training, experience, and attainments, is exceptionally well qualified to analyze and interpret environmental trends and information of all kinds; to appraise programs and activities of the Federal Government in the light of the policy set forth in title I of this Act; to be conscious of and responsive to the scientific, economic, social, aesthetic, and cultural needs and interests of the Nation; and to formulate and recommend national policies to promote the improvement of the quality of the environment.

**Sec. 203 [42 USC § 4343].**

(a) The Council may employ such officers and employees as may be necessary to carry out its functions under this Act. In addition, the Council may employ and fix the compensation of such experts and consultants as may be necessary for the carrying out of its functions under this Act, in accordance with section 3109 of title 5, United States Code (but without regard to the last sentence thereof).

(b) Notwithstanding section 1342 of Title 31, the Council may accept and employ voluntary and uncompensated services in furtherance of the purposes of the Council.

**Sec. 204 [42 USC § 4344].** It shall be the duty and function of the Council --

1. to assist and advise the President in the preparation of the Environmental Quality Report required by section 201 [42 USC § 4341] of this title;
2. to gather timely and authoritative information concerning the conditions and trends in the quality of the environment both current and prospective, to analyze and interpret such information for the purpose of determining whether such conditions and trends are interfering, or are likely to interfere, with the achievement of the policy set forth in title I of this Act, and to compile and submit to the President studies relating to such conditions and trends;
3. to review and appraise the various programs and activities of the Federal Government in the light of the policy set forth in title I of this Act for the purpose of determining the extent to which such programs and activities are contributing to the achievement of such policy, and to make recommendations to the President with respect thereto;

4.  to develop and recommend to the President national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation;

5.  to conduct investigations, studies, surveys, research, and analyses relating to ecological systems and environmental quality;

6.  to document and define changes in the natural environment, including the plant and animal systems, and to accumulate necessary data and other information for a continuing analysis of these changes or trends and an interpretation of their underlying causes;

7.  to report at least once each year to the President on the state and condition of the environment; and

8.  to make and furnish such studies, reports thereon, and recommendations with respect to matters of policy and legislation as the President may request.

**Sec. 205 [42 USC § 4345].** In exercising its powers, functions, and duties under this Act, the Council shall --

1.  consult with the Citizens' Advisory Committee on Environmental Quality established by Executive Order No. 11472, dated May 29, 1969, and with such representatives of science, industry, agriculture, labor, conservation organizations, State and local governments and other groups, as it deems advisable; and

2.  utilize, to the fullest extent possible, the services, facilities and information (including statistical information) of public and private agencies and organizations, and individuals, in order that duplication of effort and expense may be avoided, thus assuring that the Council's activities will not unnecessarily overlap or conflict with similar activities authorized by law and performed by established agencies.

**Sec. 206 [42 USC § 4346].** Members of the Council shall serve full time and the Chairman of the Council shall be compensated at the rate provided for Level II of the Executive Schedule Pay Rates [5 USC § 5313]. The other members of the Council shall be compensated at the rate provided for Level IV of the Executive Schedule Pay Rates [5 USC § 5315].

**Sec. 207 [42 USC § 4346a].** The Council may accept reimbursements from any private nonprofit organization or from any department, agency, or instrumentality of the Federal Government, any State, or local government, for the reasonable travel expenses incurred by an officer or employee of the Council in connection with his attendance at any conference, seminar, or similar meeting conducted for the benefit of the Council.

**Sec. 208 [42 USC § 4346b].** The Council may make expenditures in support of its international activities, including expenditures for: (1) international travel; (2) activities in implementation of international agreements; and (3) the support of international exchange programs in the United States and in foreign countries.

**Sec. 209 [42 USC § 4347].** There are authorized to be appropriated to carry out the provisions of this chapter not to exceed $300,000 for fiscal year 1970, $700,000 for fiscal

year 1971, and $1,000,000 for each fiscal year thereafter.

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

International Dark-Sky Association, Inc.,   |

        |

    *Appellant*,          |

               |     No. 22-1337 (consolidated

        v.          |     with 23-1001)

               |

Federal Communications Commission,   |

        |

    *Appellee*.          |

## <u>DECLARATION OF RUSKIN HARTLEY</u>

1.    My name is Ruskin Hartley, and I make these statements

pursuant to 28 U.S.C. § 1746 and based upon my own personal

knowledge. I am over 18 years of age, and if called to do so, am

competent to testify that the contents of this Declaration are accurate

and true.

2.    I have been working as a conservationist and in conservation

education for over 25 years. In 2019 I became the Executive Director of

the International Dark-Sky Association, Inc. ("IDA")[1].

3.    The FCC's failure to analyze the potential environmental

effects of the 30,000 satellites proposed by SpaceX harms IDA's

---

[1] Please note, in late 2022, the Board of Directors rebranded the organization as
DarkSky International.

ADD109

organization interests. A 501(c)(3) organization, IDA advocates for the protection of the night sky from light pollution for all.[2] Founded in 1988, IDA is the recognized authority on light pollution and is the leading organization combating light pollution worldwide. Among our programs, IDA certifies more than 200 International Dark Sky Places worldwide, including 134 in the United States. The International Dark Sky Places program was founded in 2001 to encourage communities, parks and protected areas around the world to preserve and protect dark skies through responsible lighting practices and public education. These protections are now at risk from the proposed satellites. This risk is not speculative but imminent as members have already viewed and photographed the impact of the already-launched Space-X satellites and their impact on the viewable night sky from International Dark Sky Places. For that I refer you to IDA member declarations from James D. Lowenthal, Ph.D., and Diana Umpierre.

    4.    IDA members will be harmed by the authorization of the proposed 30,000 satellites in a number of ways including: (1) light

---

[2] See www.darksky.org. IDA's mission is to "protect the night from light pollution." IDA's vision is that "the night sky, filled with stars, is celebrated and protected around the world as a shared heritage benefitting all living things."

2

ADD110

pollution will have negative impacts on the health and quality of life of IDA members as well as on the plants and animals such members value; (2) light pollution, including brightening of the night sky and visible satellite trails,  will fundamentally alter the view of the night sky that has been a constant part of the human experience and is an essential part of the living heritage of many communities around the world; (3) increased deposition of soot and carbon in the atmosphere will contribute to catastrophic climate change and destructive heat waves, floods, hurricanes and wildfires; and (4) deposition of alumina from deorbiting satellites risk ozone depletion that will increase the risk of cancer and other negative health effects.

5.      Likewise, the IDA recognizes the environmental and ecological importance of natural darkness at night, and partners with leading nature advocacy organizations such as the Sierra Club, the Audubon Society, and the Natural Resources Defense Council to protect the nighttime environment.

3

ADD111

I declare under penalty of perjury and under the laws of the United

States of America that the foregoing is true and correct.


Dated: 04/13/2023 _____                    _____

                                                    Ruskin Hartley

4

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| International Dark-Sky Association, Inc., | |
|---|---|
| *Appellant*, | |
| v. | No. 22-1337 (consolidated with 23-1001) |
| Federal Communications Commission, | |
| *Appellee*. | |

## DECLARATION OF JAMES LOWENTHAL

1.    My name is James Lowenthal, and I make these statements pursuant to 28 U.S.C. § 1746 and based upon my own personal knowledge. I am over 18 years of age, and if called to do so, am competent to testify that the contents of this Declaration are accurate and true.

I.    PROFESSIONAL BACKGROUND AND IMPACTS OF THE COMMISSION'S DECISION

2.    I am the Mary Elizabeth Moses Professor and Chair of Astronomy at Smith College in Northampton, Massachusetts. I teach undergraduate students in astronomy at Smith and the Five College Astronomy Department and work with and supervise graduate students in astronomy at UMass Amherst. I am also an avid amateur astronomer and astrophotographer and have led archaeoastronomy expeditions to remote regions of the desert Southwest to share with "astrotourists"

1

the ancestral Puebloan sites there – many of them aligned with celestial objects and serving as calendars or cosmological sentries – under dark and star-studded skies.

3.    In my classes, I teach beginning and advanced observational techniques using naked-eye and telescopic observations; intro surveys to the Universe; astrophysics; cosmology; and astronomy and public policy.  I frequently take students on field trips to sites away from the light pollution of Northampton so they can see the starry sky, meteors, and the Milky Way – some of them for the first time in their lives.  The profound connection those students experience with nature, the cosmos, their ancestors and the depth of human history and culture is the highlight of the semester for many of them.

4.    Seeing a swarm of artificial satellites from low-Earth-orbit (LEO) satellite constellations ("satcons") crawling across the starry sky directly disturbs and interferes with that connection.  It is distracting, and, for many, an offensive desecration of the natural and pristine night sky.

5.    My research focuses on distant early galaxies, some more than 95% of the way back in time to the Big Bang, and how they form and evolve over cosmic time.  I use some of the largest and most sophisticated telescopes in the world and in space, including the Keck and Gemini telescopes on Mauna Kea, Hawaii; the UMass/Mexico Large Millimeter Telescope on Sierra Negra, Mexico; and the Hubble Space Telescope ("Hubble").

2

ADD114

6.      Images and spectra obtained by those large telescopes, including Hubble, are increasingly affected by interference from satellite streaks, and all the ground-based facilities will be significantly impacted by diffuse sky glow from satcons and related debris.  It is virtually certain that that interference will increase sharply as launches of LEO satcons continue to accelerate in the coming decade. Ground-breaking major telescopes such as the Vera Rubin Observatory nearing completion in Chile will be particularly affected by satcon interference, and that will ripple through most fields of astrophysics, including my own work.

7.      The pace of astrophysical progress will be slowed, and the process will be complicated by the need to avoid satellites, correct for and remove their streaks, assess their impact on scientific results, and increase exposure times at expensive facilities to make up for data lost to satcons. Although the impacts are hard to quantify at this time, they are certain to occur and will be significant.

II.    MY INTERESTS ARE TIED TO THE INTERESTS OF THE INTERNATIONAL DARK-SKY ASSOCIATION AND ARE ADVANCED BY THE EFFORTS OF THE INTERNATIONAL DARK-SKY ASSOCIATION.

8.      Ground-based astronomy – which is an indispensable part of the US astronomical facility portfolio and critically supports all space-based astronomy as well -- depends critically on access to dark and unpolluted night skies.  Artificial light at night (ALAN) – the garden-variety light pollution IDA has battled for over

3

ADD115

30 years – is a significant and growing threat to research astronomy, amateur astronomy, astrotourism, and all people worldwide who seek solace and inspiration from gazing at the night sky, one of nature's greatest gifts. The mission of IDA is to protect that gift.

9.     As a leader of archaeoastronomy tours and a nature lover, I have visited certified IDA Dark Sky Places around the country including the Grand Canyon, Death Valley, and Chaco Canyon. I am very worried about the impacts to those places from LEO satcons.

III.    MY INTERESTS AND THE INTERESTS OF IDA ARE IN PROTECTING THE CONDITIONS OF THE HUMAN ENVIRONMENT AND, IN PARTICULAR, THE VISIBILITY OF THE NIGHT SKY

10.     The starry night sky is synonymous with nature. I am one of countless people who turn to nature for solace and rejuvenation, inspiration and recreation. The dark night sky is an inseparable part of those experiences. Like thousands of generations of humans before us gathered around campfires under starry skies, I cannot imagine a meaningful experience in nature that did not include the stars and the Milky Way – whether it's a remote backpacking trip to high mountain country or walking home from my office on a cold clear winter night.

ADD116

11.    Scores of scientific studies over recent decades have demonstrated that the natural world apart from humans likewise depends on darkness at night to thrive.

12.    I helped organize the two Dark & Quiet Skies conferences in 2020 and 2021 of which IDA was a part as well and am co-author on the resulting reports to the United Nations Committee on the Peaceful Uses of Outer Space (UN COPUOS). I co-chaired the BioEnvironment Working Group of Dark and Quiet Skies 2020[1] and the Light Pollution Working Group of Dark and Quiet Skies 2021. Both of the resulting reports to the UN give detailed summaries of the state of the science on effects of light pollution on flora and fauna, and it is not good: almost every species and every ecosystem studied is negatively impacted, from mammals and birds to fish, insects, reptiles and amphibians, trees, crops, even coral.[2]

13.    Protecting the night sky is thus fundamentally an environmental issue, and light pollution must be considered a form of pollution in the human environment. Satellite mega constellations contribute, likely significantly, to that pollution of the night-time sky. 40% of birds migrate, and 80% of those species migrate at night, many or most using the stars to navigate. What will happen when

---

[1] Connie Walker et al, *Dark and Quiet Skies for Science and Society: Report and recommendations*, U.N. OFFICE FOR OUTER SPACE AFFAIRS (2020), https://www.iau.org/static/publications/dqskies-book-29-12-20.pdf.

[2] Id. at pp. 25.

5

ADD117

all the "stars" seem to be moving before their eyes?  Current projections indicate an increase in diffuse sky brightness by factors of several times due to debris from satcon launches, operations, de-orbits, and collisions.  How will sea turtle hatchlings that need darkness at night find their way to the sea when the sky is glowing 10 times brighter than natural darkness?  How will dung beetles that use the Milky Way to orient their nocturnal journeys survive?

IV.    THE GOALS OF IDA AID IN FORWARDING MY STUDIES AND GOALS.

14.    The IDA recognizes the environmental and ecological importance of natural darkness at night, and partners with leading nature advocacy organizations such as the Sierra Club, the Audubon Society, and the Natural Resources Defense Council to protect the nighttime environment.  More locally, in my hometown of Northampton and in my state of Massachusetts, I also partner with ecological organizations with a shared goal of protecting natural darkness at night.  As the President of the Massachusetts chapter of IDA, I have given numerous invited talks and night walks at local environmental centers and statewide organizations including Sierra Club Massachusetts.  I have partnered with the Appalachian Mountain Club to bring night-time programming and awareness of the threats of light pollution to their summer student internships and their lodges and remote mountain hut system.

6

ADD118

15.    All of those efforts are directly supported by and congruent with the mission of IDA.  Without IDA, there would be no national or international coordination of efforts to protect the night sky and natural darkness at night.  IDA provides resources, training, community, brainstorming, and inspiration for those efforts.  I identify strongly as an IDA member and am proud to be associated with the organization as a volunteer, advocate, and committee member.

## V.    THE DECISION OF THE COMMISSION WILL INTERFERE WITH MY WORK AND THE GOALS OF IDA.

16.    The FCC decision not to apply NEPA to satellite constellation launches, operations, and orbits means that those activities can contribute directly to pollution of the night sky with no legal or regulatory constraints.  The sky is already becoming increasingly crowded with satellites.  This affects my professional research, my teaching, my outreach, and my personal experience and connection with the night sky.

17.    International experts on astronomy, satellites, dark skies, light pollution, ecology, human health and space law convened as part of the two SATCON conferences and the two Dark & Quiet Skies conferences in 2020-2022.  The broad consensus, captured in the four reports from those four meetings, is that the impacts to research astronomy from satcons currently planned through 2030 are expected to be significant and possibly devastating for many sub-fields of astrophysics.

7

18.    My main field of specialty – the study of distant galaxies in the early Universe – depends on deep surveys with large ground-based telescopes, such as the Keck and Gemini telescopes in Hawaii and the Large Millimeter Telescope in Mexico, as well as space-based observatories such as the Hubble Space Telescope. All of those are subject to interference from LEO satcons.

19.    One of the most exciting new facilities is the Vera Rubin Observatory, a US-led international telescope nearing completion in Chile that will scan the entire sky to unprecedented sensitivity every three days.  The Rubin Observatory aims to open new windows on observational cosmology including the nature of Dark Matter and Dark Energy and the shape, size, and fate of the observable Universe – all of which bear directly on my research.  Those observations will set a new gold standard of precision for the cosmological models that all extragalactic astronomers like me use.  And the new discovery space Rubin offers will almost certainly yield surprises about physics and the Universe – if they are allowed to proceed.   Unfortunately, Rubin, of all ground-based observatories current and under construction, is probably the most severely impacted by LEO satcons, with significant fractions (as much as ½) of their observations unschedulable due to expected satellite interference in the next decade.

20.    Recent studies in the scientific literature, including some on which I am co-author, indicate that an additional threat posed to astronomy, the night sky,

8

human health, and wildlife by LEO satellites is the increase in the diffuse brightness of the night sky due to LEO satcons.  Separate from the interference by individual intact satellites trailing across the view and our research images, this diffuse sky brightness comes from the aggregate effects of thousands of artificial satellites and their associated debris – ranging from intact but defunct and abandoned satellites to wreckage from collisions in orbit to flecks of paint to droplets of rocket fuel spread out in a fine haze around the Earth, reflecting sunlight and washing out the stars and the Milky Way.

21.    Current projections indicate that the night sky could become several times brighter than natural if all currently planned satcons are launched and no significant new mitigations are conceived, developed, and implemented.  That diffuse glow would be the equivalent of ground-based light pollution from a medium-sized city, but it would appear everywhere, even the most remote desert locations on Earth.

22.    That increase in diffuse sky glow not only jeopardizes research astronomy and the cultural heritage of the stars and the Milky Way.  It also threatens human health and all kinds of flora and fauna.  Humans need darkness at night for good health, and ground-based light pollution is already associated with elevated rates of hormonal cancers such as breast and prostate cancer, mood disorder in teens, obesity, and diabetes.  Allowing the sky brightness to grow

9

ADD121

everywhere by factors of several will add significantly to those health risks. At the same time, the activities of most plants and animals are tied intimately to the natural cycle of daily light and dark. A permanently brighter night sky will affect the health of most ecosystems, including foraging, reproduction, and migration of vertebrates from fish to mammals to amphibians and invertebrates from insects such as pollinators to coral.

## VI.    THE EXPERIENCED IMPACT OF EXISTING SATELLITES

23.    All astronomers and skygazers like myself are used to seeing occasional satellites cross the sky. For decades those satellites have been a curiosity and at worst a minor nuisance; an occasional streak across an image might mean that exposure would have to be done over. But starting in May, 2019 with the launch of the first 60 SpaceX Starlink satellites, the picture has changed dramatically. I saw those first Starlinks the night after they were launched into orbit, when they appeared as a string of bright "stars" marching across the sky, as bright as the bright stars of the Big Dipper. I was in the White Mountains of northern New Hampshire in the middle of a training session for undergraduate summer interns. We were outside under the stars learning how to use telescopes. One of the students suddenly pointed to the sky and cried out, "What is that?!" The sight was both impressive and terrible – I knew immediately it was a major turning point in the history of humanity and our connection with the sky.

10

24.     Since then, I've seen and photographed many Starlink satellites –
some in a long train like that first batch while they're still in a staging orbit, some
after they've spread apart and been maneuvered to their final operating orbit and
altitude.

25.     As an astrophotographer, I spend many nights each year outside with
camera and tripod.  I seek places far from city lights and light pollution so I can see
and photograph the Milky Way and faint stars.  But those places cannot escape
interference from satellites.  On a family vacation to the Central Coast of Maine in
2021, where skies were reasonably dark and clear, I found that there was virtually
no place in the sky I could look or point my camera without an artificial satellite
spoiling the view within a matter of minutes or even seconds.  When I saw one, I
would often turn away in dismay and anger and face a new direction, only to see a
different satellite there too.  That continued all night long, well past twilight.
Almost every frame taken with a wide-angle lens shows at least one, often multiple
satellite trails.

26.     As an educator, one of my main goals is to connect students and the
public with nature, to open their eyes to the wonder of the cosmos, to share with
them the magic of the naturally dark night, the stars, and the Milky Way.  That
goal is now compromised by satcons.  It is now virtually impossible to experience
the clear night sky without seeing satellites. This is at best distracting, and at worst

11

it ruins the experience.  I'm worried it will make stargazing for outreach and education so unattractive and challenging that I won't be able to continue doing it anymore, and that future generations will miss out completely on that profound connection with the night sky that I and so many others seek.

27.    I'm now 58 years old and have spent my whole adult life immersing myself in the night sky, studying it, admiring it, getting inspiration from it, feeling joy from sharing it with others.  I feel those profound connections to the naturally dark, unpolluted night sky are now seriously threatened by LEO satellites.

VII.   THE IMMINENT IMPACT OF FUTURE LEO SATCONS.

28.    I have already spent hundreds, possibly thousands of hours studying this new threat to astronomy and the night sky.  I have served on numerous committees, organized and participated in conferences, developed and delivered briefings to government agencies, and co-authored reports, all related to satcons. That is time I would much rather have spent on my own research on the origin of galaxies, or working with students, or in other volunteer roles.  I am deeply concerned that if all the planned satcons are actually launched, the amount of time and energy I have to spend dealing with it will only increase.

29.    Most of all, I'm deeply concerned that the pace of astronomical research – the oldest science, the science that gave us an understanding of orbits and gravity and general relativity now used by the satcons that are threatening

12

ADD124

further progress – will be significantly slowed, and that some beautiful and

important mysteries of the Universe that could have been studied through

unpolluted skies will now remain unexplored, perhaps for generations to come.

VIII.   INTERFERENCE WILL CONTINUE TO IMPACT MY STUDIES
        AND THE GOALS OF IDA.

30.     There are many kinds of astronomical research, with many different

technical requirements and characteristics, and a correspondingly large range of

vulnerabilities to interference from satcons. Single-object spectroscopy of bright

stars may not be harmed much, but deep wide-field imaging in the optical and

near-IR of distant galaxies is very vulnerable. Some science projects may be able

to dodge satellites and deal with the inevitable streaks, but the search for near-

Earth objects including "killer asteroids" and the coming "big science" projects

that depend on statistics of large numbers of galaxy images to study Dark Matter

and Dark Energy such as the Vera Rubin Observatory's Legacy Survey of Space

and Time may be devastated by LEO satcons. These effects are difficult to model

and quantify, as there are many variables, the satcon technology is evolving

rapidly, and we've never faced this challenge before. Nevertheless, the SATCON

and Dark and Quiet Skies reports make it clear: the threat from LEO satcons to

astronomy is real, imminent, and in many cases very serious. The position

statement by the American Astronomical Society on satcons supports and expands

13

ADD125

on those views, and explicitly endorses the findings and recommendations of the

SATCON reports.[3]

---

[3] See https://baas.aas.org/pub/2021i0205/release/1 (last viewed April 12, 2023).

ADD126

I declare under penalty of perjury that the foregoing is true and correct.


Dated: __12 April 2023__                    _____

                                            James Lowenthal

15

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

International Dark-Sky Association, Inc.,   |

          |

    *Appellant*,                 |

          |      No. 22-1337 (consolidated

      v.                 |      with 23-1001)

          |

Federal Communications Commission,   |

          |

    *Appellee.*                 |

## <u>DECLARATION OF DIANA UMPIERRE</u>

1.     My name is Diana Umpierre, and I make these statements pursuant to 28 U.S.C. § 1746 and based upon my own personal knowledge. I am over 18 years of age, and if called to do so, am competent to testify that the contents of this Declaration are accurate and true.

2.     Since 2000, I have resided in Pembroke Pines, Broward County, in the State of Florida, near the America's Everglades.

3.     My interest in the night sky dates back to childhood and it inspired me to pursue a career in the physical sciences. In 1985, in a story featured in a New Jersey local newspaper I shared my passion for the heavens, for astronomy, for star watching, and the hope of working for NASA to help others explore space.[1]

---

[1] "Science interest takes immigrant to the Ivy League", The Herald-News, September 30, 1985.

1

ADD128

4.      In 1990, I earned my Bachelor of Science degree in Geological Sciences from Cornell University in Ithaca, New York. During my time in Cornell, I participated in the student astronomy club, took an astrophysics class by Dr. Thomas Gold (astrophysicist who coined the term 'the Earth's magnetosphere'), attended a lecture by Dr. Carl Sagan on the dangers of weaponizing space, toured Arecibo Observatory (radio observatory), and interned one summer at NASA Lewis Research Center (now Glenn Research Center).

5.      Since 2011, when my son gave me a telescope for Christmas, he and I frequently spend time enjoying the night sky and nocturnal environment in South Florida. His night sky photography of the Milky Way over the Everglades has been featured in several news articles and in the National Park Service website, including one of a night camping under the stars at Big Cypress National Preserve.[2]

6.      I became an active volunteer member of the International Dark-Sky Association ("IDA") in 2012 to help protect and conserve the night sky and species and natural ecosystems in South Florida.

7.      I was elected twice by the IDA membership to serve on the IDA board of directors, which I did from January 2015 to December 2020, including one year as President and two as Vice President of the board.

---

[2] https://www.nps.gov/bicy/learn/nature/change-a-light-save-the-night.htm (Last visited April 12, 2023.

2

8.      In May 2019, during my time on the IDA board of directors, I became aware of a new threat to the integrity and quality of the night sky soon after a batch of SpaceX Starlink satellites were launched from the State of Florida and reports of their impacts were shared by professional astronomers around the world.

9.      A few months later, on January 12, 2020 at approximately 6:50 pm ET, on my way home a day after receiving an Everglades Coalition award, I stopped at a rest stop on Alligator Alley (US 75) when I was unexpectedly startled at the sight of a long Starlink satellite train crossing the Everglades, about thirty of them close to each other observed from near Everglades National Park, and Big Cypress National Park, a designated International Dark Sky Place. The big Starlink satellite train was as bright at Rigel, the brightest star in Orion constellation and the fifth brightest in the sky.

10.     Why is this significant? Because if we end up with hundreds to thousands of these satellites with similar or even half that brightness to an unaided human eye, this could mark the end of true stargazing as known for the past approximately 200,000 years of human existence.

11.     It was my fervent advocacy for the protection of pristine night skies over the Everglades that motivated, the Everglades Coalition to select a framed photograph of a starry night sky over the Everglades for the Grassroots Activism Award they presented to me on January 11, 2020. In my award acceptance speech,

3

ADD130

I recounted how it was my fear of "losing what I loved so much as a child: the sight of stars" that snapped me into action by "organizing fellow stargazers… for protection of the night", an effort that contributed to Big Cypress National Preserve becoming the 1st National Park Service unit, east of Colorado, to earn an International Dark-Sky Place designation. But, the following night, after witnessing the bright Starlink satellite train over the River of Grass, the Everglades, I cried myself to sleep.

12.    My interests as a star gazer and environmental advocate are directly impacted by the failure of the Commission to perform an analysis pursuant to NEPA of the impacts of the proposed launch of the Starlink satellites at issue in the instant matter.

13.    All of those efforts are directly supported by and congruent with the mission of IDA.  IDA plays a vital role in the national and international coordination of efforts to protect the night sky and natural darkness at night.  IDA provides resources, training, community, brainstorming, and inspiration for those efforts.  I identify strongly as an IDA member and am proud to be associated with the organization as a volunteer, advocate, and former board member.

4

ADD131

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _04/13/2023_

_Diana Umpierre_
Diana Umpierre

5

ADD132